# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| STATE OF MAINE,<br><br>        Plaintiff,<br><br>        v.<br><br>BP P.L.C.; BP AMERICA INC.; BP ENERGY COMPANY; BP ENERGY RETAIL LLC; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORPORATION; CHEVRON U.S.A. INC.; EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION; EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US; SHELL TRADING (US) COMPANY; SHELL P.L.C.; SHELL USA, INC.; SUNOCO LP; and AMERICAN PETROLEUM INSTITUTE,<br><br>        Defendants. | Civil Action No.<br><br>**NOTICE OF REMOVAL**<br><br>[Removal from Maine Superior Court, Cumberland County, Case No. PORSC-CV-24-442]<br><br>Action Filed: November 26, 2024 |

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corporation and Chevron U.S.A. Inc. (collectively, the "Chevron Parties") remove this action—with reservation of all defenses and rights—from Maine Superior Court, Cumberland County, Case No. PORSC-CV-24-442, to the United States District Court for the District of Maine, pursuant to 28 U.S.C. §§ 1367(a), 1442, and 1446. All other defendants that have been properly joined and served (collectively with the Chevron Parties, "Defendants") have consented to removal.

This Court has removal jurisdiction pursuant to the Federal Officer Removal Statute, 28 U.S.C. § 1442. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims for which it does not otherwise have federal jurisdiction because they form part of the same

case or controversy as those claims over which the Court has jurisdiction.[1]

---

[1] In filing this Notice of Removal, the Chevron Parties (like all other Defendants) do not waive, and expressly preserve, any right, defense, affirmative defense, or objection, including, without limitation, lack of personal jurisdiction, insufficient process, and/or insufficient service of process. A number of Defendants contend that personal jurisdiction in Maine is lacking over them and intend to move to dismiss on that ground at the appropriate time. *See Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) (removal to federal court does not waive objection to personal jurisdiction); *see also, e.g.*, *Harlow v. Children's Hosp.*, 432 F.3d 50, 54 (1st Cir. 2005).

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................ 1

II.     TIMELINESS OF REMOVAL ................................................................... 4

III.    SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL ....................... 5

IV.     THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE .............................................................. 7

        A.      Courts Construe The Federal Officer Removal Statute Broadly In Favor Of Removal .................................................................... 8

        B.      Defendants Satisfy All Elements Of The Federal Officer Removal Statute ........ 10

                1.      Defendants "Acted Under" Federal Officers And Agencies .................. 11

                        a.      Defendants Acted Under Federal Officers During World War II And The Korean War ....................................... 15

                        b.      Defendants Acted Under Federal Officers By Supplying Highly Specialized Fuels For Military Use ................................ 23

                        c.      Defendants Acted Under Federal Officers By Constructing, Operating, And Managing Government Petroleum Production Facilities ..................................................... 31

                        d.      Defendants Have Acted Under Federal Officers By Developing Mineral Resources On The Outer Continental Shelf For Decades ..................................... 33

                        e.      Defendants Acted Under Federal Officers By Developing Mineral Resources On Federal Lands .......................................... 49

                        f.      Defendants Acted Under Federal Officers By Supplying And Managing The Strategic Petroleum Reserve ........................ 52

                        g.      Defendants Acted Under Federal Officers By Constructing Pipelines For Oil Transportation................................. 55

                        h.      Defendants Acted Under Federal Officers Pursuant To The Emergency Petroleum Allocation Act ......................... 59

                2.      Defendants' Activities Are Related To Plaintiff's Claims ..................... 60

                3.      Defendants Have Colorable Federal Defenses ....................... 68

V.    THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER ......................... 75

## I.     INTRODUCTION

1.      It is not an accident that the United States Department of Defense is the single largest consumer of energy in the United States and one of the world's largest users of petroleum fuels.  For more than a century, United States policy has expressly recognized the fundamental strategic importance of oil and gas.  In fact, for vital security and economic reasons, every Administration since World War II has taken active steps to increase U.S. oil production, including from Defendants.  While the potential risks of global climate change have increased focus on alternative sources of energy, petroleum and other fossil fuels remain the backbone of United States energy policy.

2.      Now, however, Plaintiff asks the Court to find that this same petroleum production and use that has been essential for ensuring the Nation's national defense and energy and economic security constitutes, among other things, an unlawful "public nuisance" under Maine law.  Exhibit 1 to Notice of Removal ("Compl."), ¶ 350.  Invoking various novel theories, the nearly 190-page, 457-paragraph Complaint seeks to impose liability on Defendants for having "extracted," "sold," and "promoted" fossil fuel products.  *Id.* ¶¶ 6, 8.  Plaintiff seeks, among other relief, compensatory and punitive damages, civil penalties, and equitable relief "by means of an equitable fund to pay for adaptation, mitigation, and resilience measures in the State."  *Id.* at 187–88 (Prayer for Relief).

3.      Plaintiff's claims depend on Defendants' production, promotion, distribution, and sale of oil and gas products that create greenhouse gas emissions when combusted by end users.  Because Plaintiff seeks damages for harms allegedly caused by global greenhouse gas emissions, Plaintiff does not—and cannot—limit its claims to harms allegedly caused by oil and gas extracted, produced, distributed, promoted, sold, marketed, or used in Maine.  Instead, Plaintiff's claims expressly target Defendants' nationwide and *global* activities.  Indeed, Plaintiff's claims sweep even more broadly.  They depend on the activities of billions of oil and gas consumers, including

1

not only entities like the U.S. government and military,[2] but also countless hospitals, schools, manufacturing facilities, organizations, individual households, and governments around the world—including the State of Maine itself.

4.    The scope of Plaintiff's theory is breathtaking.  Plaintiff seeks to regulate the sale of oil and gas anywhere in the world, including all past and otherwise lawful sales and even sales to the federal government.  Because Plaintiff challenges the *global* production, extraction, distribution, sale, and consumption of fossil fuels over the past several decades, *see, e.g.*, Compl. ¶¶ 6–9, 15, 43–54, the Complaint necessarily implicates numerous actions taken by Defendants and others under the direction and supervision of the federal government to ensure the Nation's national defense and energy and economic security.  And the Complaint necessarily reaches vital congressional and executive responsibilities, such as the production of oil and gas for the U.S. military under government direction during wartime, the production and supply of highly specialized fuels for the U.S. military, the development of mineral resources on the outer continental shelf and on federal lands under federal supervision, the supply and management of the nation's Strategic Petroleum Reserve, and more.

5.    Although the First Circuit previously rejected an attempt to remove a climate suit brought by the State of Rhode Island on federal officer removal grounds, *see Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50 (1st Cir. 2020), *judgment vacated on other grounds*, 141 S. Ct. 2666 (2021), *reinstated*, 35 F.4th 44, 53 n.6 (1st Cir. 2022), Maine's suit, and this Notice of Removal, are distinguishable for several reasons that support removal of this action.  *First*, Defendants here

---

[2]    As explained in detail below, Plaintiff's purported disclaimer of relief arising from the provision of certain products to the federal government and injuries occurring on federal land does not deprive this Court of jurisdiction.

provide additional grounds for removal that were not considered in *Rhode Island*, including the production and distribution of highly specialized fuels to the U.S. military.[3] In fact, of the eight separate grounds for removal under the federal officer removal statute here, only one was asserted by the defendants in *Rhode Island* (production activities on the Outer Continental Shelf ("OCS")). *Second*, with respect to the OCS ground, Defendants provide additional and detailed evidence not presented in *Rhode Island* that demonstrates Defendants acted under the close supervision and direction of federal officers. *Third*, the *Rhode Island* court focused only on oil and gas "produced and sold . . . *in Rhode Island*," 979 F.3d at 60 (emphasis added), whereas Maine's claims necessarily implicate Defendants' *global* production, extraction, distribution, and sales activities, including those carried out at the behest of federal officers. *See, e.g.*, Compl. ¶¶ 6–9, 15, 43–54. *Finally*, *Rhode Island* suggested that the "distribution" of petroleum products at federal behest (as opposed to mere extraction) would have supported federal officer removal, *id.*—and, as explained in this Notice of Removal, Defendants distributed a significant amount of petroleum to the federal government under the direction of federal officers. *See infra* ¶¶ 19, 22–113.

6.     At bottom, this case is about the global production, sale, and consumption of vital products that virtually every person on the planet uses and relies upon each day. Oil and gas power our national defense; keep our homes, offices, factories, hospitals, and other essential facilities illuminated, heated, cooled, and ventilated; and transport people and products, including virtually

---

[3]   More specifically, these additional grounds include Defendants acting under federal officers by producing and distributing oil and gas during World War II, the Korean War, and subsequently; supplying highly specialized fuels for military use; building, operating and managing government petroleum production facilities; developing mineral resources on federal lands through specialized leases overseen and managed by federal supervisors; supplying fuel for and managing the Strategic Petroleum Reserve; constructing of pipelines for oil transportation; and reporting on crude supplies and refining activities under the Emergency Petroleum Allocation Act.

every consumer good—from food to medicine to clothing—across the nation and around the world. The national energy policy necessarily reflects a balance between fueling our everyday activities, being prepared to defend national interests wherever threatened, environmental concerns, and other factors. By means of this lawsuit, Plaintiff seeks to strike its own preferred balance, overturn decades of federal energy policy, penalize actions taken at the behest of the federal government, and threaten the reliable and affordable supply of energy on which this country and the world depend. Because Plaintiff's Complaint relates to and seeks substantial relief from Defendants' production and distribution of oil and gas under the direction, supervision, and control of federal officers, Plaintiff's action must be heard in this federal forum.

## II.    TIMELINESS OF REMOVAL

7.    Plaintiff filed a Complaint against the Chevron Parties and other Defendants in Maine Superior Court, Cumberland County, Case No. PORSC-CV-24-442, on November 26, 2024. A copy of all process, pleadings, or orders in the possession of Chevron Corporation is attached as Exhibit 1 to this Notice of Removal, and a copy of all process, pleadings, or orders in the possession of Chevron U.S.A. Inc. is attached as Exhibit 2 to this Notice of Removal.

8.    This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after service. 28 U.S.C. § 1446(b). Chevron Corporation and Chevron U.S.A. Inc. were served on December 17, 2024. Exhibit 3 to Notice of Removal, Declaration of Joshua D. Dick ("Dick Decl."), ¶ 2. The consent of the other Defendants is not required because the Chevron Parties remove this action pursuant to 28 U.S.C. § 1442(a)(1). *See Hamilton v. Fed. Home Loan Mortg. Corp.*, 2014 WL 12726326, at *2 (D. Me. Mar. 3, 2014) (when removal is "pursuant to 28 U.S.C. § 1442, unanimity of consent is not a prerequisite to removal"); *see also* 28 U.S.C. § 1446(b)(2)(A). Nevertheless, all properly joined and served Defendants have consented to removal. Dick Decl. ¶ 3. Consent is not required from any Defendant that has not

been served.  *See* 28 U.S.C. § 1446(b)(2)(A).

## III.    SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

9.      Plaintiff brings claims against Defendants seeking damages and equitable relief for "climate change impacts" it claims to have suffered or allegedly will suffer, such as sea level rise, extreme weather, and other natural phenomena.  Compl. ¶ 1; *see also id.* ¶¶ 54, 248–333.  Plaintiff asserts the following claims: negligence; public nuisance; private nuisance; common law trespass; "civil aiding and abetting"; statutory nuisance under 17 M.R.S. § 2802; violations of the Maine Unfair Trade Practices Act; and strict liability failure to warn under 14 M.R.S. § 221.  *Id.* ¶¶ 334–457.  Plaintiff seeks compensatory damages; punitive damages; "[a]ny other damages as permitted by law"; civil penalties under 5 M.R.S. § 209; disgorgement of profits; "abatement in Maine of the nuisances complained of herein, for example by means of an equitable fund to pay for adaptation, mitigation, and resilience measures in the State"; joint and several liability "for all past damages the State has incurred, and future damages the State will incur . . . and any other relief necessary to remedy climate change-related harms that the State will face"; and other relief.  *Id.* at 187–88 (Prayer for Relief).

10.      The Complaint makes clear that Plaintiff seeks damages resulting from the *global* production, extraction, distribution, and sale of oil and gas products.  Plaintiff's claims center on Defendants' worldwide "extract[ion]" and sale of "fossil fuel products," which Plaintiff alleges have "driven a concurrent increase in $CO_2$ and other GHG emissions."  *Id.* ¶ 6.  These "[f]ossil fuel emissions," in turn, "are the dominant driver of climate change."  *Id.*  It is "consumer demand for fossil fuels and the consequent buildup of $CO_2$ in the atmosphere," via emissions, "that drives climate change and its physical, environmental, and socioeconomic consequences," including the "climate change-related injuries" alleged in the Complaint.  *Id.* ¶ 9; *see also id.* ¶ 44 ("The mechanism by which human activity causes global warming and climate change is . . . well-

established: ocean and atmospheric warming is overwhelmingly caused by anthropogenic GHG emissions.").  While Plaintiff purports to challenge certain alleged misrepresentations related to climate change, its theory of liability and requested relief is necessarily based on global greenhouse gas emissions.  Under Plaintiff's theory of relief, alleged misrepresentations matter for Plaintiff's tort claims only insofar as they purportedly led to a marginal increase in global greenhouse gas emissions that allegedly have caused Plaintiff's harms.  If Plaintiff's tort claims were based *solely* on misrepresentations, the requested relief sought would look much different.  But Plaintiff instead seeks damages for the alleged effects of global climate change allegedly due to increased greenhouse gas emissions.  *See id.* at 188 (seeking all "relief necessary to remedy climate change-related harms that the State will face").  Accordingly, Plaintiff's theory of liability necessarily depends on proof that Defendants' conduct led to increased production, distribution, sale, and consumption of oil and gas that in turn produced increased emissions around the world that, in turn, led to Plaintiff's alleged climate change-induced injuries.

11.     For purposes of meeting the jurisdictional requirements for removal only, the Chevron Parties submit that removal is proper because Defendants are authorized to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  The Chevron Parties and multiple Defendants: (1) were "acting under" a federal officer or agency; (2) the suit against them relates to acts under color of federal office; and (3) they assert colorable federal defenses.  *See, e.g.*, *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 184–86 (1st Cir. 2024) ("*Express Scripts*"); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022); *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941–47 (7th Cir. 2020); *In re Commonwealth's Mot. to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 461, 469 (3d Cir. 2015) ("*Def. Ass'n of Phila.*"); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998).  Despite Plaintiff's

purported disclaimer of injuries arising on federal property and through the provision of products to the government, *see* Compl. ¶¶ 17–18, the Complaint alleges that the cumulative impact of Defendants' *global* extraction, production, distribution, and sales activities over the past several decades—which necessarily include Defendants' substantial activities under the direction, supervision, and control of federal officers—contributed to the *global* greenhouse gas emissions that Plaintiff claims caused its alleged injuries. *See, e.g.*, Compl. ¶¶ 6–9, 15, 43–54.[4]

## IV. THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

12. The federal officer removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). A party seeking removal under section 1442 must show: (1) that it "act[ed] under a federal officer's authority"; (2) that the "suit" is "for or relating to any act under color of federal office"; and (3) that it has a "colorable federal defense." *Moore*, 25 F.4th at 34–35 (cleaned up); *see also Express Scripts*, 119 F.4th at 185; *Baker*, 962 F.3d at 942–45; *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291 (5th Cir. 2020) (en banc); *Def. Ass'n of Phila.*, 790 F.3d at 467.[5] So long as federal officer jurisdiction can be exercised as to one claim against one Defendant, the entire action is properly removed. *See, e.g.*, *Express Scripts*, 119 F.4th at 185; *Moore*, 25 F.4th at 35; *Baker*, 962 F.3d at 945; 28 U.S.C.

---

[4] Should Plaintiff challenge this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds and will not be limited to the specific articulations in this Notice. Indeed, the Supreme Court has upheld removal where jurisdictional facts required to support the removal were found in later-filed affidavits rather than in the notice of removal. *See, e.g.*, *Willingham v. Morgan*, 395 U.S. 402, 407 n.3 (1969); *see also Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014). Defendants do not waive and expressly reserve all rights to argue that this action is properly removable on these grounds.

[5] The defendant must also be "a person within the meaning of the statute," which includes corporations. *Baker*, 962 F.3d at 941.

§§ 1442(a), 1367.  Defendants meet these criteria.

### A.  Courts Construe The Federal Officer Removal Statute Broadly In Favor Of Removal

13.  The federal officer removal statute "must be liberally construed to give full effect to [its] purpose," which is "to ensure a federal forum in any case where a federal official *or private actors acting on that official's behalf* may raise a defense arising out of his official duties." *Express Scripts*, 119 F.4th at 185 (cleaned up; emphasis altered).  Accordingly, "the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation'" of the statute. *Id.* (quoting *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)).  Rather, the statute is to be "given . . . a broad reading," *Moore*, 25 F.4th at 35, and "'broadly construed' in favor of a federal forum," *Def. Ass'n of Phila.*, 790 F.3d at 467.  The Supreme Court, likewise, has emphasized that "the statute must be 'liberally construed'" and, in particular, "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).  Courts have repeatedly affirmed that "removal rights under section 1442 are much broader than those under" the general removal statute. *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006).

14.  At this stage, a defendant's allegations "in support of removal" need only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker*, 962 F.3d at 941, 945.  As the First Circuit recently affirmed, a federal court "must 'credit' [the removing] party's 'theory of the case' for why removal under § 1442(a)(1) was appropriate," and this deference must extend to the removing party's "allegations" in the notice of removal. *Express Scripts*, 119 F.4th at 184, 190 (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999)).  Similarly, the Court must "construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction. *Def. Ass'n of Phila.*, 790 F.3d at 466; *see also id.* at 474 ("[W]e must accept the [defendant's] theory of the case at this juncture."); *Baker*, 962

F.3d at 947 ("Our role at this stage of the litigation is to credit only the [defendant's] theory."). Defendants need not, at this juncture, affirmatively prove that they will prevail on the merits of any federal issue because the sole issue is *where* such merits will be adjudicated. *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (holding that a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed"); *Moore*, 25 F.4th at 37 (at the removal stage, the court is merely concerned with the "colorability" of the defendant's argument, not "the merits"); *Baker*, 962 F.3d at 947 (noting that "at this point," "we are concerned with who makes the ultimate determination, not what that determination will be" (cleaned up)).

15. Where both the plaintiffs and the defendants have "reasonable theories of this case," the court's role is "to credit only the [defendants'] theory" so long as the theory is "plausible." *Baker*, 962 F.3d at 941, 947; *see also Express Scripts*, 119 F.4th at 184, 189. Here, Defendants' theory is more than plausible and should—indeed, must—be credited by this Court.

16. Plaintiff asserts that its injuries arise from global climate change, a phenomenon that allegedly derives from all of Defendants' production, extraction, distribution, and sales activities (as well as from innumerable other sources). *See, e.g.*, Compl. ¶¶ 6, 9, 15, 43–54. Such alleged injuries cannot arise from any purported deception untethered to any oil and gas production. In the Complaint, Plaintiff alleges that greenhouse gas emissions caused by billions of consumers' use of fossil fuels resulted in Plaintiff's purported harms. *See, e.g.*, *id.* ¶¶ 9, 10–12, 43–54. Plaintiff's claims thus implicate all of Defendants' oil and gas production, extraction, and distribution, inherently including such activities taken under the federal government's control.

17. For purposes of removal, not all of Defendants' alleged actions need give rise to federal jurisdiction, only some must. *See, e.g.*, *Express Scripts*, 119 F.4th at 185 ("[I]f a single defendant properly removes under § 1442, the entire action, with all defendants, must be removed

to federal court."); *Baker*, 962 F.3d at 945 (rejecting district court's reasoning that "removing defendant must operate under government orders for most of the relevant time frame"); *Moore*, 25 F.4th at 35 ("Any single claim is independently sufficient to satisfy the 'for or relating to' requirement."). That standard is met here. In *County Board of Arlington County, Virginia v. Express Scripts Pharmacy, Inc.*, for example, the Fourth Circuit held that the defendants' provision of opioids pursuant to Department of Defense ("DOD") contracts was sufficient to establish federal officer removal jurisdiction, even though the complaint there sought relief for opioid sales more generally and "did not even mention the distribution of opioids to veterans, the DOD contract, or the operation of the [military pharmacy]." 996 F.3d 243, 256 (4th Cir. 2021) ("*Arlington*"). Plaintiff's claims likewise encompass harm from every greenhouse gas emission, just as the plaintiff in *Arlington* targeted "every opioid prescription" filled by those defendants. *Id.* at 257.

**B.    Defendants Satisfy All Elements Of The Federal Officer Removal Statute**

18.    Defendants satisfy all three elements of the federal officer removal statute.

19.    First, Defendants have acted under federal officers and agencies by performing critical and necessary functions for the U.S. military to further the national defense and pursuant to government mandates, leases, and contracts under federal direction, supervision, and control. Defendants have acted under federal officers and agencies in numerous ways, including by: (1) producing and distributing oil and gas for the U.S. military during wartimes under specific government guidance and directives; (2) producing and supplying large quantities of highly specialized, noncommercial-grade fuels for U.S. military use that conformed (and still conform) to unique military specifications; (3) building, operating, and managing government petroleum production facilities; (4) developing mineral resources on the OCS through highly technical leases overseen and managed by federal supervisors; (5) developing mineral resources on federal lands through specialized leases overseen and managed by federal supervisors; (6) supplying fuel for

and managing the Strategic Petroleum Reserve; (7) constructing pipelines for oil transportation at the direction and control of the federal government; and (8) acting under federal officers pursuant to the Emergency Petroleum Allocation Act.

20. Second, Plaintiff's "suit" is "'for or relating to'" Defendants' "'act[s] under color of [federal] office.'" *Moore*, 25 F.4th at 35 (second alteration in original) (quoting 28 U.S.C. § 1442(a)(1)). Courts have "consistently given this requirement a broad reading" to encompass acts "in association with or connection with" acts under federal office. *Express Scripts*, 119 F.4th at 186 (cleaned up); *see also Moore*, 25 F.4th at 35 n.4. The statute "does not 'demand[] a showing of a specific government direction,' which goes well beyond the 'relating to' requirement." *Moore*, 25 F.4th at 36 (quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017)). Plaintiff has brought suit against Defendants for the effects of all global combustion of oil and gas products and the resulting emissions of greenhouse gases, which necessarily includes the combustion of products created for and at the direction of the federal government.

21. Third, Defendants have several "colorable federal defenses," including the government-contractor defense, preemption, federal immunity, commerce clause defenses, due process, the foreign affairs doctrine, and the First Amendment.

### 1. Defendants "Acted Under" Federal Officers And Agencies

22. Oil and gas are at the heart of the economic, energy, and security policies of the United States, and have been for decades. It has long been the policy of the United States that fossil "fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports." 42 U.S.C. § 15927(b)(1); *see also* 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) ("[F]ossil fuels" are "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production."). As Professor Mark

Wilson, a professor of history at the University of North Carolina, has explained in declarations submitted in similar climate change cases: "Over the last 120 years, the U.S. government has relied upon and controlled the oil and gas industry to obtain oil supplies and expand the production of petroleum products, in order to meet military needs and enhance national security." Dick Decl. Ex. 1 ("Wilson Decl.") ¶ 1.

23.     The reach of the federal officer removal statute "extends to private persons . . . who act under the direction of federal officers." *Camacho v. Autoridad de Teléfonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989); *see also Express Scripts*, 119 F.4th at 185. Defendants here "acted under" federal officers and agencies because the government exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel production. *Watson*, 551 U.S. at 151. Defendants also "acted under" federal officers and agencies because they engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior" by performing a job the government would otherwise have to perform itself—whether by producing and distributing oil under government directives in wartime, producing specialized fuel for distribution to the military, developing mineral resources on the OCS and federal land, constructing pipelines to distribute oil under federal direction, or otherwise assisting the government. *Id.* at 151–52, 154; *see also id.* at 147 (defendant must be "acting under" any "officer" *or* "agency"); *Moore*, 25 F.4th at 34 n.3.

24.     As noted, the Supreme Court has made clear that "the statute must be 'liberally construed'" and, in particular, "[t]he words 'acting under' are broad." *Watson*, 551 U.S. at 147; *see also Express Scripts*, 119 F.4th at 185 (same). "Acting under" can encompass a broad range of relationships, including "contract" or "payment," "employer/employee," and "principal/agent." *Watson*, 551 U.S. at 156. At its core, "'[a]cting under' . . . contemplates a relationship where the private party engages in an effort to *assist*, or to help *carry out*, the duties or tasks of the federal

superior." *Express Scripts*, 119 F.4th at 185 (quoting *Moore*, 25 F.4th at 34 n.3).

25.    "Courts have consistently held that the 'acting under' requirement is easily satisfied" in cases "involving injuries arising from a product manufactured for the government." *Moore*, 25 F.4th at 34 n.3.  Moreover, the First Circuit has recognized that the requirement is satisfied when a contractor has "operated [a facility] 'in accordance with government contracts, in conformance with military specifications, and under [military] oversight.'"  *Id.* at 33.  Where, as here, "a private contractor . . . 'help[s] the Government to produce an item it needs' and thus 'helps officers fulfill other basic governmental tasks,'" that contractor "may remove because it assists with a governmental function that the government 'itself would have had to perform.'"  *Express Scripts*, 119 F.4th at 185–86 (quoting *Watson*, 551 U.S. at 153–54); *see also Baker*, 962 F.3d at 942 (when a private party contracted with "the Government to produce an item that [the Government] needs," such assistance "goes beyond simple compliance with the law" and satisfies the "acting under" prong); *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 357 n.9 (1st Cir. 2009) (recognizing federal officer removal based on defendant's assertion that it was "acting under" a federal officer when it supplied "beryllium-containing products" to a defense contractor that "were used in manufacturing military hardware"); *Caratini-Soto v. Puerto Rico*, 2023 WL 11196890, at *3 (D.P.R. Dec. 28, 2023) (holding "jurisdiction clear" under federal officer removal statute in suit alleging injury from Pfizer COVID-19 vaccine, and finding that the acting under requirement was satisfied because "[a]bsent Defendant Pfizer's efforts, and those of similarly situated vaccine manufacturers, the Government would have had to develop, manufacture, and distribute COVID-19 vaccines itself"); *accord Sawyer*, 860 F.3d at 255 ("[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*.").

26.     For decades—including during World War II, the Korean War, and the Cold War—Defendants have acted under the direction, supervision, or control of federal officers and have assisted them in securing domestic energy independence and in meeting the requirements of the U.S. military and the national economy.   Under these circumstances, 28 U.S.C. § 1442(a)(1) affords Defendants a right to insist that any claims connected to this "special relationship" be heard in federal court.   *Baker*, 962 F.3d at 941–42 ("The crux of the ['acting under'] inquiry . . . is whether there was a special relationship between the defendant and the federal government."). The federal government has required and promoted the production and distribution of oil and gas for decades to meet the needs of the U.S. military and national economy, even as the public and the world increasingly recognized and understood the link between greenhouse gas emissions and global climate change.   Indeed, the federal "government affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020).   For example, the Office of Fossil Energy states that the government seeks to "promote[] U.S. domestic homegrown energy development to achieve energy security and jobs in energy and technology around the world."[6]

27.     Defendants acted under federal officers in many respects, each directly stemming from the U.S. government's policies designed to meet the vital national interest in assuring adequate energy sources for national defense and economic well-being.   Each of the examples provided below demonstrates that Defendants have produced and/or distributed oil and gas under the direction, supervision, and control of the federal government.   Any one of them alone is

---

[6]   U.S. Dep't of Energy, Office of Fossil Energy, 2018–2022 Strategic Vision, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf.

sufficient to support federal officer removal, and each demonstrates the strong federal interest in petroleum production and distribution, which Plaintiff now seeks to disrupt.[7]

> **a.** **Defendants Acted Under Federal Officers During World War II And The Korean War**

28.    World War II confirmed petroleum's role as a key American resource and underscored the government's interest in maintaining and managing it. *See* Dick Decl. Ex. 4 (Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 4 (Nov. 28, 1945)) ("Our overseas forces required nearly twice as many tons of oil as arms and armament, ammunition, transportation and construction equipment, food, clothing, shelter, medical supplies, and all other materials together. In both essentiality and quantity, oil has become the greatest of all munitions."); Dick Decl. Ex. 2 (National Petroleum Council, *A National Oil Policy for the United States* at 1 (1949)) ("A prime weapon of victory in two world wars, [oil] is a bulwark of our national security."). As the United States prepared for war in 1941, its need for large quantities of oil and gas to produce high-octane fuel for airplanes ("avgas"), oil for ships, lubricants, and synthetic rubber far outstripped the nation's existing capacity. Avgas, for example, has been described as "the most critically needed refinery product during World War II," and "essential to the United States' war effort." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Shell II*"). The government created agencies to control the petroleum industry, including Defendants; to build refineries; to direct the production and distribution of certain petroleum products; and to manage scarce resources for the

---

[7]    The examples provided in this Notice of Removal are meant only to provide illustrative examples. They are not an exhaustive collection of the factual bases that support the grounds for removal asserted herein. Defendants expressly reserve all rights to include additional support for any and all grounds for removal in any further briefing should Plaintiff challenge removal.

war effort. "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government* . . . in bringing about a victory." Dick Decl. Ex. 3, at 1 (Statement of Senator O'Mahoney, Chairman, Special Committee Investigating Petroleum Resources, S. Res. 36 (Nov. 28, 1945)) (emphases added).

29.    The government also directed and regulated the operation of War Emergency Tankers, Inc., a cooperative venture undertaken by eight oil companies (including Standard Oil Company, one of ExxonMobil's predecessor companies) to aid in tanker operation as general agents of the War Shipping Administration during the duration of the war.[8]  That venture was overseen by the Administrator of the War Shipping Administration, which had the contractual power, along with "his officers and responsible employees" and "any person or agency authorized by the Administrator," to provide "instructions" and "directions" to the participant companies.[9]

30.    In 1941, President Roosevelt created the Office of Petroleum Coordinator and designated Interior Secretary Harold Ickes as the Petroleum Coordinator for National Defense. *See Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *10 (S.D. Tex. Sept. 16, 2020), *appeal dismissed*, 2021 WL 5545961 (5th Cir. June 18, 2021).  President Roosevelt explained that:

> [r]ecent significant developments indicate the need of coordinating existing Federal authority over oil and gas and insuring that the supply of petroleum and its products will be accommodated to the needs of the Nation and the national defense program . . . . One of the essential requirements . . . which must be made the basis of our petroleum defense policy . . . is the development and utilization with

---

[8]    *See* Dick Decl. Ex. 83 (*Eight Oil Companies Form New Tanker Group*, Maritime Reports at 1, 6 (Sept. 2, 1943)).

[9]    Dick Decl. Ex. 84 (Service Agreement for Ocean Tank Vessels of Which the United States of America is Owner or Owner Pro Hac Vice between the United States and War Emergency Tankers, Inc. (Oct. 8, 1943), art. 17).

maximum efficiency of our petroleum resources and our facilities, present and future, for making petroleum and petroleum products available, adequately and continuously, in the proper forms, at the proper places, and at reasonable prices to meet military and civilian needs.

*Id.* (alteration and omissions in original). The Office of Petroleum Coordinator promptly began "directives" and "recommendations" to the oil and gas industry, requiring refineries to prioritize the production of aviation gasoline.

31. In 1942, President Roosevelt established several agencies to oversee wartime production and distribution by the petroleum industry, including Defendants.[10] Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW"). A "federal network of agencies . . . coordinate[d] the manufacture of war materials and their distribution to meet America's military needs around the world." *Exxon Mobil Corp.*, 2020 WL 5573048, at *14. The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production, including with respect to oil and gas; it also limited the production of nonessential goods.

32. For its part, the PAW centralized the government's petroleum-related activities. By Executive Order, "the PAW was charged with ensuring 'adequate supplies of petroleum for military, or other essential uses,' and '[e]ffect[ing] the *proper distribution* of such amounts of materials.'" *Shell II*, 751 F.3d at 1286 (emphasis added) (quoting Exec. Order No. 9276, 7 Fed. Reg. 10,091, 10,092 (Dec. 4, 1942)). PAW's "directives and orders governed the '*production*,

---

[10] The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this notice of removal only, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that Plaintiff's Complaint, as pleaded, can and has been properly removed to federal court.

refining, treating, storage, shipment, receipt and *distribution* within the industry of petroleum, petroleum products, or associated hydrocarbons.'" *Exxon Mobil Corp.*, 2020 WL 5573048, at *11 (internal citation omitted) (emphasis added). It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production orders to refineries and to enter into contracts that gave extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies." Dick Decl. Ex. 4, at 6; *see also United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002) ("*Shell I*") (discussing federal control of petroleum production).

33.　　In short, the "PAW told the refiners what to make, how much of it to make, and what quality." *Shell II*, 751 F.3d at 1286 (quoting John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War*, 1941–1945, at 219 (1946)); *see also* Dick Decl. Ex. 4, at 11 ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the disposition of the products were all closely scheduled, by daily telegraphic directives when necessary."); Dick Decl. Ex. 5 (Statement of George A. Wilson, Director of Supply and Transportation Division, Wartime Petroleum Supply and Transportation, Petroleum Administration for War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 212 (Nov. 28, 1945)) ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available."). In the days after the attack on Pearl Harbor, the Office of the Petroleum Coordinator for National Defense stated that "[i]t is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*." *Shell II*, 751 F.3d at 1286 (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

34. The government dictated where and how to drill, rationed essential materials, and set statewide minimum levels for oil production. Dick Decl. Ex. 6 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War*, 1941–1945 (1946)), at 171, 177–78, 184. As Professor Wilson explains: "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them." Wilson Decl. ¶ 11. Professor Wilson establishes that "[s]ome directives restricted the use of certain petroleum products for high-priority war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines." *Id.*

35. The PAW's directives to Defendants were often coercive. The PAW would "get the results" it desired—namely the maximum production and distribution of petroleum products for the war effort—and if "[it] can't get them by cooperation, then [it] will have to get them some other way."[11] The PAW also maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance."[12] In sum, the federal government deployed an array of directions, threats, and sanctions to ensure Defendants assented to PAW's production directives.

36. The court in *Exxon Mobil* acknowledged the long history of federal government control over Defendants' lawful oil production and distribution-related activities in finding that the government was responsible for certain environmental response costs under federal law: "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum

---

[11]  Dick Decl. Ex. 7 (Secretary Harold Ickes, Conference of Petroleum Industry Chairmen, 8 (Aug. 11, 1941)).

[12]  Dick Decl. Ex. 8 (Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams (Aug. 12, 1942)).

industry." 2020 WL 5573048, at *11. The *Exxon Mobil* court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with the federal officer's direction. *Id.* at *11; *see also id.* at *12 ("J. Howard Marshall, the former Chief Counsel for the Petroleum Administration for War, testified that companies that weren't making essential war materials were simply not able to run their refineries." (internal quotation marks omitted)). In fact, the federal government "insiste[d] on having the plants operate 24 hours a day, 7 days a week, year round." *Id.* at *8. Put simply, the federal government "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *14. Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive TNT, under direct contract with the Army Ordnance Department. *See id.* at *13; *see also* Harold Nockolds, *The Engineers* 28 (1949).

37. The controls placed on the production and distribution of petroleum during World War II extended through the Korean War. *See Exxon Mobil*, 2020 WL 5573048, at *15 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase [its] production of wartime . . . petroleum products").

38. At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81–774 ("DPA"). The PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.[13] As

---

[13] *See* Dick Decl. Ex. 9, at 122 (Fourth Annual Report of the Activities of the Joint Committee on Defense Production, H. Rep. No. 84-1, at 122 (Jan. 5, 1955, 1st Sess.)); *see also Exxon Mobil Corp.*, 2020 WL 5573048, at *15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD directed oil companies to expand production during the Korean War, for example, by calling on [the] industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952." Wilson Decl. ¶ 28.

39.     The government also invoked the DPA immediately after the 1973 Oil Embargo to address immediate and critical petroleum shortages by the military.[14]  Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the Department of Defense" and provided companies that complied with immunity from "damages or penalties."[15]  The Interior Department subsequently "issued directives to 22 companies [including Defendants or their predecessors or subsidiaries[16]] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through December 31, 1973, for use by the DOD."[17]

40.     The DOD is the United States' single largest consumer of energy and one of the world's largest users of petroleum fuel.  *See* Dick Decl. Ex. 10; Lengyel, Colonel, USAF, Gregory J., *Department of Defense Energy Strategy: Teaching an Old Dog New Tricks* (August 2007),

---

[14]   *See* Dick Decl. Ex. 11 (Twenty-Fourth Annual Report of the Activities of the Joint Committee on Defense Production, S. Rep. No. 94-1, Pt. 1, at 442 (Jan. 17, 1975, 1st Sess.)).

[15]   Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6, 1973).

[16]   The companies included Amoco Oil Co., Exxon Co., U.S.A., Mobil Oil Corp., Marathon Oil Co., Standard Oil Co. of California, and Shell Oil Co.  Dick Decl. Ex. 12 (*Naval Petroleum Reserve Numbered 1, Elk Hills, Calif.: Hearing Before the Subcommittee On National Stockpile and Naval Petroleum Reserve of the Committee on Armed Services on S.J. Res. 176*, 93d Cong. 73–74 (1st Sess. 1973)) (reprinting Department of Interior, Office of Oil and Gas, *News Release: Companies Directed to Supply the Needs of Defense Department* (Nov. 28, 1973) (listing companies and quantities)); Dick Decl. Ex. 13 (John W. Finney, *Fuel is Diverted for the Military*, N.Y. Times (Nov. 28, 1973) (reporting on directives)).

[17]   *See* Dick Decl. Ex. 13.

https://www.brookings.edu/wp-content/uploads/2016/06/lengyel20070815.pdf. For more than a century, petroleum "products [have been] used for the war effort," including "many 'ordinary' products [that are] *crucial* to the national defense, such as . . . fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military machines." *Exxon Mobil*, 2020 WL 5573048, at *31 (emphasis added); *see also id.* at *47 (noting the "value of [the] petroleum industry's contribution to the nation's military success"). In fiscal year 2019 alone, the DOD purchased 94.2 million barrels of fuel products in compliance with military specifications, totaling $12.1 billion in procurement actions.[18]

41. As two former Chairmen of the Joint Chiefs of Staff have explained in amicus briefs submitted in other climate change-related cases, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and, during their tenure, petroleum products were "crucial to the success of the armed forces." Dick Decl. Ex. 14, at 2–3 (Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen, in Support of Petitioners, *BP p.l.c. v. Mayor and City Council of Baltimore*, 593 U.S. 230 (2021) (No. 19-1189)); *see also* Dick Decl. Ex. 15, at 7–8, 20–23 (Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen, in Support of Defendants-Appellants, *City and Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022) (No. 21-15313)) (similar). "Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been essential military contractors, throughout the last century." Wilson Decl. ¶ 2. The "U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime." *Id.*

---

[18]  Dick Decl. Ex. 10 (Def. Logistics Agency Fact Book).

42.     The federal government's wartime control over the production and distribution of petroleum by Defendants easily meets the "acting under" requirement.    Defendants "manufactured" their products "for the government," under the "'subjection, guidance, [and] control'" of the federal government in order to assist the federal government in its wartime operations.  *Moore*, 25 F.4th at 34 n.3 (quoting *Watson*, 551 U.S. at 551).  The Seventh Circuit has likewise recognized that wartime circumstances such as these satisfy the "acting under" requirement, affirming federal officer removal in a suit against defendants for injuries from chemicals used in manufacturing, when the defendants manufactured products involving the chemicals during World War II according to the federal government's "detailed specifications," "compulsion," and "continuous federal supervision" over the manufacturing defendants.  *Baker*, 962 F.3d at 943; *see also Genereux*, 577 F.3d at 357 n.9.

> **b.     Defendants Acted Under Federal Officers By Supplying Highly Specialized Fuels For Military Use**

43.     Many of the Defendants have continuously produced and distributed to the U.S. military highly specialized petroleum products required for national defense and wartime efforts for the last eighty years.  The federal officer removal "acting under" prong applies to situations, like this one, where the federal government uses a private contractor to "fulfill . . . basic governmental tasks . . . that, in the absence of a contract with a private firm, the Government itself would have had to perform."  *Watson*, 551 U.S. at 153–54; *see also Express Scripts*, 118 F.4th at 185–86; *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012); *Caratini-Soto*, 2023 WL 11196890, at *3.  Defendants acted under federal officers by producing and supplying highly specialized, noncommercial-grade fuels for the military that continue to be the "lifeblood of the full range of Department of Defense capabilities."  Dick Decl. Ex. 16, at 2.  As several circuits have found, when specialized products have "detailed federal specifications" pursuant to

government contracts and must be produced "in accordance with those specifications," the acting under standard is satisfied. *Baker*, 962 F.3d at 940–41, 944; *see also Arlington*, 996 F.3d at 252 (similar); *Winters*, 149 F.3d at 400 (noting "the government's detailed specifications concerning the make-up, packaging, and delivery of Agent Orange" and holding "the defendants acted pursuant to federal direction").

44.     During World War II, the federal government asserted substantial control over Defendants, directing the development, production, and distribution of avgas.[19]  Because, as noted above, avgas was "'the most critically needed refinery product' during World War II and was essential to the United States' war effort," *Shell II*, 751 F.3d at 1285, the United States government "exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor," *Exxon Mobil.*, 2020 WL 5573048, at *1.  It did so to maximize production of fuel for the military and direct the allocation of pivotal resources.  *See, e.g.*, *Shell I*, 294 F.3d at 1049–50.  This control is like the federal government's conduct in *Baker*, mandating defendant manufacturers to produce "critical wartime commodities" according to strict regulations, "direct[ing] nearly every aspect of [the] production process" at one site and controlling the "operation," "plans," "designs," and "schedules" at another.  962 F.3d at 940–41.

45.     To this day, Defendants supply the DOD with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements. U.S. Navy Captain Matthew D. Holman recently explained that "[f]uel is truly the lifeblood of the full range of DOD capabilities, and, as such, must be available on specification, on demand, on time, every time.  In meeting this highest of standards, we work hand-in-hand with a dedicated

---

[19]   During World War II, approximately 80% of the seven billion barrels of crude oil needed to support the American war effort were produced in the United States.  Dick Decl. Ex. 6, at 1, 169.

24

team of Sailors, civil servants, *and contractors* to deliver fuel to every corner of the world, ashore and afloat." Dick Decl. Ex. 17 (emphasis added). Indeed, as two former Chairmen of the Joint Chiefs of Staff have explained, the contracts to produce these specialized fuels "were *not typical commercial agreements*"; rather, they required Defendants "to supply fuels with unique additives to achieve *important objectives*" "*under the oversight and direction* of military officials." Dick Decl. Ex. 15, at 6, 20 (emphases added).

46. "By 2010, the U.S. military remained the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel." Wilson Decl. ¶ 40. Defendants Shell USA, Inc. (f/k/a Shell Oil Company), BP, and ExxonMobil (or their predecessors, subsidiaries, or affiliates), for example, have been three of the top four suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[20] DESC procures a range of military-unique, petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels. Several other Defendants have also supplied (and continue to supply) these critical products for the U.S. military.

47. More specifically, for example, during the Cold War, Shell Oil Company produced and supplied to the federal government specialized jet fuel to meet the unique performance

---

[20] *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf (last visited Jan. 2, 2025).

requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs.[21] Shell Oil Company produced and supplied millions of gallons of "Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification."[22] Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1, including a hangar, pipelines, and storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program.[23] Under the OXCART program,

---

[21] *See* Dick Decl. Ex. 18, at 61–62 (Gregory W. Pedlow & Donald E. Welzenbach, The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954–1974 (1992)), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf (last visited Jan. 2, 2025) ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low-volatility, low-vapor-pressure kerosene fuel for the craft. The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a boiling point of 300ºF at sea level. Manufacturing this special fuel required petroleum byproducts."); *id.* Ex. 19 (CIA Doc. No. CIA-RDP90B00170R000100080001-5, Clarence L. Johnson, Development of the Lockheed SR-71 Blackbird (Aug. 3, 1981)) ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem. . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements. . . . Shell, and [other] [c]ompanies[,] took on the task of developing these fluids."); *see also id.* Ex. 20 (Ben Rich & Leo Janos, Skunk Works 127, 205 (1994)).

[22] Dick Decl. Ex. 21 (CIA Doc. No. CIA-RDP67B00074R000500400016-2, Contract No. AF33(657)-8577 (SH-511) (Aug. 14, 1962)); *see id.* Ex. 22 (CIA Doc. No. CIA-RDP67B00074R000500400012-6, Amendment No. 2 to Contract No. AF33(657)-5577 (SH-511) (Aug. 26, 1963)).

[23] Dick Decl. Ex. 23 (CIA Doc. No. CIA-RDP67B00074R000500440005-0, Concurrence in Contract No. SH-515 with Shell Oil Company, Project OXCART (Sept. 20, 1963)); *see id.* Ex. 24 (CIA Doc. No. CIA-RDP67B00074R000500450004-0, Contract No. AF33(657)-13272 (SH-516) (June 30, 1964)); *id.* Ex. 25 (CIA Doc. No. CIA-RDP67B00074R000500440006-9, Contract No. AF33(657)-12525 (SH-515) (Sept. 20, 1963)); *id.* Ex. 26 (CIA Doc. No. CIA-RDP67B00074R000500430003-3, Concurrence in Contract No. SH-514 with Shell Oil Company, New York, N.Y. (June 28, 1963)); *id.* Ex. 27 (CIA Doc. No. CIA-RDP67B00074R000500420006-1, Contract No. AF33(657)10449 (SH-513) (Feb. 25, 1963)); *id.* Ex. 28 (CIA Doc. No. CIA-RDP67B00074R000500410006-2, Contract No. AF33(657)-8582 (SH-512) (Sept. 13, 1962)).

Shell Oil Company also "tested" "refinery procedures" to ensure fuels were "up to standard."[24]  In supplying specialized fuel and facilities under contracts for the federal government's overhead reconnaissance programs, Shell Oil Company acted under federal officers, *see, e.g.*, Dick Decl. Ex. 23 ("This work is under the technical direction of Colonel H. Wilson."), and helped the government to produce an essential item that it needed for national defense purposes and would otherwise have had to produce itself, *see Watson*, 551 U.S. at 153.  "Extant government documents show that Shell also acted under CIA and Air Force direction to build infrastructure to support the distribution of these special fuels, including tanks and supply lines at U.S. air bases around the world."  Wilson Decl. ¶ 32.

48.    As another example, from at least 2010 to 2013, Shell Oil Company or its affiliates entered into billion-dollar contracts with the DOD's Defense Logistics Agency ("DLA") to supply specialized JP-5 and JP-8 military jet fuel.  *See* Dick Decl. Exs. 30–38.  The DOD's detailed specifications for the makeup of the military jet fuels require that they "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" with "military unique additives that are required by military weapon systems."  *See* Dick Decl. Ex. 39, at 5, 10, §§ 3.1, 6.1; *id.* Ex. 40, at 5, 11, §§ 3.1, 6.1.

49.    Similarly, BP entities have contracted with the DLA to supply a significant quantity of specialized military fuels over decades.  For example, BP entities contracted with the DLA to supply approximately 1.5 billion gallons of specialized military fuels for the DOD's use in the years 2016 to 2020 *alone*.  Dick Decl. Ex. 41, at 1, 6.  Since 2016, BP entities entered into approximately 25 contracts to supply various military-specific fuels, such as JP-5, JP-8, and F-76.

---

[24]  Dick Decl. Ex. 29 (CIA Doc. No. CIA-RDP63-00313A000500130031-9, Summary of OSA Activities for Week Ending 21 August 1963 (Aug. 23, 1963)).

DLA required that the fuels contain specialized additives, including fuel system icing inhibitor ("FSII"), corrosion inhibitor/lubricity improver ("CI/LI"), and, for F-76 fuels, lubricity improver additives ("LIA"). *See generally id.* Such additives are essential to support the high performance of the military engines they fuel.

50.     The DOD exerted significant control over the BP entities' actions in fulfilling these contracts, seeking to ensure that these unique fuels (1) ignite, but do not freeze, at low temperatures from high altitudes; (2) rapidly dissipate accumulated static charge so as not to produce sparks or fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating); (3) efficiently combust to allow for longer flights on less fuel; and (4) maintain the integrity of the fuel handling systems over a long period of time.[25]

51.     To meet its unique operational needs, the DOD required that the BP entities supply each fuel in accordance with highly specialized, DOD-mandated specifications. As one would expect when dealing with highly specialized military equipment, these fuel contracts are far more detailed and prescriptive than contracts for fuel intended for consumer-type vehicles. Like the contracts in *Arlington*, the contracts for these specialized fuels established "how [Defendants] must operate" and fixed "[p]ricing, . . . shipping, payment, and many other specifications." *Arlington*, 996 F.3d at 252.

52.     In particular, the contract specifications require express amounts of "military

---

[25] Dick Decl. Ex. 42 § 1.2.2 (MIL-HDBK-510A); *id.* Ex. 43, tbl. 1, 2–9 (Air Force Wight Aeronautical Lab., *Military Jet Fuels, 1944-1987*, AFWAL-TR-87-2062 (Dec. 1987)) [hereinafter "Air Force Lab, *Military Jet Fuels*"]; NREL, *Investigations of Byproduct Application to Jet Fuel*, NREL/SR-510-30611, at 4–6 (Oct. 2001), https://www.nrel.gov/docs/fy02osti/30611.pdf (last visited Jan. 2, 2025).

unique additives that are required by military weapon systems," such as SDA, FSII, and CI/LI.[26] "[T]his [additive] requirement is unique to military aircraft and engine designs,"[27] and each additive serves a vital role in allowing the DOD to fulfill its mission safely and efficiently.

53.     The DOD *required* the BP entities to use SDA, a conductivity improver additive, to dissipate static charge created during military jet distribution and refueling.  If the charge is not dissipated, refueling could result (and has resulted) in a spark or fire, especially when rapid refueling is necessary during combat with hot military engines.[28]

54.     The DOD *required* the BP entities to use FSII to depress the freezing point of military jet fuels supplied by BP.  FSII ensures that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high altitudes, which would result in slush or ice crystal formation, causing blockages of fuel filters, pumps, or lines and could ultimately cause engine flameout.[29]

55.     The DOD *required* the BP entities to use CI/LI to (1) improve lubricity, reducing

---

[26]   Dick Decl. Ex. 39, at 5, 7, 10 (DLA, *Detail Specifications, Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, AND JP-8+100, MIL-DTL-83133E* (April 1, 1999)). Several of the BP entities' DLA contracts to supply JP-8 required that the BP entities meet the specifications of MIL-DTL-83133J.  Dick Decl. Ex. 41, at 4; *id.* Ex. 44 (MIL-DTL-83133J specs).

[27]   *Id.* at 10.

[28]   Dick Decl. Ex. 42 § 1.4.1.2 (MIL-HDBK-510A); *id.* Ex. 43, at 1 (Air Force Wright Aeronautical Laboratories, *Effect of Corrosion Inhibitors on Conductivity of Avian Turbine Fuel*, ARWAL-TR-85-2076) ("The Air Force and Navy have reported numerous incidents in the [1980s] solely related to electrostatic discharge.").

[29]   Dick Decl. Ex. 45 (Dep't of Defense, FSII Specifications, MIL-DTL-85470B (June 1999)); *id.* Ex. 42 § 1.4.1.1; *id.* Ex. 43, at 30, 41–44) (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 46 (Department of Army Technical Manual, *Petroleum Handling Operations for Aviation Fuel*, TM 10-1107 at 6 (Feb. 1960)) ("The jet aircraft is subject to wider and more rapid changes of temperature. . . . Consequently, any water present may freeze before it can reach the sumps of jet aircraft.  When this happens, ice particles may clog the fuel screen and cause fuel starvation.").

friction and ensuring that the military engines do not seize during operation; and (2) prevent corrosion in military fuel-handling, transportation, and storage equipment, all of which is primarily constructed of uncoated steel.[30]

56.     In addition, the DOD specifications required the BP entities to conform the fuels they supplied to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and freezing point—specifications which are essential to performance of the military function.[31]  The specifications also required adherence to specific testing methods for the various additives and chemical and physical requirements in accordance with enumerated American Society for Testing and Materials ("ASTM") standards, such as ASTM D2624 for conductivity and ASTM D3241 for thermal stability.[32]

57.     The DOD retained and exerted control over the BP entities by requiring them to either repair or replace the products at no increase in contract price if the fuels did not conform to the exact specifications.

58.     The DOD's detailed specifications for the makeup of the military jet fuels—which, according to Plaintiff, are a contributing cause of climate change and Plaintiff's asserted harms— and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Defendants and the government in producing

---

[30]   Dick Decl. Ex. 47 (Dep't of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H); *id.* Ex. 42 § 1.4.1.3 (MIL-HDBK-510A); *id.* Ex. 43, at 28, 30, 38–39 (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 48 (MIL-PRF-32490 (LIA) specs).

[31]   Dick Decl. Ex. 39, at 6 (MIL-DTL-83133E); *id.* Ex. 43, at 17–35 (Air Force Lab, *Military Jet Fuels*) (describing the necessity for specific physical and chemical requirements in military jet fuels); *id.* Exs. 44, 49–52 (the JP-5 specs (MIL-DTL-5624W); the NATO-76 specs (MIL-DTL-16884N and -16884P); and Def Stan 091-91 (Jet A-1) Issue 9 specs).

[32]   Dick Decl. Ex. 39, at f76 (MIL-DTL-83133E); *see also id.* Ex. 53 (ASTM D1655-20 Jet A specs).

and distributing these fuels to the military.  *See Baker*, 962 F.3d at 943.  These specialized jet fuels are designed specifically to assist the military in fulfilling its unique and essential missions and thus fall into the category of specialized military products that support federal officer jurisdiction. *See id.*; *Arlington*, 996 F.3d at 252 (similar); *Winters*, 149 F.3d at 400.

### c. Defendants Acted Under Federal Officers By Constructing, Operating, And Managing Government Petroleum Production Facilities

59.    Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities.  During World War II, the government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction*."  Wilson Decl. ¶ 14 (emphasis added).  "The U.S. government enlisted oil companies to operate government-owned industrial equipment . . . to comply with urgent government orders."  *Id.* ¶ 15.  These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or of government-owned equipment within industrial facilities.  *Id.* ¶ 19.  Among the largest facilities was a refinery site in Richmond, California, operated by SoCal (a Chevron predecessor), which was "the second-largest of all the facilities focused on aviation gasoline production, providing 10 percent of total global output of aviation fuel" by 1945.  *Id.*  Several other Defendants or their predecessors operated similar production equipment and facilities for the government.  *Id.* ¶ 20.  In *Moore*, the First Circuit emphasized that courts "have consistently held that the 'acting under' requirement is satisfied where a federal contractor removes a case involving injuries arising from a product manufactured for the government."  25 F.4th at 34 n.3; *see also Arlington*, 996 F.3d at 251–52; *Genereux*, 577 F.3d at 357 n.9.

60.    Defendants built plants and manufactured war products for the Allied effort.  For

example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two-year period. The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . . Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a blending agent" to make "avgas." Dick Decl. Ex. 54, at 94; *see also* Wilson Decl. ¶ 23.

61. In addition, the government's need for highly specialized fuels, discussed *supra* Section IV.B.1.b., necessitated changes to Defendants' refining equipment and operations.[33] And the impacts of the government's particular fuel specifications on Defendants' operations were typically long-lasting.[34] For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998—roughly five decades later.[35]

62. The federal government entered into contracts with predecessors or affiliates of Defendants Chevron, Shell USA, Inc., and ExxonMobil to obtain "vast quantities of avgas."[36] These contracts provided federal officers with the power to direct the operations of Defendants. For example, the government's contract with Shell USA, Inc.'s affiliate specified that it "*shall* use

---

[33] *See* Dick Decl. Ex. 55, at 40 (W. J. Sweeney, Aircraft Fuels and Propellants, Report for the Army Air Force Scientific Advisory Group (1946)) ("The refiner cannot build the equipment for making the fuel without knowing what its composition must be to meet the needs of the engine.").

[34] Dick Decl. Ex. 56 (I. Waitz, S. Lukachko, & J. Lee, Military Aviation and the Environment: Historical Trends and Comparison to Civil Aviation, 42 J. of Aircraft 2 (2005)).

[35] *See* Dick Decl. Ex. 57 (Coordinating Research Council, Handbook of Aviation Fuel Properties, CRC Report No. 635 (2004)).

[36] Several prior decisions discuss these contracts and the power that the federal government held over Defendants to control production of oil and gas. *See, e.g.*, *Shell II*, 751 F.3d at 1286; *Exxon Mobil*, 2020 WL 5573048, at *31.

its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible and not later than August 1, 1943.*" *Shell Oil Co. v. United States*, No. 1:06-cv-00141-SGB (Fed. Cl. Nov. 20, 2012), ECF No. 106-1 at JA002, JA027 (emphases added). To maximize production of this critical product, the "Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts." *Shell II*, 751 F.3d at 1287 (internal citations omitted). At the direction of the federal government, the oil companies, which include certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war." *Id.*

63.     With respect to Exxon Mobil's affiliates, the government "exerted substantial control and direction over the refineries' actions, including decisions on how [and when] to use raw materials and labor." *Exxon Mobil*, 2020 WL 5573048, at *1, *8. Thus, "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry" and "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *11, *14.

## d.     Defendants Have Acted Under Federal Officers By Developing Mineral Resources On The Outer Continental Shelf For Decades

64.     Defendants also acted under federal officers by producing oil and gas pursuant to the federal mineral exploitation and production regime created by the Outer Continental Shelf Lands Act ("OCSLA"). Congress enacted OCSLA in 1953 to govern the "exploration, development, [and] production of minerals" in the OCS, which includes all submerged lands that belong to the United States but are not part of any State. 43 U.S.C. § 1349(b)(1); *see also* 43 U.S.C. §§ 1301, 1331. OCSLA provides for federal control over the OCS to ensure the

"expeditious and orderly development" of what Congress recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs." 43 U.S.C. § 1332(3). The initial regulations "went well beyond those that governed the average federally regulated entity at that time." Declaration of Professor Tyler Priest, Dick Decl. Ex. 58 ("Priest Decl.") ¶ 19. "An OCS lease was a contractual obligation on the part of lessees to ensure that all operations *'conform to sound conservation practice'* . . . and *effect the 'maximum economic recovery'* of the natural resources on the OCS." *Id.* (citing 19 Fed. Reg. 90 (May 8, 1954), 30 C.F.R. §§ 250.11, 2656) (emphases added). In fact, the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS." *Id.* ¶ 20. As in *Arlington*, Defendants "are required to comply with all of these contractual requirements along with the statutes, regulations and policy manuals governing" their operations. 996 F.3d at 252.

65. Federal officials in the Department of the Interior—whom the Code of Federal Regulations called "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS from the earliest OCS exploration. *See* Priest Decl. ¶ 19. Federal supervisors had complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 26, and had authority to suspend operations in certain situations, *id.* ¶ 20. The supervisors also "had the final say over methods of measuring production and computing royalties," which were based on "the estimated reasonable value of the product as determined by the supervisor." *Id.* (internal quotation marks omitted).[37] As Professor Priest explains, these federal officials "did

---

[37] The federal government uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes. *See* Dick Decl. Ex. 59 § 6(b) ("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*." (emphasis added)). A typical commercial private lease would never reserve similar unilateral authority to one contracting party to control a material term of the lease contract. *See* Dick Decl. Ex. 61 (Commercial Lease – Texas

not engage in perfunctory, run-of-the-mill permitting and inspection." *Id.* ¶ 22. Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. *Id.* ¶ 28.

66.     In addition, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders," which, among other things: "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conductor casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells"; and "required the installation of subsurface safety devices on all OCS wells." *Id.* ¶ 24 (citations omitted). Professor Priest observes that through these OCS Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety." *Id.* ¶ 25. These controls went far beyond typical regulations, as the federal government imposed requirements as the resource owner to achieve its economic and policy goals. *See, e.g.*, *id.* ¶¶ 28, 32.

67.     During the 1960s, U.S. domestic oil consumption increased 51%, compared to only 36% during the previous decade.[38] Demand continued to climb into the early 1970s, and domestic supply failed to keep pace, so the United States soon found itself facing a precarious shortage of oil. The United States increasingly turned to foreign countries, particularly in the Middle East, for oil. The amount of oil that the United States imported grew from 3.2 million barrels per day in 1970 to 6.2 million barrels per day in 1973.[39] By April 1973, President Nixon warned Congress

---

Association of Realtors, Form TAR-2101). This would be akin to a commercial rental lease providing that the landlord has sole discretion to specify the rent owed.

[38] Dick Decl. Ex. 62, at 17 (Jay Hakes, *A Declaration of Energy Independence* (2008)).

[39] Dick Decl. Ex. 63, at 591 (Yergin, *The Prize*).

of an impending energy crisis:

> As America has become more prosperous and more heavily industrialized, our demands for energy have soared. Today, with 6 per cent of the world's population, we consume almost a third of all the energy used in the world. Our energy demands have grown so rapidly that they now outstrip our available supplies, and at our present rate of growth, our energy needs a dozen years from now will be nearly double what they were in 1970. . . . If recent trends continue unchecked, we could face a genuine energy crisis. But that crisis can and should be averted, for we have the capacity and the resources to meet our energy needs if only we take the proper steps—and take them now.[40]

68.    To avert a national energy crisis, President Nixon ordered a dramatic increase in possible production on the OCS:

> Approximately half of the oil and gas resources in this country are located on public lands, primarily on the Outer Continental Shelf [OCS]. The speed at which we can increase our domestic energy production will depend in large measure on how rapidly these resources can be developed. I am therefore directing the Secretary of the Interior to take steps which would triple the annual acreage leased on the Outer Continental Shelf by 1979, beginning with expanded sales in 1974 in the Gulf of Mexico and including areas beyond 200 meters in depth under conditions consistent with my oceans policy statement of May, 1970.[41]

69.    Before the nation's precarious energy balance could stabilize, events abroad would exacerbate the crisis. The 1973 OPEC Oil Embargo "led to nationwide shortages of petroleum, a $60 billion drop in GNP, [and] more rapid inflation," among other harms.[42] The government called upon the oil and gas industry, including Defendants, to address this shortage. The nation's energy

---

[40]    Dick Decl. Ex. 64 (Excerpts From Nixon Message, N.Y. Times, Apr. 19, 1973, https://www.nytimes.com/1973/04/19/archives/excerpts-from-nixon-message-developing-our-domestic-energy.html (last visited Jan. 2, 2025)).

[41]    *Id.*

[42]    U.S. Dep't of Energy, National Energy Plan II, at 1 (1979), https://books.google.com/books?id=VR7PpPbRKFgC&printsec=frontcover#v=onepage&q&f=false (last visited Jan. 2, 2025).

woes continued to mount in the mid-to-late 1970s with a natural gas shortage caused by an abnormally cold winter in 1976 to 1977, a national coal strike in 1978, and a substantial reduction in crude oil supplies following the Iranian Revolution of 1979.[43] Yet the nation's dependency on imported oil continued to increase. By 1977, the United States was importing up to 8.8 million barrels per day—fully half of the nation's total domestic oil consumption.[44] The growing influence of OPEC, the quadrupling of oil prices during the energy crises of the 1970s, the staggering loss in GNP, and the now-infamous gas lines, price controls, and rationing that accompanied these energy crises spurred the U.S. government to take action over the ensuing decades to quickly and dramatically increase domestic oil production.

70. In 1973, President Nixon established the goal of energy independence for the U.S. by 1980. President Nixon dubbed this plan "Project Independence 1980" and, among other things, ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."[45] President Nixon explained:

> Let me conclude by restating our overall objective. It can be summed up in one word that best characterizes this Nation and its essential nature. That word is "independence." From its beginning 200 years ago, throughout its history, America has made great sacrifices of blood and also of treasure to achieve and maintain its independence. In the last third of this century, our independence will depend on maintaining and achieving self-sufficiency in energy. . . . What I have called Project Independence 1980 is a series of plans and goals set to [e]nsure that by the end of this decade, Americans will not have to rely on any source of energy

---

[43]  *Id.*

[44]  *Id.* at tbl. IV-1.

[45]  Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 17, 29 (Jan. 23, 1974), https://babel.hathitrust.org/cgi/pt?id=miua.4731948.1974.001&seq=57 (last visited Jan. 2, 2025).

beyond our own.[46]

71.     In 1978, Congress amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs created by the oil embargoes of the 1970s.  Congress's express purpose in amending the statute was to foster "expedited exploration and development of the OCS in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments."[47]  Congress expressly underscored the national public interest in "develop[ing] oil and natural gas resources in the [OCS] in a manner which is consistent with the need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible."  43 U.S.C. § 1802(2).

72.     During the debate over the 1978 amendments, Senator Fritz Hollings proposed that the federal government create a national oil company to develop the oil and gas resources located on the OCS: "My bill authorizes and directs the Secretary of the Interior to initiate a major program of offshore oil exploration—including deep drilling—in frontier areas of the [OCS]. . . .  The Federal Government can conduct this program by using the same drilling and exploration firms that are usually hired by oil companies.  The taxpayers of the United States—rather than the oil

---

[46]   Address to the Nation about National Energy Policy, 1 Pub. Papers 973, 976 (Nov. 25, 1973), https://babel.hathitrust.org/cgi/pt?id=miua.4731942.1973.001&seq=1027 (last visited Jan. 2, 2025).  After the Arab Oil Embargo, there was immense public pressure for Washington to "do something"—to return prices to what they had been before the embargo and, at the same time, ensure adequate domestic supplies.  Dick Decl. Ex. 63, at 660 (Yergin, *The Prize*).  *See also* Meg Jacobs, *America's Never-Ending Oil Consumption*, Atlantic (May 15, 2016), https://www.theatlantic.com/politics/archive/2016/05/american-oil-consumption/482532/ (last visited Jan. 2, 2025).

[47]   43 U.S.C. § 1802 (1) & (2); *see California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981); *see also* S. Rep. No. 93-1140, at 4937 (1974) ("During the next decade, development of conventional oil and gas from the United States Outer Continental Shelf can be expected (a) to provide the largest single source of increased domestic energy, (b) to supply this energy at a lower average cost to the U.S. economy than any alternative and (c) to supply it with substantially less harm to the environment than almost any other source.").

companies—would be the clients for these drilling companies, and the information received would pass directly into the public domain."[48]  The proposal to create a government agency to develop the OCS was ultimately rejected.  Instead, the government decided to contract with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government.  Dick Decl. Ex. 65; Priest Decl. ¶¶ 55–56.

73.     This was not the only proposal at the time to create a national oil company.  *See* Priest Decl. ¶¶ 52–53; Cong. Rec. H4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall); Dick Decl. Ex. 65.  Another proposal "would have formally established a 'Federal Oil and Gas Corporation'" that would be "'owned by the federal government' and 'in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands in sufficient quantities to mitigate such shortage and hardship.'"  Priest Decl. ¶ 53.  Yet another proposal, from Representatives Harris and McFall, "would provide for the establishment of a National Energy and Conservation Corporation—to be called Ampower—similar to the Tennessee Valley Authority."  121 Cong. Rec. H4490 (daily ed. Feb. 26, 1975).  Representative Harris explained: "The creation of a quasi-public corporation such as Ampower can and should perform these functions on public lands" to "[e]nsure that the public's oil and gas is developed in the public interest."  Dick Decl. Ex. 65, 9275–76.  These proposals were ultimately rejected in favor of an arrangement by which the government would contract with private companies, including Defendants—*acting as agents*—to achieve this federal objective with expanded federal supervision and control.  *See* Priest Decl. ¶ 55.

74.     It is significant that Congress considered creating a national oil corporation to develop the federally owned oil and gas resources located on the OCS, as many other countries

---

[48]   *See* Dick Decl. Ex. 66 (121 Cong. Rec. S903-11 (1975)).

seeking to exploit their domestic petroleum resources have done. Ultimately, Congress decided that the best and most efficient way to meet its enumerated national public policy goals and objectives was to contract with private energy companies, including many of the Defendants here, to produce federally owned oil and gas from these federal lands. The result was a closely supervised leasing program directed by the Department of the Interior and providing the federal government with control over the production sufficient to protect the national interests.[49] This program thus required private companies to "perform[] a job that, in the absence of a contract with a private firm, the Government itself would have had to perform," making removal appropriate. *Watson*, 551 U.S. at 154.

75.     One of the Federal Energy Administration's first undertakings in 1974 was to propose significantly expanding the OCS leasing program, because "[r]ecent world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products" and "[i]nterruptions in oil imports impose severe costs on the United States due to the pervasive economic role of petroleum in almost every sector of the economy."[50] This increased OCS leasing represented a crucial federal policy, because "the Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism to [e]nsure that the most favorable OCS exploration prospects become available for near-term development." *Id.*

76.     Around this time, it was necessary to spur production of oil and gas on the OCS because alternatives were not feasible. In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be

---

[49]   *See* Dick Decl. Ex. 66 (Cong. Rec. S903-11 (Jan. 27, 1975)).

[50]   Dick Decl. Ex. 67, at App'x 2 (H.R. Doc. No. 93-406 (1974)).

commercially practical for years to come" and thus "a healthy economy remains dependent on supplies of oil and gas."[51]  The Committee concluded that "[d]evelopment of our OCS resources will afford us needed time—as much as a generation—within which to develop alternative sources of energy."[52]

77.    The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national goals.[53]  The amendments instructed the Secretary of the Interior to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities "which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval."  43 U.S.C. § 1344(a)–(e).  Since 1978, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources.[54]

78.    In the 1990s, Congress amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at "reduc[ing] America's dependence on unreliable sources of imported oil by helping unlock an estimated 15 billion barrels of oil in the central and western Gulf of Mexico" for energy companies' exploration and production.  Press Secretary, White House Office of Communications, Statement on North Slope Oil Bill Signing, 1995 WL

---

[51]  Dick Decl. Ex. 68, at 254 (H.R. Rep. No. 94-1084 (1976)).

[52]  Dick Decl. Ex. 69, at 53 (H.R. Rep. No. 95-590 (1977)).

[53]  *See id.* (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").

[54]  *See, e.g.*, Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

699656, at *1 (Nov. 28, 1995). And in the 2000s, the Bush Administration opened approximately 8 million additional acres of OCS lands for leasing in the Gulf of Mexico, stating: "By developing these domestic resources in a way that protects the environment, we will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil."[55]

79.     As Professor Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies. They reflect the creation of a valuable national security asset for the United States over time."  Priest Decl. ¶ 7(1) (emphasis added).  The development of the OCS was a "political and policy-driven project to incorporate ocean space and the OCS into the nation's public lands and manage OCS resources in the long-term interest of U.S. energy security." *Id.*  The federal OCS program "procured the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own." *Id.*  The federal government "had no prior experience or expertise," and "[t]herefore . . . had little choice but to enlist the service of the oil firms who did." *Id.* ¶ 18.  But it was the federal government, not the oil companies, that "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" in order to advance federal interests in the production of these federally owned resources. *Id.* ¶ 7(2).  Accordingly, "[t]he policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling offshore." *Id.*  "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves" and "promot[e] the expansion of offshore oil and gas drilling, production, and transportation." *Id.*  The importance of the OCS to domestic energy security and economic prosperity has continued to the present, and

---

[55] The White House, *Fact Sheet: Tax Relief and Health Care Act of 2006* (Dec. 20, 2006), https://georgewbush-whitehouse.archives.gov/news/releases/2006/12/text/20061220.html (last visited Jan. 2, 2025).

across every administration. *See* Priest Decl. ¶ 79. For example, in 2010, President Obama announced "the expansion of offshore oil and gas exploration" because "our dependence on foreign oil threatens our economy." *Id.* ¶ 78.

80. The leases require Defendants to maximize the ultimate recovery of the hydrocarbons from the leased area; require that drilling take place in accordance with a government approved exploration plan, development and production plan, or development operations coordination document as well as approval conditions; and specify that the federal government retains the right to oversee the lessee's rate of production from its leases.[56] The U.S. Bureau of Ocean Energy Management ("BOEM") maintains oversight over the lessees as they operate on federal land. Prior to exploration, development, or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewers, or other agencies.[57] Indeed, for decades, Defendants' OCSLA leases have instructed that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."[58]

81. Under these requirements, OCS lessees are subject to exacting oversight by BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property.[59] At all stages—from exploration, to preparation for developing and

---

[56] *See generally* Dick Decl. Exs. 59, 71, 81, 82; Adam Vann, Congressional Research Service, RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (last visited Jan. 2, 2025) (describing the multistep process for approval of development plans and BOEM oversight procedures).

[57] *See* Offshore Oil and Gas Development: Legal Framework at 11–13.

[58] Dick Decl. Ex. 70 § 10 (emphasis added).

[59] *See, e.g.*, 30 C.F.R. §§ 250.101–115, 250.130–146, 250.168–295, 250.400–463 (BSEE) & 550.101–147 (BOEM).

producing oil and gas reserves that have been discovered, to actual drilling and production—OCS lessees must submit exhaustive operational plans demonstrating how they will comply with the complex and detailed technical requirements imposed by these agencies. The relevant agency must then find, complete, and approve these plans before any such work can begin. BSEE then carefully monitors compliance with the approved plan and must approve any significant modification thereof.

82.     The federal government retains the right to control a lessee's rate of production on the OCS from its lease.[60]  In particular, BSEE, within the Interior Department, may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir.[61]  This requirement has existed since 1974,[62] and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises."[63]

83.     Through these federal leases, the government retains supervision and control over the use of federal property. The mineral leasing laws, including OCSLA and the Mineral Leasing Act of 1920, 30 U.S.C. §181 *et seq.* ("MLA"), discussed below, are an exercise of Congress's power under the Property Clause of the Constitution, U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). The government issues onshore and offshore leases for a primary term of five to ten years, with a habendum clause under which the lessee

---

[60]   *See* Dick Decl. Ex. 70 § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law").

[61]   *See* 30 C.F.R. § 250.1159.

[62]   *See* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11).

[63]   75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities.  30 U.S.C. § 226(e) (onshore); 43 U.S.C. § 1337(b)(2) (OCS); Dick Decl. Ex. 59 § 3.

84.     The United States controls federal mineral lessees like Defendants in other ways, too.  An OCS lessee does not have an absolute right to develop and produce; rather, it has priority over other parties to seek approval from the United States to develop and produce under the lease.  *See Sec'y of the Interior v. California*, 464 U.S. 312, 337–39 (1984); *Vill. of False Pass v. Clark*, 733 F.2d 605, 614–16 (9th Cir. 1984).  The government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe."[64]  The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property.  The government reserves the right to purchase up to 16⅔% of lease production, less any royalty share taken in-kind.[65]  The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[66]

85.     Through federal leases, the government balances economic development with environmental considerations.  The Secretary of the Interior may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil

---

[64]  Dick Decl. Ex. 70 § 14; Dick Decl. Ex. 59 § 15(d); *see* 43 U.S.C. § 1341(b).

[65]  *See* 43 U.S.C. § 1353(a)(2).  The United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit.  *See* 43 U.S.C. § 1341(f).

[66]  *Id.*  In addition, the Secretary may compel a lessee to offer a percentage of lease production "to small or independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners).  Dick Decl. Ex. 59 § 15(c); *see* 43 U.S.C. § 1337(b)(7).

and gas.[67]  The Secretary may also suspend production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."[68]

86.     As these statutory and lease provisions demonstrate, a federal oil and gas lease is the means by which the federal government directs a lessee to develop federal minerals on the government's behalf.  Through these leases, the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.  Without these federal leases on federal lands, the federal government would itself have to undertake these activities.  Accordingly, this is the kind of "special relationship" that supports federal officer removal.  *Watson*, 551 U.S. at 157.

87.     Authorization of each five-year OCS leasing program is subject to environmental review under the National Environmental Policy Act, requiring the preparation of an Environmental Impact Statement ("EIS") to support the Record of Decision approving the scope of the program.  The EIS approving each five-year leasing program details the national need for oil and gas and how the leasing program meets those needs.[69]

88.     These environmental analyses confirm that the OCS leasing program exists to fulfill Congress's mandate to manage and encourage production of oil and natural gas from the OCS to further the national interest, not merely the commercial interests of the lessees.  In 2009, for

---

[67]  43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.").

[68]  43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons).

[69]  *See, e.g.*, 2012–2017 EIS.

example, oil produced from the OCS accounted for 30% of all domestic production.  The U.S. Treasury averages more than $10 billion per year from OCS bonuses, rental payments, and royalties.  In evaluating alternatives that could replace OCS leases or the required "no action" alternative (*i.e.*, no OCS leases), the 2012–2017 EIS concluded that such alternatives would not meet the federal government's purpose or needs because any reduction in production would be replaced mostly by foreign imports of oil and gas, frustrating congressional intent.[70]

89.      The Record of Decision approving the 2017–2022 OCS Leasing Programs recognizes that the Secretary of the Interior must develop schedules of OCS oil and gas leasing that "best meet national energy needs for the 5-year period following its approval or re-approval."[71] Although the federal government identified the no-lease alternative as the most environmentally preferred alternative, the government rejected it because it did "not meet the purpose and need for action . . . as it leaves a void in planning for national energy needs."[72]

90.      In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department reached nearly one billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production.[73]  The federal government has reaped enormous financial benefits from the ongoing policy decision to contract

---

[70]  *See id.* at 1–4, 4-606, 4-643 (projecting changes in oil markets if OCS production was halted).

[71]  43 U.S.C. § 1344(a)–(e).

[72]  U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program (Jan. 17, 2017), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-Record-of-Decision.pdf (last visited Jan. 2, 2025).

[73]  *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government. Moreover, the activities of lessees (including Defendants) pursuant to these leases further Congress's directives to the Executive Branch to facilitate and manage the production of oil and natural gas from the OCS to achieve the federal government's policy objectives. If not for these activities of lessees under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself.

91.     The federal government's control over oil and gas production is thus fundamentally different from situations in which a highly regulated private party "simply compl[ies] with the law" and is outside the scope of the federal officer removal statute. *Watson*, 551 U.S. at 152. Plaintiff's claims seek to punish Defendants for activities conducted under the close supervision of the federal government that effectuate national energy policy and support national defense. Plaintiff's claims thus implicate precisely the type of "special relationship" that supports federal officer removal. *Id.* at 157.

92.     In *Rhode Island*, the First Circuit rejected the defendants' OCS federal officer removal argument on the grounds that "there appear[ed] to be no 'close supervision' of this extraction or production of oil 'specially conformed to government use.'" 979 F.3d at 59 (quoting *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.), Inc.*, 965 F.3d 792, 822, 825 (10th Cir. 2020)). Here, however, the Chevron Parties have submitted substantial additional evidence not before the court in *Rhode Island* demonstrating precisely that this close supervision existed. *See also* Dick Decl. Ex. 60 (Notice of Removal ¶¶ 56–57, Dkt. 1, *Rhode Island v. Chevron Corp.*, No. 1:18-cv-00395 (D.R.I. July 13, 2018)). Most notably, the declaration from Professor Priest, which was not offered in *Rhode Island*, extensively details how OCS regulations "went well

beyond those that governed the average federally regulated entity at that time," granting to the federal government the power to "direct how oil and gas resources would be extracted and sold from the OCS." Priest Decl. ¶¶ 19, 20.

93.     The First Circuit also found that there was an inadequate "nexus" between the OCS leases and Rhode Island's claims because the contract did not relate to the production, distribution, and sale of "oil and gas products in Rhode Island." *Rhode Island*, 979 F.3d at 60. But, as discussed above, *supra* ¶¶ 1–6, 9–11, 16, Plaintiff's allegations here extend to the *global* production, distribution, and sale of fossil fuels, including in the OCS. The required "nexus" therefore exists. The federal government also exercises control over the distribution of oil, gas, and other materials extracted on the OCS, reserving the right to purchase a certain share of lease production and possessing the power to deliver reserved production across the federal government. *See* 43 U.S.C. § 1353(a)(2).

      **e.**      **Defendants Acted Under Federal Officers By Developing Mineral Resources On Federal Lands**

94.     Defendants also acted under the direction, supervision, and control of the federal government in developing mineral resources on federal lands onshore. The Interior Department's Bureau of Land Management ("BLM") leases, similar to OCS leases, provide that the United States "reserves the right to specify rates of development and production in the *public interest*."[74]

95.     Federal onshore leases, which include those held by Defendants, result in the production, sale, and disposition of substantial amounts of oil and gas. "Oil and gas produced from the Federal mineral estate are significant parts of the nation's energy mix. For fiscal year (FY) 2022, sales of oil, gas, and natural gas liquids produced from the Federal mineral estate

---

[74]   Dick Decl. Ex. 71 § 4 (emphasis added).

accounted for approximately 11 percent of all oil and 9 percent of all natural gas produced in the United States."[75]

96.     As BLM explains, "[o]nshore oil and gas lease operations are subject to . . . orders and instructions of the authorized officer."[76]  Both "[p]roduction *and* sales reports must be filed" with the Interior Department.[77]   The federal government maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property.  The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[78]

97.     For onshore leases, the Secretary of the Interior may take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States."[79]  BLM leases also provide that "Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly."[80]  In addition, the Secretary may compel a lessee to offer a percentage of lease production to "small refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers and refiners).[81]

---

[75]   Bureau of Land Mgmt., *About the BLM Oil and Gas Program*, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about (last visited Jan. 2, 2025).

[76]   Dick Decl. Ex. 72 (Bureau of Land Mgmt., Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development, ch. 5, at 37 (2007)).

[77]   *Id.* (emphasis added).

[78]   Dick Decl. Ex. 71 § 4.

[79]   30 U.S.C. § 192.

[80]   Dick Decl. Ex. 71 § 10.

[81]   43 U.S.C. § 1353(b).

98.     As with OCS leases, the federal government also reserves the authority in BLM leases to determine the value of production for purposes of determining how much royalty a lessee owes.[82]  A typical commercial private lease would never reserve similar unilateral authority to one contracting party to control a material economic term of the lease contract.  *See* Dick Decl. Ex. 61 (Commercial Lease – Texas Association of Realtors, Form TAR-2101).  As noted, this would be akin to a commercial lease providing that the landlord has sole discretion to specify the rent owed.

99.     Through federal leases, the government balances economic development with environmental considerations.  The Secretary of the Interior may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.[83]  The Secretary may also direct or grant suspensions of operations.[84]  BLM onshore leases also require the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.[85]

100.    The MLA limits the onshore federal oil and gas lease acreage that may be held by any one person, enforceable by an action in federal court.  30 U.S.C. § 184(d), (h).  The government has the right to obtain "prompt access" to facilities and records.  30 U.S.C. § 1713.  And the United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit.  *See* 30 U.S.C. § 181.

101.    As discussed with respect to OCS leases, *supra* Section IV.B.1.d., a federal oil and gas lease is a contract to develop federal minerals on the government's behalf, and the government

---

[82]  *See* Dick Decl. Ex. 71 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products . . . .").

[83]  43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (MLA leases).

[84]  *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[85]  Dick Decl. Ex. 71 § 6.

retains extensive supervision and control over the lessees. These are activities that the federal government would itself have to undertake without Defendants' assistance and thus removal is proper. *Watson*, 551 U.S. at 157.

### f. Defendants Acted Under Federal Officers By Supplying And Managing The Strategic Petroleum Reserve

102. In response to the oil embargoes of the 1970s, Congress created the Strategic Petroleum Reserve ("SPR") in the Energy Policy Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871, to protect the country's energy security. The SPR is a "stockpile of government-owned petroleum managed by the DOE [created] as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[86] Several Defendants "acted under" federal officers in producing and distributing oil for the SPR and managing it for the federal government.

103. The Act "declar[ed] it to be U.S. policy to store up to 1 billion barrels of petroleum products, provid[ed] for an early reserve, to contain at least 150 million barrels by December 1[9]78, and for an eventual storage system of at least 500 million barrels by December 1982. It [was] estimated that a 500 million barrel reserve, combined with conservation measures, [could] essentially replace lost imports, for a period of 6 months for the most likely interruptions." Dick Decl. Ex. 73 (Statement of Hon. John F. O'Leary, Administrator, Federal Energy Administration, Hearing before the Committee on Interior and Insular Affairs, U.S. Senate, on FEA's Strategic Petroleum Reserve Plan, at 30 (Feb. 4, 1977)).

104. Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United States under

---

[86] *See* H.R. Rep. No. 115-965, at 3 (2018), https://www.congress.gov/115/crpt/hrpt965/CRPT-115hrpt965.pdf (last visited Jan. 2, 2025).

any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas." For example, after the September 11, 2001 attacks, President George W. Bush ordered that the SPR, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the DOE and the Department of the Interior."[87] From 1999 through December 2009, the U.S. government's "primary means of acquiring oil for the [SPR]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[88] During that time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.[89]

105. The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations.[90] The federal government also contracted with some of the Defendants (including their predecessors, subsidiaries, or affiliates) to deliver to the SPR millions of barrels of oil under the RIK program.[91] The government also contracted with those Defendants

---

[87] Statement on the Strategic Petroleum Reserve, 2 Pub. Papers 1406 (Nov. 13, 2001), https://www.govinfo.gov/content/pkg/PPP-2001-book2/pdf/PPP-2001-book2.pdf (last visited Jan. 2, 2025).

[88] U.S. Dep't of Energy, *Filling the Strategic Petroleum Reserve*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited Jan. 2, 2025).

[89] Dick Decl. Ex. 74 (U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report for Calendar Year 2010, at 18, 37 (2011) ("SPR 2010 Report")); *see id.* at 39 (Table 13).

[90] *See, e.g.*, Dick Decl. Ex. 75 (Dear Operator Letter) (invoking OCSLA and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").

[91] *See, e.g.*, Dick Decl. Ex. 76 (U.S. Dep't of Interior, Minerals Management Service, *MMS RIK*

to assist in the physical delivery of these RIK payments to the Strategic Petroleum Reserve. *See, e.g.*, Dick Decl. Ex. 77, at 19.

106.    Finally, some of the Defendants acted under federal officers by operating the SPR infrastructure for the government.  For example, from 1997 to 2019, DOE leased to Defendant Shell USA, Inc. affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana.  "Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a drawdown."[92]  Starting January 2020, the DOE leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company).[93]  Similarly, "[u]nder the lease agreement, Exxon Mobil [Pipeline Company] . . . *must support the SPR as a sales and distribution point in the event of an SPR drawdown*."[94]  And the DOE has leased to the same ExxonMobil

---

*Program to Help Fill Strategic Petroleum Reserve* (May 31, 2007)) (describing such contracts "to transport Royalty in Kind (RIK) crude oil that will be used to resume filling the nation's Strategic Petroleum Reserve (SPR)"); Minority Staff of the Permanent Subcomm. on Investigations of the Comm. on Governmental Affairs, S. Prt. 108-18, U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Cost to Consumers But Not Overall U.S. Energy Security (1st Sess. 2003) (describing government contract with a predecessor affiliate of Shell Oil Company to deliver nearly 19 million barrels of oil to the Strategic Petroleum Reserve as part of the RIK program), https://www.govinfo.gov/content/pkg/CPRT-108SPRT85551/html/CPRT-108SPRT85551.htm (last visited Jan. 2, 2025).

[92]  *See* SPR 2010 Report at 16.

[93]  *See* U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil.

[94]  U.S. Dep't of Energy, *Strategic Petroleum Reserve Annual Report for Calendar Year 2018*, at 15 (Jan. 2020) (emphasis added) https://www.energy.gov/sites/prod/files/2020/01/f70/2018%20SPR%20Report%20to%20Congress.pdf.

affiliate two government-owned pipelines that are part of the SPR near Freeport, Texas.[95]

107.     The SPR subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[96]  The United States has exercised this control, including as a result of President Bush's Executive Order to draw down the reserve in response to Hurricane Katrina in 2005, President Obama's Executive Order to draw down the reserve in response to disruptions to oil supply in Libya in 2011, and President Biden's authorization to draw down the reserve in response to the war on Ukraine.[97]  Thus, the hundreds of millions of barrels of oil distributed by Defendants from these facilities—the sale and combustion of which are part of the alleged causal chain leading to Plaintiff's alleged injuries— were distributed subject to federal government direction, control, and supervision.[98]

> **g.**     **Defendants Acted Under Federal Officers By Constructing Pipelines For Oil Transportation**

108.     Defendants also acted under the federal government as agents in constructing and operating pipelines to transport and distribute oil for national defense purposes.  "An important way in which the U.S. government exerted control over industry in World War II was by paying

---

[95]  *See* Dick Decl. Ex. 74 (SPR 2010 Report), at 25, 49; U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[96]  *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program.").

[97]  *See* Dick Decl. Ex. 78, U.S. Dep't of Energy, *History of SPR Releases*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited Jan. 2, 2025); *see also* Dick Decl. Ex. 85 (U.S. Dep't of Energy, *Strategic Petroleum Reserve Annual Report for Calendar Year 2022*, at 9, 30–32 (Oct. 2023)); Dick Decl. Ex. 79, at 17, 18, 21.

[98]  *See generally* U.S. Dep't of Energy, *2018-2022 Strategic Vision*, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf (last visited Jan. 2, 2025).

for production, refining, and transportation facilities that the government itself continued to own," including these pipelines. Wilson Decl. ¶ 13.

109. During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by German submarines."[99] "To [e]nsure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines"). *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). War Emergency Pipelines, Inc. ("WEP"), "a Delaware corporation created by eleven of the major oil companies," including predecessors or affiliates of Defendants,[100] constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government. *WEP II*, 175 F.2d at 335; *Schmitt v. War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 158 (E.D. Ark. 1947) ("*WEP I*").[101]

110. Federal officers exerted operational control over the Inch Lines and Defendants' affiliates. WEP operated wholly on capital from the government, and "received no fee or profit." *WEP II*, 175 F.2d at 336; *see also, e.g.*, *WEP I*, 72 F. Supp. at 158. The government also required

---

[99] Dick Decl. Ex. 80, at 3 (National Park Service, Historic American Engineering Record No. TX-76, War Emergency Pipeline (Inch Lines) Inch Lines Historic District (1968)).

[100] The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony-Vacuum Oil Company, Inc., and Tidal Pipe Line Company. Several of these companies are predecessors or affiliates of current Defendants. *See* Dick Decl. Ex. 81 (Certificate of Dissolution of War Emergency Pipelines, Inc. 1–2 (Aug. 28, 1947)); *id.* Ex. 6, at 108 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War: 1941–1945* (1946)).

[101] These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *WEP I*, 72 F. Supp. at 157.

approval and set the salaries of all personnel that WEP employed. *See WEP II*, 175 F.2d at 336.

> After completion of the pipe lines, [WEP], in the name of, and acting as agent for [the government], purchased petroleum or petroleum products at the origins of the respective pipe lines, at OPA prices, and as such agent delivered and sold the through-put at the respective termini. The sales price was cost plus a sum specified by Defense Supplies Corporation. The Petroleum Administration for War issued directives to . . . [WEP], which, among other things, designated from whom products should be purchased and to whom they should be sold.

*WEP I*, 72 F. Supp. at 158.

111. Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines, respectively, and exerted substantial control over WEP, and thus Defendants. The government required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines.[102] The government had power to "direct such affirmative action as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages" and "augmenting supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to Atlantic ports" that were "los[t] through enemy action." *Id.* The goal was to ensure "maximum operating capacity for the prosecution of the war and most effective utilization of petroleum." *See* Dick Decl. Ex. 82, at 25–26 (Statement of W. Alton Jones, Chairman, Committee on Postwar Disposal of Pipe Lines, Refineries, and Tankers, Hearings before the Special Committee Investigating Petroleum Resources (Nov. 15, 1945)) ("Under wartime operation, the oil business operated under directives of the Petroleum Administration for War. . . . [Oil companies] w[ere] ordered to divert oil and deliver at the receiving terminals of the big lines sometimes by expensive means to keep these

---

[102] Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068–69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

lines running to capacity, and that was done in the interest of the war effort because we needed every barrel of oil we could deliver to the East.").

112.    The government controlled all oil WEP moved through the pipelines on its behalf.[103]    During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels of crude oil and refined products" and serving "military necessity" for "the cross-Atlantic fronts."[104]    The Inch Lines "*were built for a single purpose, to meet a great war emergency*. . . . [T]hey helped to win a war that would have taken much longer to win without them."  Dick Decl. Ex. 4, at 17 (emphasis added).   "In a war dependent on oil products for its success, the distribution of those products to consumers could not be left to chance or to the operation of the ordinary competitive forces."  *Id.*  Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities. *Watson*, 551 U.S. at 154.[105]

---

[103]  8 Fed. Reg. at 1069, 1555.1 § (e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § (d)(3) (same).

[104]  Dick Decl. Ex. 6, at 104–05, 108.

[105]  The federal government has taken a number of other actions to promote the domestic production of oil and gas to protect important state interests.   These include the Energy Petroleum Allocation Act of 1973, Pub L. No. 93-159, 87 Stat. 627 (1973) and the Federal Energy Administration ("FEA") Act of 1974, Pub. L. No. 93-275, 88 Stat. 96 (1974).   The FEA congressional report published stated, "Prospects for large, new discoveries of onshore oil and gas deposits in the lower 48 States are small.   For this reason, it is proposed that leasing of the Federal OCS be accelerated, to include frontier areas of Alaska, the Atlantic and Pacific coasts, and the Gulf of Mexico."  Dick Decl. Ex. 67, at 1012 (H.R. Doc. No. 93-406).   The report further noted that "there would be strategic foreign policy and national security advantages in having energy sources which are not susceptible to interruption by a foreign power."  *Id.*   More recent administrations have continued to promote the development of oil and gas on the OCS.   For example, the Energy Policy Act of 2005 sought, among other things, "to promote oil and natural gas production from the [OCS] and onshore Federal lands under lease by providing royalty incentives to use enhanced recovery techniques."  Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

### h. Defendants Acted Under Federal Officers Pursuant To The Emergency Petroleum Allocation Act

113.    In response to the oil embargoes of the 1970s, Congress also passed the Emergency Petroleum Allocation Act of 1973, Pub. L. No. 93-159, 87 Stat. 637 (1973), in order to manage resulting shortages and "distribute [petroleum products] fairly across the total spectrum of petroleum use in this country." *Oversight—Mandatory Petroleum Allocation Programs: Hearings Before the S. Comm. on Interior and Insular Affs.*, 93rd Cong., 25 (1974) (Statement of John C. Sawhill, Deputy Administrator, Federal Energy Office) ("Mandatory Allocation Hearings"). Pursuant to the Act, from 1974 to 1981, the federal government implemented an "omnibus mandatory allocation program covering every facet of the petroleum industry and affecting, if not dictating, virtually every domestic transaction involving crude oil and covered petroleum products." *Emergency Petroleum Allocation Act Extension: Hearing on H.R. 15905, H.R. 151000, H.R. 15491, H.R. 16116, H.R. 16303, H.R. 16757, and S. 3717 (and all identical bills) Before the Subcomm. on Communications and Power of the H. Comm. on Interstate and Foreign Commerce*, 93d Cong. 8 (1974) (Statement of Hon. John C. Sawhill, Deputy Administrator, Federal Energy Office).  This program required that Defendants distribute available gasoline supplies to wholesale purchasers (largely service stations) on a pro rata basis.  *See* Mandatory Allocation Hearings at 37. Further, the program mandated that Defendants regularly report to the federal government on their crude oil supplies and refining activities; where a Defendant's crude oil supplies exceeded a certain benchmark, it was forced to sell to others who fell below that benchmark.  *See id.* at 41.  Congress deemed the allocation system, and the oil companies' participation in it, necessary due to "shortages of crude oil" that constituted "a national energy crisis which is a threat to the public health, safety, and welfare" requiring "prompt action by the Executive branch."  Pub. L. No. 93-159, sec. 2(a)(1) & (3), 87 Stat. 628.

## 2. Defendants' Activities Are Related To Plaintiff's Claims

114. Plaintiff's claims also satisfy the "for or relating to" prong of federal officer removal. As the First Circuit has explained, this prong applies when the plaintiff's "suit" is "'for or relating to'" Defendants' "'acts under color of [federal] office.'" *Moore*, 25 F.4th at 35 (alteration in original) (quoting 28 U.S.C. § 1442(a)(1)). "Any single claim is independently sufficient to satisfy the 'for or relating to' requirement under § 1442(a)(1)." *Id.* Critically, "[c]ircuits have consistently given this requirement a broad reading and held that no causal link is required." *Id.* This "'broad'" language thus encompasses claims "in 'association with or connection with'" acts under federal office. *Id.* at 35 n.4 (quoting *Morales*, 504 U.S. at 383–84); *see also Express Scripts*, 119 F.4th at 186 ("'Relating to,' as it is used in § 1442(a)(1), means 'in association with or connection with.'" (cleaned up)); *Baker*, 962 F.3d at 943 (explaining that to meet this prong, there need only be a "connect[ion] or associat[ion] with acts under color of federal officer"); *Latiolais*, 951 F.3d at 292; *Def. Ass'n of Phila.*, 790 F.3d at 471; *New Hampshire v. 3M Co.*, 665 F. Supp. 3d 215, 227 (D.N.H. 2023).

115. In line with other circuits, the First Circuit has affirmed that Congress has abandoned the former, and "far narrower," requirement of a "causal link" between the actions that the defendants were asked to do by the federal government and the acts for which the defendants were being sued. *Moore*, 25 F.4th at 34. The Removal Clarification Act of 2011 altered this standard by inserting the words "or relating to" into the statute, which intentionally "broaden[ed] the universe of acts that enable Federal officers to remove [suits] to Federal court." *Express Scripts*, 119 F.4th at 186 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425). Thus, since the Removal Clarification Act, any requirement of a causal link is "erroneous[]"; "[t]he First Circuit nexus standard is not a causal requirement and is not to be understood as anything more than a 'related to' nexus." *Moore*, 25 F.4th at 35; *see also, e.g.*, *Latiolais*, 951 F.3d at 292–96;

*Sawyer*, 860 F.3d at 258; *Baker*, 962 F.3d at 944; *Def. Ass'n of Phila.*, 790 F.3d at 467.

116.     Even before the Removal Clarification Act, the Supreme Court had "never utilized a rigid causation standard for removal," and a removing party was required only to "'demonstrate that the acts for which they [we]re being sued' occurred at least in part '*because of* what they were asked to do by the Government.'"  *Baker*, 962 F.3d at 943–44 (quoting *Def. Ass'n of Phila.*, 790 F.3d at 471).  "'[T]he statute [did] not require that the [lawsuit] must be for the very acts which the [defendant] admits to have been done . . . under federal authority.  It is enough that [the] acts . . . constitute the basis . . . of the state [lawsuit].'"  *Baker*, 962 F.3d at 944 (quoting *Maryland v. Soper*, 270 U.S. 9, 33 (1926)).  The Removal Clarification Act then "'broadened federal officer removal to actions . . . *connected* or *associated*[] with acts under color of federal office.'"  *Baker*, 962 F.3d at 943 (quoting *Latiolais*, 951 F.3d at 292).

117.     In light of this standard, the federal officer removal statute "does not 'demand[] a showing of a specific government direction'" for the defendants' alleged conduct, "which goes well beyond the 'relating to' requirement."  *Moore*, 25 F.4th at 36 (quoting *Sawyer*, 860 F.3d at 258).  Other circuits have affirmed that it is not necessary "that the complained-of conduct *itself* was at the behest of a federal agency."  *Baker*, 962 F.3d at 944; *see also Def. Ass'n of Phila.*, 790 F.3d at 470 (same).  The plaintiff's "suit" must simply be connected or associated with acts under color of federal office.  *Moore*, 25 F.4th at 35.  It is "sufficient" if the plaintiff's "allegations are directed at the relationship between the [defendants] and the federal government," for at least *some* of the time frame relevant to the plaintiff's claims.  *Baker*, 962 F.3d at 944–45; *accord Def. Ass'n of Phila.*, 790 F.3d at 470–71; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016).  And in performing this analysis, the Court "must 'credit'" Defendants' "'theory of the case.'"  *Express Scripts*, 119 F.4th at 184 (quoting *Acker*, 527 U.S. at 432).

118. In *Moore*, the plaintiff brought failure-to-warn and other state tort claims in Connecticut state court against a Naval contractor, alleging that he had been exposed to asbestos while working at a shipyard operated by the contractor. 25 F.4th at 32–33. The First Circuit affirmed the contractor's removal of the case to federal court, reversing the district court and finding that it had committed "clear error" in applying the pre-2011 "causal link" requirement. *Id.* at 33–34. Given that the Navy "oversaw" the design and construction of the submarine on which plaintiff had been working in the shipyard, the plaintiff's claims "clearly 'relate[d] to'" the contractor's work acting under the Navy. *Id.* at 35–36. Importantly, the First Circuit rejected the district court's conclusion that, for the contractor to invoke federal officer removal, it was necessary for the Navy to have "prohibited [the] workplace warnings" the plaintiff alleged were required, holding that "§ 1442(a)(1) does not 'demand[] a showing of a specific government direction,' which goes well beyond the 'relating to' requirement." *Id.* at 33, 36 (quoting *Sawyer*, 860 F.3d at 258).

119. *Baker* is also illustrative. There, the Seventh Circuit held that removal under the federal officer removal statute was proper where certain chemicals underlying plaintiff's purported pollution-based harms had, at times, been in materials that were "critical wartime commodities" subject to "price control[s]," detailed federal oversight, and mandatory orders "setting aside" a portion of the defendants' products for the government's own use. *Baker*, 962 F.3d at 940–41, 945.[106] The defendants did not need to show that federal officers directed the alleged pollution itself, or even the defendants' storage and waste disposal practices; rather, it was "enough for the

---

[106] *See also Williams v. Todd Shipyards Corp.*, 154 F.3d 416, 1998 WL 526612, at *1, *6 (5th Cir. 1998) (per curiam) (federal officer removal was proper even under causal standard, where the plaintiff was exposed to asbestos while working for the defendant, even though the defendant "did both commercial work for private parties" and worked under government contract on ships owned or operated by the federal government).

present purposes of removal that *at least some* of the pollution arose from the federal acts." *Id.* at 945 (emphasis added). To the extent there were "questions" about whether the alleged pollution flowed from defendants' activities under federal direction, "those are *merits questions* that a federal court should decide." *Id.* at 944. *See also, e.g.*, *Def. Ass'n of Phila.*, 790 F.3d at 471–72 ("for or relating to" element satisfied because conduct "related to" acts done under federal supervision, even though no specific conduct at issue in the suit was directed by the government).

120. Similarly, in *Papp*, the "for or relating to" element was satisfied in a failure-to-warn lawsuit where the defendant established a "connection" between manufacturing aircraft for the federal government and the plaintiffs' alleged asbestos exposure, even though the government had not directly prohibited the defendants from issuing asbestos-related warnings. 842 F.3d at 813.

121. More recently, in *Arlington*, the Fourth Circuit held that nuisance claims premised on defendants' distribution of opioids were sufficiently "related to" defendants' federally directed distribution of opioids, even though the plaintiffs' allegations did not reference any federal distribution, which was merely a subset of the distribution at issue. 996 F.3d at 256–57.

122. Here, numerous federal activities are encompassed in Plaintiff's Complaint and relate to Plaintiff's causes of action, especially when construed "in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Phila.*, 790 F.3d at 466, and giving Defendants the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 945.

123. Plaintiff alleges that Defendants' global production, extraction, distribution, and sale of oil and gas products—which necessarily includes production, extraction, distribution, and sale under the direction, supervision, and control of federal officers described above—led to the combustion of these oil and gas products, which led to the release of greenhouse gases by end users, also including the federal government. *See, e.g.*, Compl. ¶¶ 6–9, 15, 43–54. Critically, the

oil and gas upon which Plaintiff bases its claims includes the *very same* oil and gas that Defendants extracted, produced, and distributed under the direction, supervision, and control of the federal government. Moreover, the federal government directed, supervised, and controlled Defendants' production, sale, and distribution of oil and gas products to help it accomplish critical domestic and foreign policy objectives.

124. Accordingly, Plaintiff seeks to hold Defendants liable for the activities Defendants performed in the implementation of federal policy initiatives under federal direction, supervision, and control of federal officers. Their claims "necessarily include[] activity that is directly connected to . . . DOD contract[s]." *Arlington*, 996 F.3d at 257. Such a close association is more than enough to satisfy the nexus element of the federal officer removal statute, which requires only that the "suit" be related to "acts under color of [federal] office." *Moore*, 25 F.4th at 35; *see also Express Scripts*, 119 F.4th at 186; *Baker*, 962 F.3d at 943; *Latiolais*, 951 F.3d at 292; *Def. Ass'n of Phila.*, 790 F.3d at 474. At minimum—under Defendants' theory of the case and the allegations contained in this Notice of Removal, which the Court must credit in assessing whether the nexus element is satisfied, *Acker*, 527 U.S. at 432; *Express Scripts*, 119 F.4th at 184—a clear connection or association exists between Defendants "acting under" federal officers by extracting and producing oil and gas pursuant to federal contracts and specifications and Plaintiff's attempt to impose liability on Defendants for that very same conduct. *See also Leite*, 759 F.3d at 1124 ("In assessing whether a causal nexus exists, we credit the defendant's theory of the case.").

125. Plaintiff's allegations regarding Defendants' alleged misrepresentations and "deception" do not preclude removability. Plaintiff's claims, as pleaded, depend on the theory that Defendants' alleged misrepresentations resulted in the increased global production, distribution, sale, and use of oil and gas products, thereby producing increased global emissions that allegedly

combined with other emissions and exacerbated climate change and thus caused Plaintiff's alleged injuries. *See, e.g.*, Compl. ¶¶ 6–9, 15, 43–54. Because Defendants have acted under the direction, supervision, and control of federal officers in producing oil and gas for decades, Plaintiff's "suit" is "relat[ed] to" Defendants' "'act[s] under color of [federal] office.'" *Moore*, 25 F.4th at 35 (quoting 28 U.S.C. § 1442(a)(1)) (some alterations in original). And, as *Express Scripts* made clear, the Court must adhere to *Defendants'* "theory of the case." 119 F.4th at 184.

126. As noted, Plaintiff's "suit" need only be "related" to Defendants' "acts under color of federal office," a standard which encompasses claims "in association with or connection with" acts under federal office, and "does not demand a showing of a specific government direction." *Moore*, 25 F.4th at 35 & n.4, 36 (cleaned up); *see also Express Scripts*, 119 F.4th at 186. Insofar as First Circuit precedent requires that the plaintiff's suit relate to activities "mandate[d]" by a defendant's relationship with the government, *Rhode Island*, 979 F.3d at 60, such a requirement is easily satisfied in this case. As discussed at length above, the federal government has mandated, and continues to mandate, that Defendants produce, distribute, and sell oil and gas products in numerous ways. And Plaintiff's claims are premised upon the global production, distribution, and sale of oil and gas—including by Defendants in these contexts—which, Plaintiff alleges, led to global emissions and global climate change, which ultimately caused its harm. *See, e.g.*, Compl. ¶¶ 6–9, 15, 43–54.

127. Plaintiff's attempt to disclaim "relief with respect to any federal property, land or assets," and "injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government" likewise cannot defeat removal, because the emissions from oil and gas products and activities directed by the federal

government are inextricable from any and all other emissions. Compl. ¶¶ 17, 18.[107] Courts consistently reject attempts to frustrate federal removal with disclaimers where, as here, Defendants' federal officer defenses are still applicable to one or more of Plaintiff's claims, and emissions from Defendants' activities performed under federal control are indivisible from other emissions.

128. *Express Scripts* makes clear why Plaintiff's purported disclaimer is ineffective. In *Express Scripts*, the Commonwealth of Puerto Rico alleged that defendants "schemed to unlawfully inflate insulin prices through rebate negotiations and price setting" and purported to evade federal jurisdiction by disclaiming any "relief relating to any federal program." 119 F.4th at 179, 181. But as defendants showed, their challenged conduct—the negotiations over rebates and prices for insulin—"simultaneously" affected both insurance carriers serving government employees through a federal program and other carriers serving private parties. *Id.* at 183, 192. The conduct was thus "indivisible"; it was impossible "to divide" a defendant's negotiations between "federal and non-federal work to enforce the disclaimer." *Id.* at 192, 194. The First Circuit held that this "indivisibility" was "an important facet of [defendant's] 'theory of the case' that must be 'credited' in evaluating removal." *Id.* at 189. And, in doing so, the court noted that "the disclaimer did not foreclose [the defendant's] arguments that it acted under a federal officer and possess[ed] colorable federal defenses." *Id.* at 194.

129. Here, Plaintiff seeks damages for harms allegedly caused by global greenhouse gas emissions resulting from the global production and distribution of oil and gas, which create greenhouse gas emissions when combusted by end users, including the U.S. government and

---

[107] Plaintiff's purported disclaimer also does not address the numerous other grounds for federal officer removal detailed above that do not relate to damages arising on federal property or assets or from the supply of specialized, noncommercial fossil fuel products.

military.  *See* Compl. ¶¶ 6–9, 15, 43–54.  And, because greenhouse gases "'become well mixed in the atmosphere'" once emitted, and cannot be traced to any particular source, the emissions from government and military users are indistinguishable from and cumulative with all other emissions. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) ("*AEP*") (quoting 74 Fed. Reg. 66514, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act (Dec. 15, 2009)); *see also City of New York v. Chevron Corp.*, 993 F.3d 81, 92 (2d Cir. 2021) (same).  Accordingly, crediting Defendants' theory of the case and under Plaintiff's own allegations, Plaintiff has no basis on which to attempt to carve out fuel extraction and production on federal lands conducted at the direction of the federal government, or anywhere else for that matter.

130.  Similarly, in *Baker*, the plaintiffs attempted to assert that their action did not pertain to manufacturing activities by one defendant that acted under federal direction in an obvious attempt to evade federal officer removal.  *See* 962 F.3d at 945 n.3.  The Seventh Circuit decisively rejected this gambit, holding that, when the plaintiffs allege that certain manufacturing "waste streams" "harmed them," they cannot "have it both ways" by "purport[ing] to disclaim" that their lawsuit challenged a defendant's similar actions "for the government." *Id.*  Plaintiffs' attempted disclaimer was "just another example of a difficult causation question that a federal court should be the one to resolve." *Id.*  Likewise, here, greenhouse gas emissions attributable to Defendants' production of oil and gas under the direction of the federal government have precisely the same alleged impact on Plaintiff as do emissions from any other source.  *See, e.g.*, Compl. ¶¶ 44–54; *AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted 'become well mixed in the atmosphere'; emissions in New Jersey may contribute no more to flooding in New York than emissions in China." (citation omitted)); *see also, e.g.*, *Rhodes v. MCIC, Inc.*, 210 F. Supp. 3d 778, 786 (D. Md.

2016) (in failure-to-warn suit with attempted disclaimer, holding that "[plaintiffs] have cited no authority that allows such [disclaimer] language to bar the assertion of the federal officer defense where it is otherwise applicable," and plaintiffs were "clearly keeping in play a claim against Defendants who could legitimately assert the federal officer defense"); *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *1 n.2, *4 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective where the plaintiff waived claims for exposure committed at the direction of a federal officer but nonetheless sought relief for exposure aboard Navy vessels).

131.    In a subsequent case that *Express Scripts* cited, the Seventh Circuit affirmed remand *only* after the plaintiff "clearly and unequivocally conceded" that it would not seek relief even for *mixed* contamination—*i.e.*, contamination from a combination of governmental and private sources. *Illinois ex rel. Raoul v. 3M Co.*, 111 F.4th 846, 849 (7th Cir. 2024) ("If even a morsel of contamination" comes from a government source, plaintiff's "recovery is barred"). Here, Plaintiff does not—and cannot—disclaim such relief, as doing so would eviscerate all of its claims.

### 3.    Defendants Have Colorable Federal Defenses

132.    Defendants satisfy the third prong, which requires them to show that they have "colorable federal defenses." The First Circuit has emphasized that "a 'colorable federal defense' need not be 'clearly sustainable.'" *Moore*, 25 F.4th at 37 (quoting *Willingham*, 395 U.S. at 407). "Rather, a federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Id.* (quoting *Latiolais*, 951 F.3d at 297). If a defendant makes "at least a colorable showing," further argument as to the success of the defense "speaks to the merits of the defense but does not undermine the colorability of the . . . defense." *Id.*; *see also Express Scripts*, 119 F.4th at 186 (colorable federal defense need not be "clearly sustainable" or "indisputable" (cleaned up)).

133.    Defendants intend to raise several meritorious federal defenses, including the

government-contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504–14 (1988); preemption, *see Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); and federal immunity, *see Campbell-Ewald v. Gómez*, 577 U.S. 153, 166–69 (2016). Defendants satisfy all elements of the government-contractor defense, which precludes liability related to alleged defects in military equipment when: (1) the United States approved reasonably precise specifications for that equipment; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about dangers in the use of the equipment that were known to the supplier but not to the United States (if any). *Boyle*, 487 U.S. at 512. This defense allows government contractors, like Defendants here, to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract. *Id.* at 511–12.

134.    *Boyle* is analogous. In *Boyle*, the Supreme Court applied a federal common-law government contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy. 487 U.S. at 504–13. In addition, as the Court acknowledged in *Campbell-Ewald*, "[w]here the Government's 'authority to carry out the project was validly conferred,'" a contractor "who simply performed as the Government directed," may be immune from liability. 577 U.S. at 167 (quoting *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20 (1940)). Here, Defendants produced and distributed oil and gas at the direction of, and in accordance with detailed specifications provided by, the federal government, even as the federal government was well aware of the potential for fossil fuels to contribute to climate change, as equally as Defendants were aware.[108] Defendants thus have a

---

[108] *See, e.g.*, *Juliana*, 947 F.3d at 1164 ("the federal government has long promoted fossil fuel use despite knowing that it can cause catastrophic climate change"); Second Supplemental

colorable argument that they are immune from liability.

135.    *Baker*, the analogous case from the Seventh Circuit affirming federal officer removal, also confirms the viability of Defendants' government contractor defense where, as here, defendants provided "critical wartime supplies" to the federal government as "dictated" by the federal government according to its "detailed specifications."  962 F.3d at 946–47.  "[A]ll that the defense requires," the Seventh Circuit explained, is that the contractor supplied products for government use in conformity with "the government's 'reasonably precise specifications.'"  *Id.* at 946 (quoting *Boyle*, 487 U.S. at 512).  As discussed in detail above, Defendants have done, and continue to do, exactly that.

136.    Likewise, in *Moore*, the First Circuit found that both the government contractor immunity and federal immunity defenses asserted by the defendant contractor were sufficiently "colorable" so as to justify federal officer removal, emphasizing that all that was required was that the defenses not be "wholly insubstantial and frivolous."  *See* 25 F.4th at 36–38.

137.    Plaintiff's claims are also barred by the U.S. Constitution, including the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3, the Supremacy Clause, *id.* art. VI, cl. 2, the Due Process Clauses, *id.* amends. V & XIV, § 1, and the foreign affairs doctrine, *see United States v. Pink*, 315 U.S. 203, 230–31 (1942).

138.    For example, although Plaintiff purports to plead state-law claims, state law cannot

---

Appropriation Bill: Hearing on H. Doc. 330 Before the Subcomm. of the Comm. on Appropriations, 84th Cong. 472–73 (1956) (testimony of Dr. Roger Revelle of "enormous quantity" of carbon dioxide being added to the atmosphere, which "may, in fact, cause a remarkable change in climate"); Gilbert N. Plass, *The Carbon Dioxide Theory of Climatic Change*, 8 Tellus 140 (1956) (study funded by U.S. Office of Naval Research finding that "extra $CO_2$ released into the atmosphere by . . . human activities may have caused the temperature to rise during the present century"), available at https://onlinelibrary.wiley.com/doi/abs/10.1111/j.2153-3490.1956.tb01206.x.

constitutionally apply here and thus is precluded and preempted. As the U.S. Supreme Court has long made clear, the federal Constitution's structure generally precludes States from using their own laws to resolve disputes caused by out-of-state and international conduct. Thus, in cases involving "interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations," "our federal system does not permit the controversy to be resolved under state law" "because the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). Consistent with this principle, the Supreme Court has repeatedly recognized that one State cannot apply its own law to claims that "'deal with air and water in their ambient or interstate aspects'"; in that context, "borrowing the law of a particular State would be inappropriate." *AEP*, 564 U.S. at 421–22 (citation omitted). Every federal court to consider the question has held that plaintiffs cannot rely on state law to obtain relief for the alleged consequences of global climate change. *See generally, e.g.*, *City of New York*, 993 F.3d 81. As the Second Circuit put it, "states will invariably differ in their assessment of the proper balance between these national and international objectives," meaning "there is a real risk that subjecting the Producers' global operations to a welter of different states' laws could undermine important federal policy choices." *Id.* at 93. The Constitution bars the application of state law here to avoid subjecting the same interstate and worldwide emissions to adjudication under conflicting state laws, and thus precludes and preempts the state-law causes of action Plaintiff asserts.

139. Moreover, Plaintiff's claims are preempted by the federal Clean Air Act. In an analogous matter more than thirty years ago, the U.S. Supreme Court held that the Clean Water Act "precludes a court from applying the law of an affected State against an out-of-state source" because doing so would "upset[] the balance of public and private interests so carefully addressed

71

by the Act." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).  The preemptive scope of the Clean Air Act is materially identical to that of the Clean Water Act.  *See, e.g.*, *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 304 (4th Cir. 2010) (applying *Ouellette*'s reasoning to the Clean Air Act based on the two statutes' similar structure).  The "Clean Air Act entrusts [the] complex balancing" of total permissible nationwide greenhouse gas emissions with the "Nation's energy needs" "to [the] EPA." *AEP*, 564 U.S. at 427.  The Clean Air Act thus precludes Plaintiff's attempt to use Maine law to obtain damages for injuries allegedly caused by innumerable worldwide sources of greenhouse gas emissions.  *See Delaware v. BP Am., Inc.*, 2024 WL 98888, at *24 (Del. Super. Ct. Jan. 9, 2024) (holding in a materially identical case that "seeking damages for injuries resulting from out-of-state or global greenhouse, are pre-empted by the [Clean Air Act]" and "beyond the limits of [state] common law"); *Mayor and City Council of Baltimore v. BP P.L.C.*, 2024 WL 3678699, at *8 (Md. Cir. Ct. July 10, 2024) (adopting the Second Circuit's reasoning in *City of New York* and holding that the Clean Air Act preempts Baltimore's state law claims).

140.    The relief Plaintiff seeks would also have the practical effect of imposing liability for conduct far outside the borders of Maine and the United States.  But imposing such extraordinary extraterritorial liability on lawful, government-encouraged conduct—namely, the release of greenhouse gas emissions—would constitute "a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).  A "State cannot," consistent with due process, "punish a defendant for conduct that may have been lawful where it occurred." *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 409, 421 (2003); *see also BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 573 (1996).  Moreover, such extraterritorial liability for conduct lawful in other States would exceed "the usual 'legislative power of a State to act upon persons and property

within the limits of its own territory,'" a principle that respects the vital "role territory and sovereign boundaries play in our federal system." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375 (2023) (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)).

141.    The foreign affairs doctrine also precludes exercises of state law and state-law causes of action that would "impair the effective exercise of the Nation's foreign policy." *Garamendi*, 539 U.S. at 419 (quoting *Zschernig v. Miller*, 389 U.S. 429, 440 (1968)); *Pink*, 315 U.S. at 230–31 ("[S]tate law must yield when it is inconsistent with or impairs the policy or provisions of a treaty or of an international compact or agreement.").  Plaintiff's claims would interfere with the U.S. government's control of foreign policy, now and prospectively, including governmental efforts to address climate change and the allocation of costs through multilateral negotiations.  *See* Obligations of States in Respect of Climate Change, Written Statement of the United States ¶¶ 1.14, 2.29, 2.51 (Mar. 22, 2024), available at tinyurl.com/ICJ-US-Climate (submission of the United States to the International Court of Justice explaining that "climate change has been the subject of continuous international negotiations for more than 30 years" and that "these ongoing diplomatic efforts" offer "the best means for achieving the international community's shared climate goals").

142.    And, finally, to the extent Plaintiff's claims target Defendants' statements or alleged failures to speak, they are barred by the First Amendment.  Plaintiff alleges that Defendants developed a "program to inform and educate members of Congress" and "fund[ed] . . .advocacy groups."  Compl. ¶¶ 125, 132.  As the Supreme Court has held, lobbying activity is protected from civil liability.  *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 671 (1965); *see also, e.g.*, *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008); *Alifax Holding SPA*

*v. Alcor Sci. Inc.*, 2019 WL 13091790, at *11 (D.R.I. Mar. 26, 2019) (applying *Noerr-Pennington* to state law tort claims). This is true even if "the campaign employs unethical and deceptive methods." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988); *see also New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) ("[T]he holding of *Noerr* is that lobbying is protected whether or not the lobbyist used deceit.").

143. Furthermore, the Complaint seeks to compel speech by Defendants, requiring them to adopt Plaintiff's preferred messaging on issues relating to climate change—even in their advertisements—or else face liability. *See, e.g.*, Compl. ¶¶ 155, 165, 420–57. But efforts like these are likewise repugnant to the First Amendment and vulnerable to a First Amendment defense. *See, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 75 (2023) (threatened imposition of liability based on the content of public statements clearly has "the potential to chill, or deter, speech"); *Nat'l Ass'n of Mfrs. v. S.E.C.*, 800 F.3d 518, 530 (D.C. Cir. 2015) ("Requiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior . . ., but that makes the requirement more constitutionally offensive, not less so." (cleaned up)); *Kimberly-Clark Corp. v. District of Columbia*, 286 F. Supp. 3d 128, 141 (D.D.C. 2017) (government "could not compel companies to state that their products are not 'environmentally sustainable'" (internal quotation marks omitted)).

144. These federal defenses are more than colorable (indeed, several courts have found them meritorious), and thus they satisfy the test for federal officer removal under the statute. *See Willingham*, 395 U.S. at 407 (defendant invoking § 1442(a)(1) "need not win his case before he can have it removed"); *Moore*, 25 F.4th at 37; *Baker*, 962 F.3d at 947 (noting that a case may "present[] complex issues, but the propriety of removal does not depend on the answers" (cleaned up)). Accordingly, removal under Section 1442 is proper.

## V. THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

145. Based on the allegations in the Complaint, this Court has original jurisdiction over this action under 28 U.S.C. §§ 1442 and 1367(a), and removal of this action is proper under 28 U.S.C. § 1446.

146. The United States District Court for the District of Maine is the appropriate venue for removal pursuant to 28 U.S.C. §§ 1442 and 1446 because it embraces the place where Plaintiff originally filed this case, in Maine Superior Court, Cumberland County. *See* 28 U.S.C. § 1442(a); 28 U.S.C. § 1446(a).

147. All Defendants that have been properly joined and served have consented to the removal of the action, *see* Dick Decl. ¶ 3, and there is no requirement that any party not properly joined and served must consent. *See* 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served"); *see also, e.g.*, *Bartell v. Liberty Mut. Pers. Ins. Co.*, 2024 WL 1090308, at *4 (D. Me. Mar. 13, 2024).[109] Copies of all process, pleadings, and orders from the state-court action being removed to this Court that are in the possession of the Chevron Parties are attached hereto as Exhibit 1 and Exhibit 2 to this Notice of Removal. Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by Chevron in the action. Upon filing this Notice of Removal, the Chevron Parties will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of Maine Superior Court, Cumberland County, pursuant to 28 U.S.C. § 1446(d).

148. Accordingly, the Chevron Parties remove to this Court the above action pending

---

[109] In addition, the consent of all defendants is not required for federal officer removal under 28 U.S.C. § 1442. *See Durham*, 445 F.3d at 1253 ("Whereas all defendants must consent to removal under section 1441, . . . a federal officer or agency defendant can unilaterally remove a case under section 1442.") (citation omitted).

against them in Maine Superior Court, Cumberland County.

Respectfully submitted,

Dated: January 3, 2025

/s/ Paul McDonald
Paul McDonald
  pmcdonald@bernsteinshur.com
John A. Woodcock III
  jwoodcock@bernsterishur.com
**BERNSTEIN SHUR**
100 Middle Street
P.O. Box 9729
Portland, ME 04104
Telephone: 207.774.1200

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
  tboutrous@gibsondunn.com
William E. Thomson, *pro hac vice forthcoming*
  wthomason@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua D. Dick, *pro hac vice forthcoming*
  jdick@gibsondunn.com
One Embarcadero Center
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.374.8451

*Attorneys for Defendants*
*Chevron Corporation and Chevron U.S.A. Inc.*

**Certificate of Service**

The undersigned hereby certifies that on January 3, 2025, a copy of the foregoing has been

served, by email, on the below counsel for Plaintiff:

Scott W. Boak
Emma Akrawi
Valerie A. Wright
**OFFICE OF THE ATTORNEY GENERAL**
6 State House Station
Augusta, ME  04333-0006
Telephone: 207.626.8800
Email: scott.boak@maine.gov
emma.akrawi@maine.gov
valerie.a.wright@maine.gov


Victor M. Sher
Matthew K. Edling
Stephanie D. Biehl
Chase Whiting
Brittany Dutton
**SHER EDLING LLP**
100 Montgomery Sheet, Suite 1410
San Francisco, CA 94104
Tel.: (628) 231-2500
Email: vic@sheredling.com
matt@sheredling.com
stephanie@sheredling.com
cwhiting@sheredling.com
brittany@sheredling.com

Adam J. Levitt
Daniel Rock Flynn
Anna Claire Skinner
Elizabeth Carpenter
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312)214-7900
Email: alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
askinner@dicellolevitt.com
ecarpenter@dicellolevitt.com

Katie R Beran
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Email: kberan@hausfeld.com

James Gotz
HAUSFELD LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0600
Email: jgotz@hausfeld.com

Ian J. Engdahl
HAUSFELD LLP
888 16th Sheet N.W., Suite 300
Washington, DC 20006
Tel: (202) 849-4772
Email: iengdahl@hausfeld.com

Tae H Kim
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 744-1955
Email: tkim@hausfeld.com

Dated:  January 3, 2025                    /s/ Paul McDonald
                                           Counsel for Defendants
                                           *Chevron Corporation*
                                           *and Chevron U.S.A. Inc.*