# EXHIBIT B

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-24-442

STATE OF MAINE,

*Plaintiff,*

v.

BP P.L.C.;
BP AMERICA INC.;
BP ENERGY COMPANY;
BP ENERGY RETAIL LLC;
BP PRODUCTS NORTH AMERICA INC.;
CHEVRON CORPORATION;
CHEVRON U.S.A. INC.;
EXXON MOBIL CORPORATION;
EXXONMOBIL OIL CORPORATION;
EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US;
SHELL TRADING (US) COMPANY;
SHELL P.L.C.;
SHELL USA, INC.;
SUNOCO LP; and
AMERICAN PETROLEUM INSTITUTE,

*Defendants.*

**COMPLAINT**

JURY TRIAL DEMANDED

REC'D CUMB CLERKS OFC
NOV 26 '24 AM8:40

## TABLE OF CONTENTS


**COMPLAINT AND DEMAND FOR JURY TRIAL**......1

**I. INTRODUCTION**......1

**II. JURISDICTION AND VENUE**......6

**III. PARTIES**......9

A. Plaintiff......9

B. Defendants......10

**IV. AGENTS AND CO-CONSPIRATORS**......41

**V. FACTUAL BACKGROUND**......43

A. Defendants Are Responsible for Causing and Accelerating Climate Change......43

B. Defendants Knew or Should Have Known the Dangers Associated with Fossil Fuel Products......48

C. Despite Their Early Knowledge of Real and Severe Harm Posed by the Consumption of Fossil Fuel Products, Defendants Affirmatively Acted to Obscure Those Harms and Engaged in a Campaign to Deceptively Protect and Expand the Use of Fossil Fuel Defendants' Fossil Fuel Products......69

D. In Contrast to Public Misrepresentations About the Risks of Climate Change, Fossil Fuel Defendants' Internal Actions Demonstrate Their Awareness of and Intent to Profit from Uses of Fossil Fuel Products They Knew Were Hazardous......89

E. Defendants Slowed the Development of Alternative Energy Sources and Knowingly Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis......92

F. Defendants Continue to Deceive Maine Consumers Through Misleading Advertisements That Portray the Fossil Fuel Defendants as Climate-Friendly Energy Companies and Obscure Their Role in Causing Climate Change......99

i. Exxon's Misleading and Deceptive Greenwashing Campaigns......103

ii. Shell's Misleading and Deceptive Greenwashing Campaigns......106

iii. BP's Misleading and Deceptive Greenwashing Campaigns......108

iv. Chevron's Misleading and Deceptive Greenwashing Campaigns......111

v. Sunoco's Misleading and Deceptive Greenwashing Campaigns......116

vi. API's Misleading and Deceptive Greenwashing Campaigns .......... 117

G. Fossil Fuel Defendants and API Also Made Misleading Claims About Specific "Green" or "Greener" Fossil Fuel Products. .......... 122

H. Defendants' Deceit Only Recently Began Coming to Light, and Their Misconduct Is Ongoing and Yet to be Fully Uncovered. .......... 132

I. Maine Has Suffered, Is Suffering, and Will Suffer Injuries from Defendants' Conduct. .......... 137

i. Sea Level Rise in the Gulf of Maine .......... 139

ii. Extreme Precipitation and Flooding in Maine .......... 143

iii. Extreme Storms in Maine .......... 147

iv. Harmful Health Outcomes in Maine .......... 151

v. Maine's Economic Vulnerability from Climate Change .......... 157

**VI. CAUSES OF ACTION .......... 162**

FIRST CAUSE OF ACTION NEGLIGENCE .......... 162

SECOND CAUSE OF ACTION PUBLIC NUISANCE .......... 165

THIRD CAUSE OF ACTION PRIVATE NUISANCE .......... 168

FOURTH CAUSE OF ACTION COMMON LAW TRESPASS .......... 171

FIFTH CAUSE OF ACTION CIVIL AIDING AND ABETTING .......... 175

SIXTH CAUSE OF ACTION STATUTORY NUISANCE .......... 178

SEVENTH CAUSE OF ACTION THE MAINE UNFAIR TRADE PRACTICES ACT .......... 181

EIGHTH CAUSE OF ACTION STRICT LIABILITY FOR FAILURE TO WARN – 14 M.R.S. § 221 .......... 183

PRAYER FOR RELIEF .......... 187

JURY DEMAND .......... 188

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The State of Maine ("Plaintiff," "State," or "Maine"), by and through the Office of the Attorney General, Aaron M. Frey, on its own behalf, as trustee of State natural resources and property, including that held in trust, as owner, lessor, occupier, and manager of State property, and in its *parens patriae* capacity on behalf of its residents, brings this action against Defendants BP p.l.c.; BP America Inc.; BP Products North America Inc.; BP Energy Company; BP Energy Retail LLC; Chevron Corporation; Chevron U.S.A. Inc.; Exxon Mobil Corporation; ExxonMobil Oil Corporation; Shell p.l.c.; Shell USA, Inc.; Equilon Enterprises LLC d/b/a Shell Oil Products US; Shell Trading (US) Company; and Sunoco LP (the "Fossil Fuel Defendants"); and the American Petroleum Institute ("API") (collectively, "Defendants"), and alleges as follows:

## I. INTRODUCTION

1. The fossil fuel industry has known for decades, based on its own internal research, that fossil fuels produce carbon dioxide ("$CO_2$") and other greenhouse gas ("GHG") pollution that can have catastrophic consequences for the planet and its people. The industry, including Fossil Fuel Defendants, took these internal scientific findings seriously, investing heavily to protect its own assets and infrastructure from rising seas, stronger storms, and other climate change impacts. But rather than warn consumers and the public, fossil fuel companies and their surrogates mounted a disinformation campaign to discredit the scientific consensus on climate change; create doubt in the minds of consumers, the media, business leaders, and the public about the climate change impacts of burning fossil fuels; and delay the energy economy's transition to a lower-carbon future while maximizing profits.

2. This successful climate deception campaign had, and continues to have, the purpose and effect of inflating and sustaining the market for fossil fuels, which drove up GHG emissions, accelerated global warming, and brought about devastating climate change impacts to Maine,

including to the State's frontline communities[1] in particular. The State has already and is currently enduring the effects of climate change-induced sea level rise, extreme precipitation and heat, and worsening air quality. As a result of the fossil fuel industry's lies and deceit, the State is confronted with the need to protect Maine's people, businesses, and infrastructure from these and other climate change hazards.

3. Despite the clear harm to Maine and other communities across the country, Defendants continue to peddle climate disinformation and attempt to mislead the public about the environmental impacts of Fossil Fuel Defendants' fossil fuel products and derivatives of Fossil Fuel Defendants' fossil fuel products (all together, "fossil fuel products").

4. The State of Maine brings this action against Defendants for creating, contributing to, and/or assisting in the creation of climate change-related harms in Maine by their failure to warn abetted by a multi-decadal sophisticated campaign of disinformation. As more fully alleged below, Defendants created, contributed to, and/or assisted in the creation of public, private, and statutory nuisances; trespassed on State property; failed to adequately warn the State and its residents, who are consumers, of the risks of climate change, climate change-related harms, and other dangers Defendants knew would inevitably follow from the intended or reasonably foreseeable use of fossil fuel products; and violated their duties to exercise due care in the advertising, marketing, selling, distributing, and/or labeling of fossil fuel products, to act reasonably for the protection of Maine and its residents, and to avoid inflicting on Maine and its residents the injuries described herein.

5. The Fossil Fuel Defendants are major, publicly-owned members of the fossil fuel industry—including extractors, producers, refiners, manufacturers, distributors, promoters,

[1] The Maine Governor's Office of Policy Innovation and the Future has defined "frontline communities" to mean "those people and communities that experience the consequences of climate change first and to a greater degree than other communities." Governor's Off. of Pol'y Innovation & the Future ("GOPIF"), *Report on Equity Considerations in Decision Making*, 23 (Feb. 25, 2022) ("Report on Equity"). Maine's most vulnerable people "are expected to be [the] most challenged to prepare for and recover from climate-related hazards." GOPIF, *Assessing the Impacts Climate Change May Have on the State's Economy, Revenues, and Investment Decisions: Summary Report*, 6 (Sept. 1, 2020) ("Governor's Summary Report").

marketers, and/or sellers of raw and refined fossil fuel products. Each Fossil Fuel Defendant funded, staffed, organized, and otherwise supported efforts to deceive the public and consumers—including in Maine—about the role of fossil fuel products in causing the global climate crisis.

6. The rate at which Fossil Fuel Defendants have extracted and sold fossil fuel products has exploded since World War II, which has driven a concurrent increase in $CO_2$ and other GHG emissions. Fossil fuel emissions—especially $CO_2$—are the dominant driver of climate change.[2] The substantial majority of all anthropogenic[3] GHG emissions in history have occurred from the 1950s to the present, a period known as the "Great Acceleration."[4] About three-quarters of all industrial $CO_2$ emissions in history have occurred since the 1960s,[5] and more than half have occurred since the late 1980s.[6] The annual rate of $CO_2$ emissions from extraction, production, and consumption of fossil fuels has increased substantially since 1990.[7]

7. Defendants have known for more than 50 years that GHG pollution from fossil fuel products would have significant adverse impacts on the Earth's climate and sea levels. Armed with that knowledge, Fossil Fuel Defendants privately took steps to protect their own assets from climate change-related harms and risks through immense investments in research, infrastructure improvements, and plans to exploit new business opportunities in a warming world.

8. But instead of warning the public of the known consequences flowing from the intended and foreseeable use of Fossil Fuel Defendants' fossil fuel products or representing those consequences truthfully, Defendants concealed and misrepresented the dangers of fossil fuels; disseminated false and misleading information about the existence, causes, and dangers of climate

[2] *See* Intergovernmental Panel on Climate Change ("IPCC"), *Summary for Policymakers in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment Report* 4–9 (2021), https://perma.cc/WQS2-2VRK.

[3] The term "anthropogenic" is defined by the Merriam Webster Dictionary as "of, or relating to, or resulting from the influence of human beings on nature." *Anthropogenic*, Merriam Webster Dictionary, https://perma.cc/LV59-6Y62 (last visited Nov. 13, 2024).

[4] Will Steffen et al., *The Trajectory of the Anthropocene: The Great Acceleration*, 2 The Anthropocene Review 81, 81 (2015).

[5] R. J. Andres et al., *A Synthesis of Carbon Dioxide Emissions from Fossil-Fuel Combustion*, 9 Biogeosciences 1845, 1851 (2012).

[6] *Id.*

[7] Glob. Carbon Project, *Global Carbon Budget 2021*, https://perma.cc/2S6Y-NC2A.

change; and aggressively promoted the profligate use of fossil fuel products at ever-greater volumes knowing the dangers this increased use posed. Since no later than the late 1980s, Defendants have spent millions of dollars orchestrating a massive disinformation campaign to cast doubt on the science of climate change; to shuttle climate denialist theories into mainstream media and science despite the fact that Fossil Fuel Defendants' own scientists had already debunked those theories; and to conceal the role of fossil fuels in driving the climate crisis. More recently, Defendants have pivoted to a new strategy of commercial deception: "greenwashing." Defendants falsely advertise certain fossil fuel products as "green" or "clean," while concealing the fact that those products are leading causes of climate change. Fossil Fuel Defendants also misleadingly exaggerate their investments in wind, solar, and other lower carbon energy resources to exploit and deceive consumers and encourage continued consumption of fossil fuel products. Defendants individually and collectively played leadership roles in all of these campaigns, which were intended to and did target consumers, including those in Maine.

9. Defendants, individually and collectively, have substantially and measurably contributed to Maine's climate change-related injuries. All Defendants' actions in concealing the dangers of, and promoting false and misleading information about, Fossil Fuel Defendants' fossil fuel products have contributed substantially to consumer demand for fossil fuels and the consequent buildup of $CO_2$ in the atmosphere that drives climate change and its physical, environmental, and socioeconomic consequences, including those in Maine. *See* Section V.I., *infra.* Substantially more anthropogenic GHGs have been emitted into the atmosphere than would have been emitted absent Defendants' tortious and deceptive conduct. If not for Defendants' tortious and deceptive conduct, the damaging consequences of climate change in Maine would have been far less extreme than those currently occurring. Similarly, future harmful effects would also have been far less damaging and costly—or would have been avoided entirely.

10. While Defendants have promoted and profited from the extraction and consumption of fossil fuels, Maine has spent, and will continue to spend, millions of dollars to recover from and adapt to climate change-induced harms. For example, Maine will have to fortify infrastructure

against sea level rise, extreme precipitation, extreme storms, and attendant coastal and inland flooding. Maine will also have to undertake numerous other interventions that have and will become necessary to protect its people and infrastructure from extreme heat, vector-born illnesses, deteriorating air quality, lost jobs and economic activity, and other climate change hazards.

11. Sea levels in the Gulf of Maine are rising at rates unprecedented in the history of human civilization because of climate change. Sea level rise, astronomical tides, and storm surge are already flooding coastal Maine communities, property, and infrastructure. And this threat grows every day as global warming reaches ever more dangerous levels and sea level rise accelerates. The current amount of sea level rise caused by Defendants' tortious and deceptive conduct is an irreversible condition on any relevant time scale: It will last hundreds or even thousands of years. Defendants' tortious and deceptive conduct thus caused harm that must be abated with costly adaptation infrastructure. Defendants' conduct will cause worsening harm in the form of additional sea level rise in Maine if Defendants' deceptive conduct is not abated.

12. Similarly, climate change causes more frequent and extreme weather events, extreme precipitation, riverine flooding, drought, extreme heat, vector-borne illnesses, and reduced air quality, which damage and strain public infrastructure and create cascading public health problems. Climate change is also threatening many of Maine's legacy and economically significant industries because of sea level rise, ocean warming, ocean acidification, and warmer winters.

13. Defendants' tortious and deceptive conduct was a substantial factor in bringing about all aforementioned climate change impacts in Maine.

14. These consequences have and will continue to disproportionately impact Maine's frontline communities, as climate change exacerbates existing environmental and public health stressors associated with socioeconomic and racial disparities.

15. Fossil Fuel Defendants' individual and collective conduct—including, but not limited to, their introduction of fossil fuel products into the stream of commerce while knowing but failing to warn of the threats those products pose to the world's climate; their wrongful promotion of fossil fuel products, including the misrepresentation and concealment of known

hazards associated with the intended use of those products; and Defendants' public deception campaigns designed to obscure the connection between fossil fuel products and climate change—was a direct and proximate cause of Maine's injuries.

16. Accordingly, Maine brings this action against Defendants for negligence, public nuisance, private nuisance, trespass and conspiracy to commit those torts, statutory nuisance, and deceptive trade practices. Maine also alleges strict liability for failure to warn against Fossil Fuel Defendants, and civil aiding and abetting against API. Maine respectfully requests that this Court order Defendants to abate, directly or through an abatement fund, their conduct causing nuisances and trespasses, and that this Court use its equitable powers to order Defendants to mitigate future harm to the environment and people of Maine attributable to Defendants' unlawful actions, including, but not limited to, by granting preliminary and permanent equitable relief. Maine also respectfully requests that this Court order Defendants to pay damages.

17. Maine does *not* seek relief with respect to any federal property, land or assets.

18. Maine hereby disclaims injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes. Maine seeks no recovery or relief attributable to these injuries.

19. Maine does *not* seek to impose liability on Defendants for their direct emissions of GHGs and does *not* seek to restrain Defendants from engaging in their lawful business operations.

20. This case is fundamentally about shifting the costs of climate change-related harms back onto the entities whose deception caused and exacerbated them. Maine seeks to ensure that the parties who have profited from deceiving consumers and the public about climate change bear the costs of that deceptive commercial activity.

## II. JURISDICTION AND VENUE

21. Jurisdiction is proper in the Maine Superior Court, Cumberland County, because Defendants have contributed to the creation of a public nuisance throughout Maine, including in Cumberland County, and the Maine Attorney General has the right and authority to seek abatement

of that nuisance on behalf of the People of the State of Maine. Injuries the State has suffered directly have also occurred within Cumberland County.

22. This Court has subject matter jurisdiction pursuant to 4 M.R.S. §§ 105 and 114. This Court has personal jurisdiction over Defendants, pursuant to 14 M.R.S. § 704-A, because each Defendant purposefully availed itself of the Maine market, and thus of the benefits of the laws of the State, during all times relevant to this Complaint, and because Maine has a legitimate interest in the subject matter of the action, and each Defendant by their conduct should have reasonably anticipated litigation in Maine, all of which renders Maine courts' exercise of jurisdiction over each Defendant consistent with traditional notions of fair play and substantial justice. Each Fossil Fuel Defendant researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold its fossil fuel products in markets around the United States, including within Maine. Each Defendant caused injurious acts to be done, or caused the consequences of those acts to occur, within Maine, as set forth in detail herein.

23. Additionally, jurisdiction is proper over each non-resident Defendant for the following reasons:

a. With respect to its subsidiaries, each non-resident Fossil Fuel Defendant controls and has controlled its direct and indirect subsidiaries' decisions about the quantity and extent of its fossil fuel production and sales; determines whether and to what extent to market, produce, and/or distribute its fossil fuel products; and controls and has controlled its direct and indirect subsidiaries' decisions related to its marketing and advertising, specifically communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment. Each subsidiary Defendant is the agent of its parent Defendant. As agents, the subsidiaries of each non-resident Defendant conducted activities in Maine at the direction and for the benefit of its parent company. Specifically, the subsidiaries furthered each parent company's campaign of deception and denial through misrepresentations, omissions, and affirmative promotion of the company's fossil fuel products as safe with knowledge of the climate change-related harms that would result from the intended use of those products, all of which

resulted in climate change-related injuries in Maine and increased sales to the parent company. The subsidiaries' jurisdictional activities are properly attributed to each parent company and serve as a basis to assert jurisdiction over each of the non-resident Defendant parent companies.

b. Through their various agreements with dealers, franchises, or otherwise, the Fossil Fuel Defendants direct and control the branding, marketing, sales, promotions, image development, signage, and advertising of their branded fossil fuel products at their respective branded gas stations in Maine, including point-of-sale advertising and marketing. The Fossil Fuel Defendants dictate which grades and formulations of their gasoline may be sold at their respective branded stations.

c. Fossil Fuel Defendants, in coordination with trade organizations, including Defendant API, conspired to conceal and misrepresent the known dangers of burning fossil fuels, to knowingly withhold material information regarding the consequences of using fossil fuel products, to spread knowingly false and misleading information to the public regarding the weight of climate science research, and to promote consumer demand for fossil fuel products, which they knew were harmful. Through their own actions and through their membership and/or participation in climate denialist front groups, each Defendant was and is a member of that conspiracy. Defendants committed substantial acts to further the conspiracy in Maine by making misrepresentations and misleading omissions to Maine consumers about the existence, causes, and effects of global warming; by affirmatively promoting Fossil Fuel Defendants' fossil fuel products as safe, with knowledge of the disastrous impacts that would result from the intended use of those products; and by failing to warn Maine consumers about the disastrous impacts of fossil fuel use. A substantial effect of the conspiracy has also occurred and will also occur in Maine, as the State has suffered and will suffer injuries from Defendants' wrongful conduct, including but not limited to the following: sea level rise, extreme storms, coastal and riverine flooding, extreme heat and related illnesses, reduced air quality, vector-borne diseases, and other social and economic consequences of these environmental changes. Defendants knew or should have known, based on information provided to them from their internal research divisions, affiliates, trade associations,

and industry groups, that their actions in Maine and elsewhere would result in these injuries in and to the State of Maine. Finally, the climate effects described herein are direct and foreseeable results of Defendants' conduct in furtherance of the conspiracy.

24. Venue is proper in this Court pursuant to 14 M.R.S. §§ 501, 505, and 507 because this action is brought by the State as Plaintiff on behalf of the State of Maine to recover monies due to the State and public funds and property belonging to the State or the value thereof. State natural resources and property have been damaged statewide, including in Cumberland County.

## III. PARTIES

### A. Plaintiff

25. Plaintiff State of Maine is a sovereign state bringing this action by and through its Attorney General, which maintains its principal office at 6 State House Station, Augusta, Maine 04333. The State brings this action pursuant to the powers vested in the Attorney General by the common law and by 5 M.R.S. § 191 as the chief legal officer of the State of Maine.

26. The State brings this action in its capacity as sovereign on its own behalf, as trustee of the State's natural resources—which are held in trust for the benefit of Maine's people—as owner of State property or of substantial interests in property, in the public interest, and pursuant to its *parens patriae* capacity on behalf of its residents.

27. The State's natural resources include all natural resources for which the State seeks damages, including without limitation aquatic animals, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, soil, sediment, public lands the State holds in trust, and State-owned lands ("State natural resources").

28. The State owns, leases, occupies, and manages extensive real property, some of which is held in trust, including, but not limited to: trails, roads, bridges and abutments, culverts, dams, harbors, submerged lands, rivers and other bodies of water, beaches, dunes, boardwalks, piers, seawalls, parks, camping areas, picnic areas, historic sites, islands, lands, buildings and appurtenances, and other improvements and infrastructure thereto ("State property").

29. The State also brings this action pursuant to the Attorney General's common law and constitutional authority, his statutory authority—including pursuant to 5 M.R.S. § 192, 5 M.R.S. § 209, and 38 M.R.S. §§ 341-A and 348—to protect the State's natural resources and property, including property held in trust, and the State's common law police powers. Those powers and authority include, but are not limited to, the power and authority to prevent and abate nuisance and to prevent and abate hazards to public health, safety, welfare, and the environment.

**B. Defendants**

30. Defendants are among the largest oil and gas companies in the world and a national oil and gas industry trade association. The fossil fuel products produced by the Fossil Fuel Defendants (and promoted by all Defendants) are responsible for the emission of billions of tons of GHGs globally.

31. When this complaint references an act or omission of Defendants, unless otherwise stated, such references should be interpreted to mean that the officers, directors, agents, employees, or representatives of Defendants committed or authorized such an act or omission or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the course and scope of their employment or agency.

32. **BP entities: BP p.l.c.; BP America Inc.; BP Products North America Inc.; BP Energy Company; and BP Energy Retail LLC**

a. Defendant **BP p.l.c.** is a multinational, vertically integrated energy and petrochemical public limited company registered in England and Wales with its principal office in London, England. BP p.l.c. consists of three main operating segments: (1) exploration and production, (2) refining and marketing, and (3) "gas and low-carbon energy." BP p.l.c. is the ultimate parent company of numerous subsidiaries, referred to collectively as the "BP Group," which explore for and extract oil and gas worldwide; refine oil into fossil fuel products such as gasoline; and market and sell oil, gasoline, other refined petroleum products, and natural gas worldwide. BP p.l.c. was formerly known as, did or does business as, and/or is the successor in

liability to British Petroleum Company, British Petroleum Company p.l.c., BP Amoco p.l.c., Amoco Corporation, and Atlantic Richfield Company.

b. BP p.l.c. controls and has controlled group-wide decisions about the quantity and rate of fossil fuel production and sales, including those of its subsidiaries. BP p.l.c. is the ultimate decision-maker on fundamental decisions about the BP Group's core business, i.e., the volume of group-wide fossil fuels to produce and market, including among BP p.l.c.'s subsidiaries. BP p.l.c.'s 2022 Annual Report summarizes the company's "Strategic progress," including on offshore and exploration projects and acquisitions and sales of various oil and gas operations that contributed to a 12% increase in the BP Group's overall fossil fuel product production. These projects were carried out by BP p.l.c.'s subsidiaries.

c. BP p.l.c. controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, climate change, GHG emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. BP p.l.c makes and has made decisions on the production and use of fossil fuel reserves for the entire BP Group based on factors including climate change. BP p.l.c.'s Board of Directors is the company's highest decision-making body, with direct responsibility for the BP Group's policies concerning climate change. BP p.l.c.'s chief executive is responsible for maintaining the BP Group's system of internal control that governs BP Group's business conduct. BP p.l.c.'s senior leadership directly oversees and has overseen a "carbon steering group," which manages climate change-related matters and consists of two committees—both overseen directly by the board—focused on climate change-related investments.

d. BP p.l.c. does, and has done, business in Maine through its wholly-owned subsidiaries as BP Oil Company, BP Energy Company, BP America Inc., and BP Energy Holding Company.

e. Defendant **BP America Inc.** is a wholly owned subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP America Inc. is a vertically

integrated energy and petrochemical company incorporated in the state of Delaware with its headquarters and principal office at 501 Westlake Park Blvd., Houston, Texas 77079. BP America Inc. is registered to do business in Maine, where it is and has been engaged in oil and gas business. BP America Inc. consists of numerous divisions and affiliates in all aspects of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, marketing, and sale of crude oil, natural gas, and petroleum products. BP America Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Amoco Oil Company; Amoco Production Company; ARCO Products Company; BP Exploration & Oil, Inc.; BP Products North America Inc.; BP Amoco Corporation; BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio (SOHIO); Standard Oil (Indiana); and Atlantic Richfield Company (a Pennsylvania Corporation) and its division, the Arco Chemical Company.

f. **BP Products North America Inc.** is a subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP Products North America Inc. is and has been engaged in fossil fuel exploration, production, refining, and marketing. BP Products North America Inc. is incorporated in Maryland and has its principal office in Naperville, Illinois. BP Products North America Inc. initially registered to do business in Maine in 1933 and remains qualified to do business in Maine today, where it is and has been engaged in oil and gas business in the State. It is a gas distributor in the State of Maine.

g. **BP Energy Company**, formerly known as Amoco Energy Trading Corporation, is a subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. It is a Delaware corporation with its principal office at 501 Westlake Park Blvd., Houston, Texas 77079. It is registered to do business in Maine, and it is and has been engaged in oil and gas business in the State of Maine.

h. **BP Energy Retail LLC** was formerly known as EDF Energy Services LLC, a registered retail natural gas supplier in Maine with over $32 million in fossil fuel-dominated energy sales into Maine in 2022. BP Energy Retail LLC is a subsidiary of BP p.l.c. that acts on BP

p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP Energy Retail LLC is a Delaware limited liability company with its principal office at 501 Westlake Park Blvd., Houston, Texas 77079. It is registered to do business in Maine, where it is and has been engaged in electricity and natural gas supply to commercial and industrial end users. Its named Manager is BP Energy Holding Company LLC, formerly known as BP Energy Retail LLC, a Delaware limited liability company with its principal office at 501 Westlake Park Blvd., Houston, Texas 77079. BP Energy Holding Company has been, and is now, registered to do business in Maine. It is also a subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and subject to BP p.l.c.'s control.

i. Defendants BP p.l.c., BP America, Inc., BP Products North America Inc., BP Energy Company, and BP Energy Retail LLC, together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "BP."

j. Plaintiff's claims against BP arise out of and are related to the acts and omissions of BP in Maine and elsewhere that caused or will cause injuries in Maine.

k. BP has purposefully directed its tortious conduct toward Maine by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Maine, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in the State, including without limitation injuries to the State and its property, infrastructure, and natural resources. BP's statements in Maine and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and BP's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of BP's products. That conduct was purposefully directed to reach and influence Maine and its residents and to obscure the dangers of BP's fossil fuel products from the State and its residents such that use of BP's fossil fuel products in Maine would not decline, thereby resulting in the State's injuries.

l. Over the last several decades and continuing to the present day, BP has advertised on television, online, and social media in the Maine market related to its fossil fuel products. Since no later than 1969 and continuing to the present day, BP has advertised in national and local print publications, including multiple Maine newspapers, circulated widely to Maine consumers.[8] As further detailed herein, these advertisements contain false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of BP's fossil fuel products and climate change, and/or misrepresenting BP's products or BP itself as environmentally friendly.

m. Significant quantities of BP's fossil fuel products are and have been transported, traded, distributed, promoted, marketed, sold, and/or consumed in Maine, from which activities BP derives and has derived substantial revenue.

n. In the 1980s and 1990s, BP owned a petroleum terminal and dock facility with associated pipeline interests in South Portland, Maine.[9] BP has been, and continues to be, a registered gas distributor in Maine.[10] Moreover, BP sells Maine electricity that is produced predominantly from the combustion of fossil fuels.[11] Additionally, by BP's own description, its "operations in Maine include Air bp and biogas."[12] BP and its affiliates operated gas stations in Maine dating back to at least 1991.

o. BP also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Maine consumers under its Castrol brand name. Castrol products are

[8] *See, e.g.*, Evening Express (Mar. 11, 1969), https://perma.cc/3779-FRRL; Bangor Daily News (June 29, 1970), https://perma.cc/B2KB-L2U9; Bangor Daily News (Oct. 26, 1989) https://perma.cc/86MA-RW2V; Bangor Daily News (Aug. 17, 1970), https://perma.cc/D9C2-UFTG; Bangor Daily News (Oct. 26, 1989), https://perma.cc/3L9J-3THS.

[9] *BP Oil Says It Will Sell Refineries in Northeast*, Morning Sentinel (Nov. 4, 1995), https://perma.cc/3Y82-388Y; *Study Hits Upkeep of Oil Tanks, Docks Here*, Evening Express (Apr. 23, 1976), https://perma.cc/BJP9-89AE.

[10] *Licensed Gas Distributors*, Me. Dep't of Admin. & Fin. Servs., https://perma.cc/3H6T-9NTR (last updated Aug. 26, 2024).

[11] *Residential & Small Non Residential Standard Offer Service Consumer Information About Your Electricity Supply*, BP Energy Retail Co. (Mar. 2024), https://perma.cc/788T-ALTH.

[12] BP, *States with bp sites*, https://bpusimpactmaplocator.bp.geoapp.me/#/@37.99503,-95.81325,3z (enter location, Maine) (last visited Nov. 13, 2024).

available at roughly 170 car service stations, distributors, and retail outlets across Maine.[13] Castrol products are distributed and advertised throughout Maine.[14]

33. **<u>Chevron entities:</u> Chevron Corporation and Chevron U.S.A. Inc.**

a. Defendant **Chevron Corporation** is a multinational, vertically integrated energy and chemicals company incorporated in Delaware, with its global headquarters and principal office in San Ramon, California. Chevron Corporation was formerly known as, did or does business as, and/or is the successor in liability to Standard Oil Company of California, Texaco Inc., and ChevronTexaco Corporation.

b. Chevron Corporation operates through a web of United States and international subsidiaries at all levels of the fossil fuel supply chain. Chevron Corporation and its subsidiaries' operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil into petroleum products and marketing those products; and manufacturing and marketing commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

c. Chevron Corporation controls and has controlled group-wide decisions about the quantity and rate of fossil fuel production and sales, including those of its subsidiaries. Chevron Corporation determines whether and to what extent its corporate holdings market, produce, and/or distribute fossil fuel products.

d. Chevron Corporation controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. Overall accountability for climate change within Chevron Corporation lies with Chevron Corporation's Board of Directors and Executive Committee.

[13] Castrol, *Where to Buy or Service*, Maine, https://www.castrol.com/en_us/united-states/home/product-finder.html?page=wheretobuy (Search address, Maine) (last visited Nov. 13, 2024).
[14] *See* Dysart's Serv. Ctr., *Lubricants*, https://perma.cc/2CKH-M2UU (last visited Sept. 17, 2024).

e. Defendant **Chevron U.S.A. Inc.** is a wholly owned subsidiary of Chevron Corporation that acts on Chevron Corporation's behalf and is subject to Chevron Corporation's control. Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal office in San Ramon, California. Chevron U.S.A. Inc. is registered to do business in Maine and is and has been engaged in all branches of the petroleum industry in the State of Maine. Through its predecessors, Chevron U.S.A. Inc. has been registered to do business in Maine since 1936. Chevron U.S.A. Inc. was formerly known as, did or does business as, and/or is the successor in liability to Gulf Oil Corporation, Gulf Oil Products Company, Gulf Oil Corporation of Pennsylvania, Chevron Products Company, Chevron Chemical Company, Chevron Texaco Products Company, Chevron U.S.A. Products Company, Chevron U.S.A. Production Company, and Warren Petroleum Company.

f. Defendants Chevron Corporation and Chevron U.S.A. Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Chevron."

g. Maine's claims against Chevron arise out of and are related to the acts and omissions of Chevron in Maine and elsewhere that caused and will cause injuries in Maine.

h. Chevron has purposefully directed its tortious conduct toward Maine by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Maine, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in the State, including Maine's injuries. Chevron's statements in Maine and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Chevron's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Chevron's products. That conduct was purposefully directed to reach Maine and to obscure the

dangers of Chevron's fossil fuel products from Maine and its residents such that use of Chevron's fossil fuel products in Maine would not decline.

i. Chevron—both directly and through its subsidiaries and/or predecessors-in-interest—has supplied substantial quantities of fossil fuel products to Maine during the period relevant to this Complaint.

j. Chevron started doing business in Maine as early as 1936. As early as 1959, Chevron had at least 66 local dealers and stations in Maine that it promoted and advertised to Maine residents.[15] Texaco, which is a Chevron-owned brand, had multiple other local Maine dealers and stations dating back to at least 1936. Texaco itself incorporated in Maine in 1941 as Texaco Inc. and began maintaining an office in Portland.

k. Over the last several decades and continuing to the present day, Chevron spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Maine market related to its fossil fuel products. Since no later than 1958, and continuing to the present day, Chevron has advertised in national and local print publications, including multiple Maine newspapers, circulated widely to Maine consumers.[16] As further detailed herein, these advertisements contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Chevron's fossil fuel products and climate change, and/or misrepresenting Chevron's products or Chevron itself as environmentally friendly.

l. Chevron and Texaco each owned and operated marine oil terminals in Hampden, Maine, beginning in the early 1900s. Failures at these terminals caused oil and gas releases in 1973, 1993, 2006, and 2008 that contaminated Maine natural resources. Texaco and

---

[15] Bangor Daily News (Oct. 13, 1959), https://perma.cc/LS9U-K6YP.

[16] *See, e.g.*, Kennebec Journal (June 3, 1958), https://perma.cc/2RPZ-KH38; Kennebec Journal (June 3, 1960), https://perma.cc/C7XM-4HUS; Lewiston Evening Journal (June 24, 1959), https://perma.cc/5LXS-QB95; The Waterville Morning Sentinel (Nov. 11, 1965); https://perma.cc/HLN2-UWCJ; Portland Evening Express (Oct. 16, 1979) https://perma.cc/V524-39L7; Portland Evening Express (Aug., 11 1981), https://perma.cc/XXV7-AKYK; Portland Evening Express (Aug., 18 1981), https://perma.cc/L7ZZ-59HQ; Portland Evening Express (Sep. 1, 1981), https://perma.cc/U7VY-ZC9E/.

Gulf also operated a bulk petroleum storage terminal at Turner Island in South Portland in the 1960s and 1970s. Multiple underground Texaco retail leaded gasoline tanks and wholesale oil tanks remain in Maine's ground.[17]

m. Significant quantities of Chevron's fossil fuel products have been transported, traded, distributed, promoted, marketed, sold, and/or consumed in Maine, from which activities Chevron derived substantial revenue. Chevron conducted and controlled, either directly or through franchise agreements, retail fossil fuel sales at Chevron, Texaco, and Gulf Oil gas station locations throughout Maine, at which locations it promoted, advertised, and sold its fossil fuel products under its various brand names, including Chevron, Texaco, and other brand names.

n. Chevron has been, and continues to be, a registered gas and special fuel distributor in Maine.[18] Chevron and Texaco did further business in Maine from at least 1998 through 2015 concerning their manufacturing and marketing of aviation fuel and related products.

o. Chevron also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Maine consumers under its Starplex/Delo, IsoClean, Techron, and Havoline brand names. These products are sold at auto parts stores across the State.[19] Chevron lubricant products are distributed throughout Maine.[20]

p. Chevron historically directed its fossil fuel product advertising, marketing, and promotional campaigns at Maine, including through maps that identified the locations of its service stations in Maine. Chevron markets and advertises its fossil fuel products in Maine to Maine residents by maintaining an interactive website, which directs Maine residents to Chevron's nearby retail service stations and/or lubricant distributors.[21]

---

[17] Me. Dep't of Env't Prot., *Active and Out of Service Registered Underground Storage Tanks Including Tanks That Have Not Been Properly Abandoned* (Nov. 1, 2024), https://perma.cc/A5DT-3BNL.

[18] *Licensed Gas Distributors*, *supra* note 10; *Licensed Special Fuel Supplier*, Me. Dep't of Admin. & Fin. Servs., https://perma.cc/NRF4-T86Z (last updated Aug. 26, 2024).

[19] O'Reilly Auto Parts, *Chevron*, https://www.oreillyauto.com/shop/brands/a/chevron/chv (choose Selected Store; then search address, Maine) (last visited Nov. 13, 2024); Chevron Lubricants, *Find a Retailer*, https://www.chevronlubricants.com/en_us/home/where-to-buy/find-a-retailer.html (Search address, Maine) (last visited Nov. 13, 2024).

[20] *See* Dysart's Serv. Ctr., *Lubricants*, https://perma.cc/2CKH-M2UU (last visited Sept. 17, 2024).

[21] Chevron Lubricants, *supra* note 19.

34. <u>Exxon entities:</u> **Exxon Mobil Corporation and ExxonMobil Oil Corporation**

a. Defendant **Exxon Mobil Corporation** is a New Jersey corporation headquartered in Spring, Texas, that has been registered to do business in Maine since 1972 and remains so today. Exxon Mobil Corporation is a multinational, vertically integrated energy and chemical company and one of the largest publicly traded international oil and gas companies in the world. Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Exxon Corporation; ExxonMobil Refining and Supply Company; Exxon Chemical U.S.A.; ExxonMobil Chemical Corporation; ExxonMobil Chemical U.S.A.; ExxonMobil Refining & Supply Corporation; Exxon Company, U.S.A.; Standard Oil Company of New Jersey; and Mobil Corporation.

b. Defendant **ExxonMobil Oil Corporation** is a wholly owned subsidiary of Exxon Mobil Corporation, acts on Exxon Mobil Corporation's behalf, and is subject to Exxon Mobil Corporation's control. ExxonMobil Oil Corporation is a New York corporation headquartered in Spring, Texas, has been registered to do business in Maine since 1909, and today engages in business in Maine involving the production, transportation, refining, and marketing of petroleum and natural gas. ExxonMobil Oil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Standard Oil Company of New York and Mobil Oil Corporation.

c. Exxon Mobil Corporation controls and has controlled group-wide decisions about the quantity and rate of fossil fuel production and sales, including those of its subsidiaries. Exxon Mobil Corporation's 2022 Form 10-K filed with the SEC represents that its success, including its "ability to mitigate risk and provide attractive returns to shareholders, depends on [its] ability to successfully manage [its] overall portfolio." Exxon Mobil Corporation determines whether and to what extent its subsidiaries market, produce, and/or distribute fossil fuel products. For example, on October 11, 2023, Exxon Mobil Corporation announced its acquisition of Pioneer Natural Resources in a press release that referred to the corporate family generally as "ExxonMobil."

d. Exxon Mobil Corporation controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. Exxon Mobil Corporation's Board of Directors holds the highest level of direct responsibility for climate change policy. Exxon Mobil Corporation's Chairman of the Board and Chief Executive Officer, its President, and the other members of its Management Committee have been actively engaged in discussions relating to GHG emissions and the risks of climate change on an ongoing basis. Exxon Mobil Corporation requires its subsidiaries, when seeking funding for capital investments, to provide estimates of project costs related to GHG emissions.

e. Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Exxon."

f. The State's claims against Exxon arise out of and are related to the acts and omissions of Exxon in Maine and elsewhere that caused and will cause injuries in Maine.

g. Exxon consists of numerous divisions and affiliates in all areas of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, promotion, marketing, and sale of crude oil, natural gas, and petroleum products. Exxon is also a major manufacturer and marketer of commodity petrochemical products.

h. Exxon has purposefully directed its tortious conduct toward Maine by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Maine. It did so knowing that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Maine, including the State's injuries. Exxon's statements in Maine and elsewhere, made in furtherance of its campaign of deception about and denial of climate change, and Exxon's affirmative promotion of its fossil fuel products as safe with

knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Exxon's products. That conduct was purposefully directed to reach Maine and obscure the dangers of Exxon's fossil fuel products from Maine and its residents such that use of Exxon's fossil fuel products in Maine would not decline.

i. Over the past several decades and continuing to the present day, Exxon spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Maine market related to its fossil fuel products. Since no later than 1955, and continuing to the present day, Exxon and its predecessors have advertised their fossil fuel products in national and local print publications, including multiple Maine newspapers, circulated widely to Maine consumers.[22] For example, Exxon ran a series of full-page advertisements in *The Portland Press Herald* in 2009 falsely touting Exxon as "looking for new ways to reduce greenhouse gas emissions"[23] and stating that Exxon has developed lightweight automobile plastics that reduce GHG emissions.[24] As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions designed to hide the connection between the production and use of Exxon's fossil fuel products and climate change, and/or misrepresenting Exxon's products or Exxon itself as environmentally friendly.

j. Significant quantities of Exxon's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Maine, from which activities Exxon derives and has derived substantial revenue.

[22] *See, e.g.*, Portland Press Herald (June 5, 1955), https://perma.cc/LZU9-DMKU; The Lewiston Evening Journal (June 14, 1955), https://perma.cc/7FDR-JDC5; Portland Evening Express (Apr. 6, 1962), https://perma.cc/EA6A-ED77; The Waterville Morning Sentinel (Apr. 11, 1962), https://perma.cc/2QZZ-RYQQ; Bangor Daily News (Dec. 8, 1989), https://perma.cc/V4ND-ED42; Bangor Daily News (Dec. 24–25, 1987), https://perma.cc/MPC6-6PGM; Bangor Daily News (July 16, 1986), https://perma.cc/MX29-VVZN; Bangor Daily News (Mar. 26, 1976), https://perma.cc/2L9Y-DXPG; Bangor Daily News (Aug. 23, 1973), https://perma.cc/3FKT-UKNA.

[23] Portland Press Herald (Mar. 16, 2009), https://perma.cc/96BP-HSW8; *see also* Portland Press Herald (Mar. 2, 2009), https://perma.cc/B68M-CPUA.

[24] Portland Press Herald (Mar. 9, 2009), https://perma.cc/ZXE8-HKP9.