UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| STATE OF MAINE,<br><br>       *Plaintiff*,<br><br>  v.<br><br>BP P.L.C.;<br>BP AMERICA INC.;<br>BP ENERGY COMPANY;<br>BP ENERGY RETAIL LLC;<br>BP PRODUCTS NORTH AMERICA INC.;<br>CHEVRON CORPORATION;<br>CHEVRON U.S.A. INC.;<br>EXXON MOBIL CORPORATION;<br>EXXONMOBIL OIL CORPORATION;<br>EQUILON ENTERPRISES LLC d/b/a SHELL<br>OIL PRODUCTS US;<br>SHELL TRADING (US) COMPANY;<br>SHELL P.L.C.;<br>SHELL USA, INC.;<br>SUNOCO LP; and<br>AMERICAN PETROLEUM INSTITUTE,<br><br>       *Defendants*. | Civil Action No. 2:25-cv-00001-NT<br><br>Hon. Nancy Torresen |

## THE STATE OF MAINE'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO REMAND

Plaintiff, State of Maine ("State" or "Maine"), for its Memorandum of Law in Support of

Its Motion to Remand, states as follows.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................2

LEGAL STANDARD .........................................................................................................3

ARGUMENT ......................................................................................................................4

I.    The State Did Not Bring This Suit "For or Relating to" Anything Defendants Allegedly Did Under Federal Direction.................................................................5

    A.    As in *Rhode Island I*, There Is No Nexus Between Defendants' Charged Conduct and Their Claimed Conduct Under Federal Officers. ...............................5

    B.    Maine Has Disclaimed Injuries Arising from Sales of Specialized Fuels to the United States for Military and National Defense Purposes. ...............................7

II.    Defendants Have Not Acted Under Federal Authority. ......................................9

III.    Defendants Have No Colorable Federal Defense..............................................19

REQUEST FOR FEES ......................................................................................................20

CONCLUSION ..................................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Annapolis v. BP P.L.C.*,
   2022 WL 4548226 (D. Md. Sept. 29, 2022) ................................................................8

*Anne Arundel v. BP P.L.C.*,
   94 F.4th 343 (4th Cir. 2024) .............................................................................*passim*

*Arizona v. Manypenny*,
   451 U.S. 232 (1981) .......................................................................................19

*Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
   996 F.3d 243 (4th Cir. 2021) ...........................................................................16

*Audubon Naturalist Soc. of the Cent. Atl. States, Inc. v. U.S. Dept. of Transp.*,
   524 F. Supp. 2d 642 (D. Md. 2007) ..................................................................17

*Baker v. Atl. Richfield Co.*,
   962 F.3d 937 (7th Cir. 2020) ................................................................... 9, 13, 19

*Ballenger v. AgcoCorp.*,
   2007 WL 1813821 (N.D. Cal. June 22, 2007) ........................................................9

*Baltimore v. BP P.L.C.*,
   31 F.4th 178 (4th Cir. 2022) ..............................................................................*passim*

*Barlow & Haun, Inc. v. U.S.*,
   805 F.3d 1049 (Fed. Cir. 2015) .........................................................................17

*Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
   25 F.4th 1238 (10th Cir. 2022) ..........................................................................*passim*

*Boulder Cnty. v. Suncor Energy (U.S.A.), Inc.*,
   2024 WL 3204275 (D. Colo. June 21, 2024) ........................................................20

*Boyle v. United Techs. Corp.*,
   487 U.S. 500 (1988) ......................................................................................19

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
   797 F.3d 720 (9th Cir. 2015) .............................................................................18

*Charleston v. Brabham Oil Co.*,
   2023 WL 11867279 (D.S.C. July 5, 2023) .............................................................1

*Connecticut v. Exxon Mobil Corp.*,
   83 F.4th 122 (2d Cir. 2023) ...............................................................................*passim*

*D.C. v. Exxon Mobil Corp.*,
   89 F.4th 144 (D.C. Cir. 2023) ................................................................. 1, 5, 7, 11

*Delaware v. BP Am. Inc.*,
   578 F. Supp. 3d 618 (D. Del. 2022) ...................................................................*passim*

*Exxon Mobil Corp. v. U.S.*,
   2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ......................................................12

*Hoboken v. Chevron Corp.*,
   45 F.4th 699 (3d Cir. 2022) ................................................................*passim*

*Honolulu v. Sunoco LP*,
   39 F.4th 1101 (9th Cir. 2022) .............................................................*passim*

*Honolulu v. Sunoco LP*,
   2021 WL 531237 (D. Haw. Feb. 12, 2021) .............................................................7

*Jefferson Cnty. v. Acker*,
   527 U.S. 423 (1999) ..............................................................................................7

*Maine v. 3M Co.*,
   2023 WL 4758816 (D. Me. July 26, 2023) ..............................................................8

*Martin v. Franklin Cap. Corp.*,
   546 U.S. 132 (2005) ............................................................................................20

*Massachusetts v. Exxon Mobil Corp.*,
   462 F. Supp. 3d 31 (D. Mass. 2020) ......................................................................1

*Minnesota v. Am. Petroleum Inst.*,
   2021 WL 1215656 (D. Minn. Mar. 31, 2021) ......................................................8, 9

*Minnesota v. Am. Petroleum Inst.*,
   63 F.4th 703 (8th Cir. 2023) ..........................................................................1, 5, 7

*Moore v. Electric Boat Corp.*,
   25 F.4th 30 (1st Cir. 2022) ........................................................................4, 6, 19

*Multnomah v. Exxon Mobil Corp.*,
   2024 WL 1991554 (D. Or. Apr. 10, 2024) ..............................................................1

*New Hampshire v. 3M Co.*,
   665 F. Supp. 3d 215 (D.N.H. 2023) ......................................................................8

*New Jersey v. Exxon Mobil Corp.*,
   2023 WL 4086353 (D.N.J. June 20, 2023) ............................................................2

*New York v. Exxon Mobil Corp.*,
   733 F. Supp. 3d 296 (S.D.N.Y. 2024) ..............................................................2, 20

*Oakland v. BP PLC*,
   969 F.3d 895 (9th Cir. 2020) ................................................................................1

*Oakland v. BP PLC*,
   2022 WL 14151421 (N.D. Cal. Oct. 24, 2022) ..........................................11, 14, 18

*Oakland v. BP PLC*,
   2023 WL 8179286 (9th Cir. Nov. 27, 2023) .....................................1, 5, 10, 11

*Par. of Plaquemines v. Riverwood Prod. Co.*,
   2022 WL 101401 (E.D. La. Jan. 11, 2022) ..........................................................11

*Progin v. UMass Mem'l Health Care, Inc.*,
   2023 WL 4535129 (D. Mass. July 13, 2023)..................................................17

*Puerto Rico v. Express Scripts, Inc.*,
   119 F.4th 174 (1st Cir. 2024)............................................................*passim*

*Rhode Island v. Shell Oil Prods. Co.*,
   979 F.3d 50 (1st Cir. 2020)..............................................................*passim*

*Rhode Island v. Shell Oil Prods. Co.*,
   35 F.4th 44 (1st Cir. 2022)...............................................................1, 2, 3, 20

*Rhodes v. MCIC, Inc.*,
   210 F. Supp. 3d 778 (D. Md. 2016) ........................................................9

*San Mateo v. Chevron Corp.*,
   32 F.4th 733 (9th Cir. 2022)............................................................*passim*

*Sierra Club v. Sigler*,
   695 F.2d 957 (5th Cir. 1983)..................................................................17

*Taber Partners, I v. Merit Builders, Inc.*,
   987 F.2d 57 (1st Cir. 1993) ....................................................................4

*U.S. v. Shell Oil Co.*,
   294 F.3d 1045 (9th Cir. 2002)...........................................................11, 12, 14

*Vermont v. Exxon Mobil Corp.*,
   2024 WL 446086 (D. Vt. Feb. 6, 2024) ....................................................2

*Watson v. Philip Morris Cos.*,
   551 U.S. 142 (2007) .......................................................................10, 11, 16, 18

**Statutes**

5 M.R.S. § 205-A ..................................................................................2

14 M.R.S. § 221 ....................................................................................2

17 M.R.S. § 2701 ..................................................................................2

17 M.R.S. § 2802 ..................................................................................2

28 U.S.C. § 1442 ..................................................................................4

28 U.S.C. § 1442(a)(1)...........................................................................6

28 U.S.C. § 1447(c) ...........................................................................1, 2, 4, 20

42 U.S.C. § 4332(2)(C)(iii) ....................................................................17

42 U.S.C. § 6241(a)..............................................................................18

42 U.S.C. § 6241(d)..............................................................................18

42 U.S.C. § 9601 .................................................................................12

# <u>INTRODUCTION</u>

Defendants have engaged in a decades-long disinformation campaign about climate change and its impacts, and the State brought this state-law action in Maine state court to seek redress for that deception. Defendants removed the case to federal court, recycling arguments that the First Circuit and courts across the country have rejected as bases for jurisdiction, along with hundreds of pages of exhibits those courts already considered and found wanting. Notice of Removal at 1–498 ("NOR"); Declaration of Joshua Dick at 1–14 ("Dick Decl."). Defendants' baseless removal wastes judicial and State resources and serves no purpose other than delay. The Court must remand and should award the State its costs and reasonable attorneys' fees. 28 U.S.C. § 1447(c).

Defendants' sole hook for federal jurisdiction is the federal officer removal statute. NOR at 5–76. But in a substantially similar case brought by the State of Rhode Island against many of the same defendants, the First Circuit held that there was "simply no nexus between anything for which Rhode Island seeks damages and anything the oil companies allegedly did at the behest of a federal officer." *Rhode Island v. Shell Oil Prods. Co.* (*Rhode Island I*), 979 F.3d 50, 60 (1st Cir. 2020). The First Circuit later revisited that decision and reaffirmed it without qualification. *Rhode Island v. Shell Oil Prods. Co.* (*Rhode Island II*), 35 F.4th 44, 53 n.6 (1st Cir. 2022).

Courts of appeals in eight circuits have considered Defendants' removal arguments in cases materially similar to the State's, and all eight have rejected them, as have even more district courts.[1]

---

[1] *Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122 (2d Cir. 2023); *Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022), *cert. denied*, 143 S. Ct. 2483 (2023); *Anne Arundel v. BP P.L.C.*, 94 F.4th 343 (4th Cir. 2024); *Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 620 (2024); *Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *Oakland v. BP PLC* (*Oakland I*), 969 F.3d 895 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2776 (2021); *Oakland v. BP PLC* (*Oakland III*), 2023 WL 8179286 (9th Cir. Nov. 27, 2023) (unpublished); *San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1797 (2023); *Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *D.C. v. Exxon Mobil Corp.*, 89 F.4th 144 (D.C. Cir. 2023); *see also Charleston v. Brabham Oil Co.*, 2023 WL 11867279 (D.S.C. July 5, 2023); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020); *Multnomah v. Exxon Mobil Corp.*, 2024

The Fourth Circuit recently admonished the defendants for regurgitating their failed arguments:

> [Defendants] in these cases display a real commitment to the maxim, "If at first you don't succeed, try, try, try again." In recent years, state and local governments have brought state-court lawsuits against energy companies, alleging they misrepresented and concealed information about their fossil fuel products in violation of state tort and consumer protection laws. The companies have sought—over and over and over—to remove the cases to federal court. By our count, that gambit has failed in at least ten cases already. The eleventh time is not the charm.

*Anne Arundel v. BP P.L.C.*, 94 F.4th 343, 346 (4th Cir. 2024). Despite Defendants' purported "additional grounds for removal" and "additional and detailed evidence" here, NOR ¶ 5, courts have already evaluated nearly every piece of "evidence" they present and concluded that federal jurisdiction does not exist. *E.g.*, *Anne Arundel v. BP P.L.C.*, Dkt. 21-cv-01323, Doc. 1.[2]

This Court must remand this action and should award Maine its costs and fees because of Defendants' objectively baseless removal. *See* 28 U.S.C. § 1447(c); *New York v. Exxon Mobil Corp.*, 733 F. Supp. 3d 296, 315–16 (S.D.N.Y. 2024) (awarding costs and fees because the defendants' federal-common-law and federal-officer-removal theories "can no longer be considered a good faith litigation strategy"); *Rhode Island II*, 35 F.4th at 62 (awarding costs).

## BACKGROUND

Maine asserts claims under state common law for negligence, public and private nuisance, trespass, and civil aiding and abetting, as well as claims under the Maine Revised Statutes for statutory nuisance, 17 M.R.S. §§ 2701, 2802, deceptive trade practices, 5 M.R.S. §§ 205-A–214, and strict liability for failure to warn, 14 M.R.S. § 221. Compl. ¶¶ 334–457. Defendants have

---

WL 1991554 (D. Or. Apr. 10, 2024); *New Jersey v. Exxon Mobil Corp.*, 2023 WL 4086353 (D.N.J. June 20, 2023); *New York v. Exxon Mobil Corp.*, 733 F. Supp. 3d 296 (S.D.N.Y. 2024); *Vermont v. Exxon Mobil Corp.*, 2024 WL 446086 (D. Vt. Feb. 6, 2024).

[2] Defendants previously relied on all but three of the 85 exhibits to their NOR in one or more of their unsuccessful bids for removal. The three new exhibits are unavailing. *See infra* pp. 5, 12–14, 17–18.

known for more than fifty years that the regular use of Fossil Fuel Defendants'[3] products releases greenhouse-gas pollution that triggers climatic injuries, including injuries in Maine. *E.g.*, *id.* ¶¶ 55–95, 248–333. Despite this knowledge, Defendants carried out a decades-long campaign of denial and disinformation about the existence of climate change and Fossil Fuel Defendants' products' contribution to it, a campaign that persists to this day. *E.g.*, *id.* ¶¶ 96–134, 156–247.

Importantly, "Maine does not seek relief with respect to any federal property, land or assets." *Id.* ¶ 17. Maine explicitly "disclaims injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes." *Id.* ¶ 18.

In an effort to manufacture a basis for removal, Defendants ignore Maine's allegations and point to eight categories of unrelated conduct, NOR ¶¶ 18–113, *all* of which have previously failed to provide a basis for federal jurisdiction. *See, e.g.*, *Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122, 142–45 (2d Cir. 2023).[4] Each circuit that has considered Defendants' arguments, including the First Circuit, has rejected Defendants' attempts to secure federal jurisdiction by rewriting climate-deception complaints. *E.g.*, *Rhode Island I*, 979 F.3d at 60; *Rhode Island II*, 35 F.4th at 53 n.6; *Anne Arundel*, 94 F.4th at 346.

## LEGAL STANDARD

Federal courts have limited jurisdiction, and "the party invoking the jurisdiction of a federal

---

[3] "Fossil Fuel Defendants" refers collectively to all named defendants except the American Petroleum Institute.

[4] These categories include "contract[ing] to manufacture avgas, synthetic rubber, and other war materials" during World War II ("WWII") and the Korean War, *e.g.*, NOR ¶¶ 36, 38; continually supplying "highly specialized petroleum products required for national defense and wartime efforts," *e.g.*, *id.* ¶ 43; "serv[ing] as government-designated operators of government-owned industrial facilities" or equipment during WWII, *e.g.*, *id.* ¶ 59; "producing oil and gas pursuant to the federal mineral exploitation and production regime created by the Outer Continental Shelf Lands Act," *e.g.*, *id.* ¶ 64; "developing mineral resources on federal lands," *e.g.*, *id.* ¶ 94; "producing and distributing oil for the [strategic petroleum reserve] and managing it," *e.g.*, *id.* ¶ 102; and "distribut[ing] available gasoline supplies to wholesale purchasers" under the Emergency Petroleum Allocation Act, *e.g.*, *id.* ¶ 113.

court carries the burden of proving its existence." *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993). Federal jurisdiction only exists under the federal-officer removal statute if a defendant can show "(1) that it was acting under a federal officer's authority; (2) that the charged conduct was carried out for or relating to the asserted official authority; and (3) that it will assert a colorable federal defense to the suit." *Moore v. Electric Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (cleaned up). Where a defendant cannot meet this burden, as is true here, the Court "shall" remand the case back to state court. 28 U.S.C. § 1447(c).

Courts cannot credit a defendant's attempt to redefine the conduct over which the plaintiff has sued. Courts may instead credit a defendant's "theory of the case" only "[t]o the extent the parties raise factual disputes about the scope of a defendant's federal obligations." *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 189 (1st Cir. 2024) (quotations omitted), *compare with* NOR ¶¶ 117, 128. A defendant may not rely on a federal defense "pertain[ing] to claims that simply do not exist." *Express Scripts*, 119 F.4th at 187 (quotations omitted).

## **ARGUMENT**

Defendants allege federal officer removal jurisdiction under 28 U.S.C. § 1442, but the eight circuits that have addressed Defendants' assertions in materially identical climate-deception cases have found jurisdiction lacking. *E.g.*, *supra* note 1; *infra* note 5. The First Circuit summarized why Defendants' arguments fail:

> At first glance, [Defendants' proffered contracts with the United States] may have the flavor of federal officer involvement in the oil companies' business, but that mirage only lasts until one remembers what Rhode Island is alleging in its lawsuit. Rhode Island is alleging the oil companies produced and sold oil and gas products in Rhode Island that were damaging the environment and engaged in a misinformation campaign about the harmful effects of their products on the earth's climate. The contracts the oil companies invoke as the hook for federal-officer jurisdiction mandate none of those activities. . . . There is simply no nexus between anything for which Rhode Island seeks damages and anything the oil companies allegedly did at the behest of a federal officer.

*Rhode Island I*, 979 F.3d at 59–60. Defendants once again attempt to create an illusion that the complaint involves conduct that would give rise to federal jurisdiction, but, as in each previous attempt, Defendants cannot meet any of the necessary elements under the statute.[5]

To support their illusion, Defendants introduce three new exhibits that have no effect on the analysis or result here. Dick Decl. Exs. 83–85. The first is an unremarkable contract from 1943 between War Emergency Tankers, Inc. and the United States to "manage and conduct the business of ocean-going oil tank vessels," *id.* Ex. 84, and the second is a single-page industry article describing that "co-operative venture," *id.* Ex. 83. Similar contracts have been rejected by every court to review them as not supporting federal-officer jurisdiction. *See infra* pp. 12–14. This contract and Defendants' conduct during World War Two ("WWII") predate the Complaint's relevant allegations by decades and are unrelated to the State's litigation. *E.g.*, *Anne Arundel*, 94 F.4th at 349; *Connecticut*, 83 F.4th at 144; *D.C. v. Exxon Mobil Corp.*, 89 F.4th 144, 156 (D.C. Cir. 2023). The third exhibit is the 2022 Strategic Petroleum Reserve ("SPR") annual report, which is merely an updated version of a document that has been firmly rejected as a basis for removal by every court that has considered it. *See infra* pp. 17–18; NOR ¶ 107; Dick Decl. Ex. 85 at 30–32.

## I.     The State Did Not Bring This Suit "For or Relating to" Anything Defendants Allegedly Did Under Federal Direction.

### A.     As in *Rhode Island I*, There Is No Nexus Between Defendants' Charged Conduct and Their Claimed Conduct Under Federal Officers.

There is no jurisdiction under the federal officer removal statute because the "charged conduct" alleged in the Complaint "was [not] carried out 'for or relating to' the asserted federal

---

[5] *See Rhode Island I*, 979 F.3d at 59–60 ("acting under" and "for or relating to" elements); *accord Connecticut*, 83 F.4th at 142–45; *Hoboken*, 45 F.4th at 712–13; *Anne Arundel*, 94 F.4th at 347–50; *Baltimore*, 31 F.4th at 228–38. *Minnesota*, 63 F.4th at 714–16 ("for or relating to" element); *accord D.C.*, 89 F.4th at 155–57; *San Mateo*, 32 F.4th at 755–60 ("acting under" element); *Oakland III*, 2023 WL 8179286, at *2; *Boulder*, 25 F.4th at 1250–54. *Honolulu*, 39 F.4th at 1106–10 ("acting under" and "colorable defense" elements).

authority" as claimed by Defendants. *Moore*, 25 F.4th at 34 (quoting 28 U.S.C. § 1442(a)(1)). The First Circuit affirmed remand in *Rhode Island I* because the defendants' charged conduct—their failure to warn and deceptive marketing of fossil fuels—was not alleged to be directed or even influenced by federal officers and there was therefore "simply no nexus between anything for which [Rhode Island] s[ought] damages and anything the oil companies allegedly did at the behest of a federal officer." 979 F.3d at 60. As in *Rhode Island I*, the "charged conduct" here is Defendants' failure to warn and deceptive marketing of fossil fuel products. *E.g.*, Compl. ¶¶ 4, 8, 15; *Moore*, 25 F.4th at 34. Defendants do not allege that any federal officer controlled or influenced their alleged deceptive marketing practices, or any aspect of their marketing at all. Nor could they.

Defendants argue that "a clear connection or association exists between Defendants 'acting under' federal officers by extracting and producing oil and gas pursuant to federal contracts and specifications and Plaintiff's attempt to impose liability on Defendants for that very same conduct." NOR ¶ 124. Not so. Federal-officer removal is warranted only if Defendants' allegedly wrongful "*charged conduct*" shares a nexus with "the asserted federal authority" under which Defendants acted, *Moore*, 25 F.4th at 34 (emphasis added), and the Complaint, again, alleges Defendants are liable for their deceptive marketing, not for extracting and producing fossil fuels. The connection Defendants draw between federal activity and "the oil and gas upon which Plaintiff bases its claims," NOR ¶ 123, mischaracterizes the question before the court. The Fourth Circuit recently rejected the same "novel and atextual attempt to expand the scope of the relevant inquiry":

> [Defendants' interpretation] is not what the statute says or how courts have interpreted it. The statutory text tells us what must relate to what. To qualify for removal, a defendant must show, as relevant here, that a suit is "against" "any person acting under [an] officer" "for or relating to any *act* under color of" a federal office. It is the "act" for which the defendant is being sued—not the plaintiff's entire civil action in a general sense—that must relate to the asserted federal duty.

*Anne Arundel*, 94 F.4th at 348. Because the deceptive marketing activities Maine challenges share

"no nexus" with any "act" Defendants allegedly undertook at federal direction, there is no jurisdiction under the federal-officer removal statute. *Rhode Island I*, 979 F.3d at 60; *see also Baltimore v. BP P.L.C.*, 31 F.4th 178, 234 (4th Cir. 2022) ("[T]oo tenuous to support removal."); *Honolulu v. Sunoco LP*, 39 F.4th 1101, 1112 (9th Cir. 2022).

Defendants nonetheless insist the Court "must credit" their misconstruction of the Complaint and ignore the theories of liability actually pleaded. NOR ¶ 124 (citing *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999), and *Express Scripts*, 119 F.4th at 184). But as courts have repeatedly held, Defendants' arguments "misunderst[an]d the[ir] cited cases." *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618, 636 n.21 (D. Del. 2022); *id.* at 638. Nothing "authorize[s] Defendants to freely rewrite the complaint and manufacture a cause of action explicitly disclaimed by Plaintiff and then ask the Court to accept their 'theory of the case' for purposes of removal." *Id.* at 636 n.21. "[I]f Defendants had it their way, they could assert *any* theory of the case, however untethered to the claims of [Maine], because this Court must 'credit' that theory." *Honolulu v. Sunoco LP*, 2021 WL 531237, at *7 (D. Haw. Feb. 12, 2021) (granting remand), *aff'd*, 39 F.4th 1101 (9th Cir. 2022). That is not the law.

Fundamentally, Defendants' "production of military-grade fuel, operation of federal oil leases, and participation in strategic energy infrastructure, even if done at federal direction, bears little to no relationship with how they conducted their marketing activities to the general public," the tortious behavior at issue. *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703, 715 (8th Cir. 2023); *see Connecticut*, 83 F.4th at 145 ("[This case presents a total mismatch."); *D.C.*, 89 F.4th at 156 ("[S]imply no relationship.").

### B. Maine Has Disclaimed Injuries Arising from Sales of Specialized Fuels to the United States for Military and National Defense Purposes.

Even if there were any meaningful relationship between the State's claims and federal

authority, express disclaimers in the State's Complaint sever that connection. Compl. ¶¶ 17–18. "[F]ederal courts have 'consistently' granted motions to remand in cases where the plaintiff expressly disclaims recovery for the claims on which federal removal is based," *Maine v. 3M Co.*, 2023 WL 4758816, at \*9 (D. Me. July 26, 2023) (citation omitted), *appeal docketed*, No. 23-1709 (1st Cir. Aug. 31, 2023), including in other climate-deception cases, *e.g.*, *Hoboken v. Chevron Corp.*, 45 F.4th 699, 713 (3d Cir. 2022) (affirming remand because disclaimers materially identical to Maine's were "no ruse").[6] "[D]isclaimers that 'clearly carve[] out certain factual bases . . . such that any alleged injury could not have happened under the direction of a federal officer' will prevent removal." *Express Scripts*, 119 F.4th at 187 (cleaned up) (citation omitted). This Court recently granted a different motion to remand by the State because of an "express, unambiguous, and plain" disclaimer in the State's complaint that "eliminate[d] a potential relationship between the plaintiff's claims and a defendant's federal acts." *Maine*, 2023 WL 4758816, at \*9.

Maine's Complaint explicitly states it does not seek relief related to federal property, land, or assets, Compl. ¶ 17, nor recovery or relief from injuries arising from Defendants' provision of specialized fossil fuel products to the federal government for national defense purposes, *id.* ¶ 18. Remand is required because the Complaint does not place Defendants' sales of specialized military fuels at issue, and there is no possibility that Maine "will hold a defendant liable for its official acts" supposedly undertaken as part of those sales. *Express Scripts*, 119 F.4th at 188.[7]

None of Defendants' citations undermine Maine's disclaimer. NOR ¶¶ 127–31. *Express*

---

[6] *Accord Annapolis v. BP P.L.C.*, 2022 WL 4548226, at \*8 (D. Md. Sept. 29, 2022); *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618, 635 (D. Del. 2022); *Minnesota v. Am. Petroleum Inst*. 2021 WL 1215656, at \*11 (D. Minn. Mar. 31, 2021); *cf. Boulder*, 25 F.4th at 1272 (affirming remand based in part on disclaimer of "damages or abatement relief for injuries to or occurring on federal lands"); *Baltimore*, 31 F.4th at 218–19 (similar).

[7] *See also New Hampshire v. 3M Co.*, 665 F. Supp. 3d 215, 227 (D.N.H. 2023) (rejecting federal-officer removal based on an "effective" disclaimer that "eliminates the connection between the State's broad statewide claims and 3M's production of [military-specification aqueous film-forming foam] for the United States military"); *Maine*, 2023 WL 4758816, at \*10.

*Scripts* is inapposite because the defendants there negotiated contracts for private and governmental health insurance plans in a single simultaneous negotiation, such that their allegedly deceptive practices in those negotiations could not be separated from conduct under government direction, "no matter what the disclaimer sa[id]." 119 F.4th at 181, 190–91. By contrast, here, the charged conduct is Defendants' "concealment or misrepresentation of information about fossil fuel products," not anything else. *Anne Arundel*, 94 F.4th at 349. That deception is neither entangled with nor inseparable from Defendants' purported conduct under federal authority. *See, e.g.*, *Minnesota v. Am. Petroleum Inst.*, 2021 WL 1215656, at *11 (D. Minn. Mar. 31, 2021).

Defendants rely heavily on *Baker v. Atlantic Richfield Co*., NOR ¶ 130, but the plaintiffs' disclaimer there was ineffective because it contradicted their theory of liability, 962 F.3d 937, 945 n.3 (7th Cir. 2020). *Rhodes v. MCIC, Inc.*, involved a so-called *jurisdictional* disclaimer that attempted to waive "any cause of action or claim for recovery that could give rise to federal subject matter jurisdiction." 210 F. Supp. 3d 778, 785–86 (D. Md. 2016). Maine's disclaimer "is not a jurisdictional disclaimer that categorically disclaims jurisdiction conferred by the federal officer removal statute, but is instead a claim disclaimer that expressly disclaims the claims upon which federal officer removal was based." *Delaware*, 578 F. Supp. 3d at 635 (cleaned up). *Ballenger v. Agco Corp.* is irrelevant for the same reason. 2007 WL 1813821, at *1 (N.D. Cal. June 22, 2007). Maine's disclaimer is a proper claim disclaimer, not an improper jurisdictional one.

## II.    Defendants Have Not Acted Under Federal Authority.

Even if there were any nexus between the wrongful conduct alleged in the State's Complaint and any federal authority, jurisdiction would still be lacking here because Defendants have not met their burden to show they "acted under" a federal superior within the meaning of the statute. "[P]recedent and statutory purpose make clear that [a] private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior" and

"typically involves subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007) (citation omitted). Federal contractors can satisfy the "acting under" requirement only "when the relationship between the contractor and the Government is an unusually close one." *Id.* at 153. "For example, a contractor is unlikely to meet the 'acting under' requirement if it sells the government an off-the-shelf commercial product or its relationship with the government is a typical, arms-length business deal." *Express Scripts*, 119 F.4th at 193. A company's mere compliance "with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official,' even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Watson*, 551 U.S. at 143.

Courts of appeals in five circuits have rejected Defendants' claims that they were "acting under" a federal officer's authority when engaging in the exact same conduct Defendants allege here.[8] At most, some Defendants have alleged that they have at times (a) complied with generally applicable legal obligations or (b) entered arm's-length business transactions with federal agencies. Neither suffices to meet the "acting under" requirement. *E.g.*, *Hoboken*, 45 F.4th at 712–13.

**WWII and the Korean War**. Defendants contend they acted under federal officers when they produced aviation gasoline ("avgas"), aided in tanker operations, operated petroleum infrastructure, drilled wells, and produced other petroleum products such as synthetic rubber, toluene, diesel, and lubricating oils during WWII and the Korean War. NOR ¶¶ 28–42. Those activities have no nexus with Maine's Complaint because they have nothing to do with Defendants' deceptive marketing and because Maine disclaimed them. Compl. ¶ 18. Even if there were a nexus, Defendants still have not shown their activities constitute "acting under" the federal government.

---

[8] *Connecticut*, 83 F.4th at 142–45; *Hoboken*, 45 F.4th at 712–13; *Anne Arundel*, 94 F.4th at 347–50; *Baltimore*, 31 F.4th at 228–37; *San Mateo*, 32 F.4th at 755–60; *Honolulu*, 39 F.4th at 1106–10; *Oakland III*, 2023 WL 8179286, at *2; *Boulder*, 25 F.4th at 1250–54.

First, in addition to falling within Maine's valid disclaimer, Defendants' activities during WWII and the Korean War predate the deceptive "charged conduct" alleged in the Complaint by decades. *E.g.*, Compl. ¶¶ 96–134; *Anne Arundel*, 94 F.4th at 349; *Connecticut*, 83 F.4th at 144. "There is simply no relationship between actions taken by [Defendants]' predecessors in the 1940s and 1950s and the allegedly deceptive statements" Defendants made years later to consumers and the public, *D.C.*, 89 F.4th at 156. The Court can reject these removal theories for that reason alone.

Second, Defendants' compliance with lawful orders under the Defense Production Act, or from the Petroleum Administration for War ("PAW") and War Petroleum Board, does not demonstrate federal control. Defendants repeatedly cite "directives" to fossil fuel companies, some of which were purportedly "coercive," to evoke an image of close control and direction, NOR ¶¶ 30–35, 38–39, but "'simply complying with the law' . . . no matter how detailed the government regulation or how intensely the entity's activities are supervised and monitored," is not acting under the government, *Baltimore*, 31 F.4th at 229 (quoting *Watson*, 551 U.S. at 143).

Third, as multiple courts have held, and contrary to Defendants' assertions, the PAW did not "control the petroleum industry" or "dictate[]" Defendants' business decisions to increase avgas production. NOR ¶¶ 28, 34. In reality, while "PAW, and other government agencies had the authority to require production of goods at refineries owned by the Oil Companies, and even to seize refineries if necessary, in fact they relied almost exclusively on contractual agreements" to meet wartime demand. *U.S. v. Shell Oil Co.*, 294 F.3d 1045, 1049–50 (9th Cir. 2002).[9] "Throughout

---

[9] *See also Oakland v. BP PLC* (*Oakland II*), 2022 WL 14151421, at *7 (N.D. Cal. Oct. 24, 2022) (granting motion to remand) (quoting Deputy PAW Administrator's statement that "[w]e kept these controls at a minimum; so far as possible we relied on the cooperation of the industry rather than on orders and directives"), *aff'd*, 2023 WL 8179286 (9th Cir. Nov. 27, 2023); *Par. of Plaquemines v. Riverwood Prod. Co.*, 2022 WL 101401, at *9 (E.D. La. Jan. 11, 2022) (granting motion to remand) ("The oil industry was indeed highly regulated, supervised, and monitored during WWII, and the regulation was both highly detailed and often quite specific. . . . The PAW was given power to direct. It threatened to direct. But threats are not themselves direction.").

the war, the Oil Companies designed and built their facilities, maintained private ownership of the facilities, and managed their own refinery operations" and "affirmatively sought contracts to sell avgas to the government," which "were profitable throughout the war." *Shell Oil*, 294 F.3d at 1050. Avgas production under these contracts was "more like an arm's-length business deal" than subjection or control and does not support removal. *Honolulu*, 39 F.4th at 1108.

Defendants' reliance on *Exxon Mobil Corp. v. U.S.* is misplaced. NOR ¶¶ 30–32, 36, 37, 40. In that cost allocation action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq*., the court in fact concluded in relevant part, "the government's involvement in [certain avgas] refineries falls short of that necessary for liability as an operator," which "support[ed] [assigning] a lower equitable share" or responsibility to the government. 2020 WL 5573048, at *47–48 (S.D. Tex. Sept. 16, 2020). The decision has nothing to do with federal officer jurisdiction, and the portions of the decision Defendants rely on show at most that Defendants "compl[ied] with [PAW] directive[s]." *Id.* at *12. Complying with the law does not qualify as "acting under" the direction of the federal government.

Finally, Defendants briefly cite War Emergency Tankers, Inc., an entity created during WWII "to aid in tanker operation." NOR ¶ 29. But Defendants themselves describe the business as a "cooperative venture" created to pursue government contracts, *id.*, and the sole contract they rely on does not evidence close governmental control. It broadly outlines the company's duties in managing a tanker fleet and requires only that the company "follow reasonable commercial practices," perform "in an economical and efficient manner," and "exercise due diligence" to protect the United States' interests. *See* Dick Decl. Ex. 84, arts. 3A(a), 3B(a)–(b); *see also* Ex. 83 (industry periodical describing company as "a co-operative venture"). As one example, the contract provides that the company must "[p]rocure the Masters of the vessels operated hereunder"

who "shall have and exercise full control, responsibility and authority with respect to the manning, navigation and management of the vessel," and "shall be procured through the usual channels and in accordance with the customary practices of commercial operators . . . ." *Id.* Ex. 84, art. 3A(d). That agreement does not confer jurisdiction here anymore than the other 1940s and 1950s wartime relationships that have been rejected by every court to review them.

***Specialized Fuels for Military Use.*** Maine has disclaimed relief arising from Defendants' sales of non-commercial, specialized fuels to the military. Compl. ¶ 18. Regardless, arm's-length sales to the government without close control or supervision cannot support jurisdiction. The fact that the government "set[s] forth detailed [product] specifications" for an item it purchases does not mean the seller is "acting under" a federal superior. *Baltimore*, 31 F.4th at 231. The government must instead have "close[ly] supervis[ed]" production by, for example, "exercis[ing] intense direction and control over all written documentation" accompanying the product, or "maintain[ing] strict control over the [product's] development." *Id.* (cleaned up); *see Baker*, 962 F.3d at 942–43.

Defendants' own documents show that they have overwhelmingly designed and produced specialized military fuels without close government supervision. An account of the Blackbird spy plane project, for example, states the government adopted a "management philosophy" of giving maximal "free[dom]" to contractors. Dick Decl. Ex. 19 at 26. Officials refrained from "substituting their judgment for that of the contractors," and the "[r]equirements for Government approval as a prerequisite to action were minimal." *Id.* at 27. Similarly, Shell Oil's contracts relating to the OXCART program simply gave the government generic rights to inspect the final deliverables, as any commercial contract would offer the buyer. *See* Dick Decl. Ex. 25 at 14–15. Nothing in the contracts suggests the government oversaw the manufacturing process itself.

Shell's contracts for JP-5 and JP-8 jet fuel are also unremarkable commercial agreements,

13

secured by Shell's winning bid and negotiated at arm's length. *Id.* Ex. 34 at 1–2. Defendants repeatedly emphasize the size of their contracts, NOR ¶¶ 46, 48–49, but the government's purchasing volume is irrelevant. "Arm's length business agreements with the federal government for highly specialized products remain arm's length business agreements," so these contracts did not result in the control and supervision necessary to satisfy this factor. *Oakland II*, 2022 WL 14151421, at *8 (rejecting removal based on design and sales of specialized fuel).

*Construction, Operation, and Management of Petroleum Production Facilities.* Defendants' operation of government-owned petroleum infrastructure during WWII likewise fails to satisfy the "acting under" standard. NOR ¶¶ 59–63. Setting aside that WWII substantially predates the relevant time period, Defendants themselves explain it was the government itself that "buil[t] refineries" and "manage[d] scarce resources" during the war, while exercising "contractual power" to facilitate fossil fuel production. *Id.* ¶¶ 28–29. The PAW "enter[ed] into contracts" with Defendants to supply petroleum, *id.* ¶ 32, "most of it aviation gasoline," Dick Decl. Ex. 1 ¶ 18. Wartime avgas production was not strictly controlled by the government, and was instead achieved "almost exclusively [through] contractual agreements" under which producers "maintained private ownership of the facilities, and managed their own refinery operations." *Shell Oil Co.*, 294 F.3d at 1050; NOR ¶¶ 50–58. Further, Maine has disclaimed recovery for injuries from production and sales of fuels to the government for military and national defense purposes.

*Mineral Resources on the Outer Continental Shelf.* Defendants expressly raised "oil extraction under the Outer Continental Shelf Land Act" on the outer continental shelf ("OCS") as a basis for removal in *Rhode Island I*, and the First Circuit gave no credence to that argument. 979 F.3d at 59. The Court held there was "simply no nexus" between Defendants' OCS drilling leases and "anything for which Rhode Island seeks damages," and suggested that the leases did not show

14

an *acting under* relationship because there is "no 'close supervision' of this extraction or production of oil 'specially conformed to government use.'" *Id*. That precedent binds this Court. The "additional evidence" Defendants offer here does nothing to alter the analysis. NOR ¶ 92.

Defendants highlight a declaration by Professor Richard Priest not offered in *Rhode Island I*. *Id*. ¶¶ 64–66, 72–73, 79, 92; Dick Decl. Ex. 58. The declaration was submitted verbatim three years ago in Defendants' unsuccessful removal attempt in *Anne Arundel*. *See* 94 F.4th 343. The declaration was rejected as unpersuasive in that case and multiple others. The Ninth Circuit in *Honolulu*, for instance, easily disposed of these same materials. 39 F.4th at 1109; *compare* NOR ¶¶ 65, 66. The other "substantial additional evidence" Defendants refer to has also been rejected by numerous federal courts. NOR ¶ 92. The only new exhibit with any potential relevance to OCS leases is the Department of Energy's 2022 SPR annual report. *Id*. Ex. 85. But that document does not in fact discuss OCS leases or their operations and is not meaningfully different from earlier SPR annual reports Defendants have unsuccessfully relied on in other cases. *E.g.*, *id.* Ex. 74 (2011 SPR annual report), Ex. 79 (2018 SPR annual report). The "[a]dditional and detailed evidence" Defendants tout about OCS lessees' conduct simply does not exist. NOR ¶ 5.

Beyond the First Circuit, five other courts of appeals have rejected Defendants' argument that they act under federal officers when they drill for oil and gas on the OCS and other federal lands. *Compare* NOR ¶¶ 64–93, *with Connecticut*, 83 F.4th at 143 ("Exxon Mobil has made this very argument to five of our sister circuits, all of which have squarely rejected it.") (collecting cases). Defendants bid for, and pay royalties on, leased mineral rights on federal property through a public process defined by statutes and regulations. "Though the federal government grants the leases, oil produced under them is produced to sell on the open market, not specifically for the government." *Hoboken*, 45 F.4th at 713 (cleaned up). The leases do not "impose close federal

15

control" and require only "compl[iance] with run-of-the-mill regulations on oil and gas production," which "is not enough for federal jurisdiction." *Id.* (citing *Watson*, 551 U.S. at 152–53),[10] *compare* NOR ¶¶ 80–91. "By winning bids for leases to extract fossil fuels from federal land in exchange for royalty payments, [Defendants are] not assisting the government with essential duties or tasks." *Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1253 (10th Cir. 2022); *Delaware*, 578 F. Supp. 3d at 638. The "leases do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties." *San Mateo v. Chevron Corp.*, 32 F.4th 733, 759 (9th Cir. 2022).[11]

The contracts at issue in *Arlington County v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243 (4th Cir. 2021), are distinguishable. NOR ¶ 64. There, the Department of Defense exercised "extensive oversight" over pharmacy benefits managers hired to assist in the "basic governmental task[]" of providing medical care to veterans and their families, which the governing statute "requires the Secretary of Defense to contract out." 996 F.3d at 252–54. The OCS leases raised by Defendants here involve private lessees' extraction of commodity oil to sell for profit on the open market, in compliance with generally applicable regulations.

The untenability of Defendants' position is illustrated by their assertion that environmental review of OCS leases under the National Environmental Policy Act ("NEPA") subjects Defendants to federal control. NOR ¶¶ 87–89. The federal government approves countless projects through this process, weighing environmental impacts against "the purpose and need for action" as it is

---

[10] *Accord Connecticut*, 83 F.4th at 143 (ExxonMobil "agreed to certain terms" as a lease condition); *Baltimore*, 31 F.4th at 232 ("[M]any of the lease terms are mere iterations of the OCSLA's regulatory requirements."); *San Mateo*, 32 F.4th at 760 (similar); *Delaware*, 578 F. Supp. 3d at 637 (similar).

[11] Defendants' citations to historic oil shortages and unenacted bills are irrelevant. NOR ¶¶ 67–74. None of the proposals Defendants cite became law, and the "contention that [Defendants] are 'acting as agents' to achieve the same 'federal objective' . . . as would a speculative, non-existent 'national oil company' lacks merit." *Delaware*, 578 F. Supp. 3d at 639; *see also Honolulu*, 39 F.4th at 1108.

statutorily required to do. NOR ¶ 89; 42 U.S.C. § 4332(2)(C)(iii).[12] Approval of OCS leases reflects the normal outcome of this process. No court has ever held that approval by the federal government under a statute like NEPA transforms a private corporation into an entity acting under federal authority. *See Sierra Club v. Sigler*, 695 F.2d 957, 962 n.3 (5th Cir. 1983).

    ***Mineral Resources on Federal Lands.*** Defendants' contentions with respect to Bureau of Land Management ("BLM") leases on federal lands are just as meritless. NOR ¶¶ 94–101. Like OCS leases, BLM onshore leases are viewed the same way as ordinary "contracts between private individuals" and do not evince close supervision. *Barlow & Haun, Inc. v. U.S.*, 805 F.3d 1049, 1055 (Fed. Cir. 2015) (quotation omitted). Provisions in these leases also resemble those in the OCS leases rejected by numerous courts. For example, Defendants point to royalty shares that can be modified by the federal government and provide "economic incentive[s] to produce oil and gas." NOR ¶ 99. "[R]eceiving incentive payments for acting in a way that promotes a broad federal interest," however, does not qualify as acting under a federal officer. *Progin v. UMass Mem'l Health Care, Inc.*, 2023 WL 4535129, at *4 (D. Mass. July 13, 2023) (citation omitted).

    ***Strategic Petroleum Reserve.*** Defendants' argument that they acted under federal officers by "supplying fuel for and managing" the SPR, NOR ¶ 19, is wrong on both the facts and the law. Defendants' various interactions with the SPR fall within the scope of the State's disclaimer, and do not show an "acting under" relationship on the merits. *Connecticut*, 83 F.4th at 143–44.[13]

    Some Defendants supplied oil to the SPR through in-kind royalty payments on OCS leases. NOR ¶¶ 104–05. For example, Defendants provide a letter from the Department of the Interior to

---

[12] The government is given broad discretion to define the purpose and need of a project and to prioritize long-term economic or energy benefits over short-term environmental costs. *Audubon Naturalist Soc. of the Cent. Atl. States, Inc. v. U.S. Dept. of Transp.*, 524 F. Supp. 2d 642, 662 (D. Md. 2007). Thus, the government's approval of OCS leases for energy purposes does not signify that these leases helped perform essential governmental tasks.

[13] *See also Hoboken*, 45 F.4th at 712–13; *Anne Arundel*, 94 F.4th at 349; *Honolulu*, 39 F.4th at 1108.

OCS operators describing a "program to use royalties in kind ('RIK') [under OCS leases] to replenish the [SPR]." Dick Decl. Ex. 75 at 1–2. But "payment under a commercial contract—in kind or otherwise—does not involve close supervision or control and does not equal 'acting under' a federal officer," *Honolulu*, 39 F.4th at 1108, and "extract[ing] fossil fuels from federal land in exchange for royalty payments" does not create an "'acting under' relationship," *Boulder*, 25 F.4th at 1238, 1253–54 (citations omitted). Defendants' pivot to their role operating SPR infrastructure fares no better. NOR ¶ 106. "[O]perating the SPR involves a typical commercial relationship and Defendants are not subject to close direction." *Honolulu*, 39 F.4th at 1108.

Defendants state that they act under the federal government when "the President[] call[s] for an emergency drawdown" from the SPR, NOR ¶¶ 107, but the obligations associated with a drawdown are statutory requirements imposed on all lessees. *See* 42 U.S.C. § 6241(a), (d). Once again, "simply complying with the law" does not satisfy Section 1442. *Watson*, 551 U.S. at 152.

***Constructing Oil Pipelines.*** Defendants point to their construction and operation of oil pipelines during WWII but offer no facts showing the government closely controlled those projects. NOR ¶¶ 108–12; Dick Decl. Ex. 6, at 108. Defendants' arguments fail for reasons already stated with respect to conduct during WWII.[14] Additionally, Defendants' declarant concedes that oil companies "provided the government" with "know-how in the areas of pipeline construction and operation." Dick Decl. Ex. 1 ¶ 13. A contractor is not acting "under federal supervision or control" when "the government [is] relying on the expertise of [the contractor] and not vice versa." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 728 (9th Cir. 2015) (cleaned up).

***Emergency Petroleum Allocation Act.*** Defendants' activities under the Emergency

---

[14] *Oakland II*, 2022 WL 14151421, at *7 (rejecting construction and operation of the Inch Lines as grounds for removal).

Petroleum Allocation Act ("EPAA"), NOR ¶ 113, likewise "are irrelevant here because the EPAA only controlled the allocation and distribution of available gasoline supplies," and "did not require fossil fuel companies to increase production levels." *Delaware*, 578 F. Supp. 3d at 636 n.22 (cleaned up). This allocation and the required reporting cited by Defendants are typical statutory requirements that do not bring Defendants under the "close supervision" of federal officers. *Rhode Island I*, 979 F.3d at 59 (citation omitted).

### III.    Defendants Have No Colorable Federal Defense.

Although this Court need not address whether Defendants have a colorable federal defense since Defendants cannot meet the first two elements of the federal officer removal statute, *see Boulder*, 25 F.4th at 1254; *San Mateo*, 32 F.4th at 760, Defendants' asserted defenses nevertheless "fail to stem from official duties or are not colorable," *Honolulu*, 39 F.4th at 1110 (citing *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)).

Defendants' federal contractor defense could only apply to "alleged defects in military equipment" and is therefore far removed from the allegations in the Complaint. NOR ¶ 133 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504–14 (1988)). The State has not brought manufacturing or design defect causes of action, does not premise liability on any "defects in military equipment," and has expressly disclaimed injuries relating to military sales of specialized fuels. Compl. ¶ 18.[15] The federal contractor defense will never be at issue in this case. *See Honolulu*, 39 F.4th at 1110 (federal contractor defense not colorable).

Defendants' anticipated preemption defenses based on the Commerce Clause, the Supremacy Clause, the Due Process Clause, the foreign affairs doctrine, and the Clean Air Act

---

[15] Because of this effective disclaimer, *Baker* and *Moore* are also distinguishable because, unlike here, both involved liability for the sale of specialized products to the federal government. NOR ¶¶ 135–36.

("CAA"), NOR ¶¶ 137–41, have nothing to do with the actions Defendants claim they took under federal direction. *See Honolulu*, 39 F.4th at 1110. For their Commerce and Supremacy Clause arguments, Defendants have essentially just "assert[ed] a defense and the word 'colorable' in the same sentence," *id.*, turning immediately to amorphous notions of the "Constitution's structure," NOR ¶ 138. Defendants' CAA, Due Process, and foreign affairs defenses are not colorable because they are irrelevant to the State's claims, which seek liability under state tort law for deceptive statements and omissions, not for global emissions. *E.g., Boulder Cnty. v. Suncor Energy (U.S.A.), Inc.*, 2024 WL 3204275, at *24–29 (D. Colo. June 21, 2024). Defendants' First Amendment pronouncements are likewise not colorable, as the First Amendment provides no protection for the alleged false or misleading commercial speech, *id.* at *29–30, and "Defendants do not contend that the government ordered their allegedly deceptive acts," *Honolulu*, 39 F.4th at 1110.

## **REQUEST FOR FEES**

Under 28 U.S.C. § 1447(c), the Court should award the State all costs and fees incurred to bring this motion because Defendants' removal is objectively unreasonable and because unusual circumstances justify an award. *See Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005). Defendants' removal arguments have been twice rejected by the First Circuit, *Rhode Island I*, 979 F.3d at 60; *Rhode Island II*, 35 F.4th at 53 n.6, and "universally rejected by federal courts across the country," as the Southern District of New York recently observed when it awarded fees in *New York*, 733 F. Supp. 3d at 314–16. Defendants' tactic of rehashing the same tired arguments to "delay[] litigation and impos[e] costs on the [State]," *Martin*, 546 U.S. at 140, "can no longer be considered a good faith litigation strategy." *New York*, 733 F. Supp. 3d at 315.

## **CONCLUSION**

The Court should remand this case to the Maine Superior Court and award the State its costs and fees incurred in litigating Defendants' unreasonable removal.

Dated: February 18, 2025

STATE OF MAINE

AARON M. FREY
ATTORNEY GENERAL

*/s/ Aaron M. Frey*
Aaron M. Frey (Bar No. 004325)
Scott W. Boak (Bar No. 009150)
Emma Akrawi (Bar No. 006343)
Valerie A. Wright (Bar No. 009166)
6 State House Station
Augusta, Maine 04333
(207) 626-8800

*/s/ Stephanie D. Biehl*

Victor M. Sher (*pro hac vice*)
Stephanie D. Biehl (*pro hac vice*)
Chase Whiting (*pro hac vice*)
Brittany Dutton (*pro hac vice*)
SHER EDLING LLP
100 Montgomery Street, Suite 1410
San Francisco, CA 94104
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Tel.: (628) 231-2500
vic@sheredling.com
stephanie@sheredling.com
cwhiting@sheredling.com
brittany@sheredling.com

Adam J. Levitt (*pro hac vice forthcoming*)
Daniel Rock Flynn (*pro hac vice*)
Anna Claire Skinner (*pro hac vice*)
James Crisafulli (*pro hac vice*)
DiCELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
askinner@dicellolevitt.com
jcrusafulli@dicellolevitt.com

Katie R. Beran (*pro hac vice*)
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
kberan@hausfeld.com

21

James Gotz (*pro hac vice*)
HAUSFELD LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0600
jgotz@hausfeld.com

*Attorneys for the State of Maine, acting by and through the Attorney General*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I caused the foregoing to be filed with the Clerk of this Court via the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

Dated: February 18, 2025                          _/s/ Stephanie D. Biehl_____
                                                 Stephanie D. Biehl (*pro hac vice*)