# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| STATE OF MAINE,<br><br>         Plaintiff,<br><br>         v.<br><br>BP P.L.C.; BP AMERICA INC.; BP ENERGY COMPANY; BP ENERGY RETAIL LLC; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORPORATION; CHEVRON U.S.A. INC.; EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION; EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US; SHELL TRADING (US) COMPANY; SHELL P.L.C.; SHELL USA, INC.; SUNOCO LP; and AMERICAN PETROLEUM INSTITUTE,<br><br>         Defendants. | Civil Action No. 2:25-cv-00001-NT<br><br>Hon. Nancy Torresen<br><br>**Oral Argument Requested** |

## <u>OPPOSITION TO PLAINTIFF'S MOTION TO REMAND</u>

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT ................................................................................................ 4

     A.   Defendants Properly Removed This Case Under The Federal Officer Removal Statute. ................................................................................. 4

          1.   Defendants "Acted Under" Federal Officers And Agencies. .................... 5

          2.   Defendants' Activities At The Direction Of Federal Officers Are "Related To" Plaintiff's Claims. ............................................................. 10

          3.   Any Attempt To Disclaim Injury Arising From The Sales Of Specialized Fuels To The United States Military Is Ineffective. ............. 15

          4.   Defendants Raise "Colorable Federal Defenses." ................................... 18

     B.   Defendants' Grounds For Removal Are Objectively Reasonable, And Plaintiff Is Not Entitled To Fees And Expenses. ................................................. 19

III.  CONCLUSION ............................................................................................ 20

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*Am. Elec. Power Co. v. Connecticut,*
    564 U.S. 410 (2011)....................................................................................................16

*Anne Arundel Cnty. v. BP P.L.C.,*
    94 F.4th 343 (4th Cir. 2024) ......................................................................................14

*Apparel Art Int'l, Inc. v. Amertex Ents. Ltd.,*
    48 F.3d 576 (1st Cir. 1995)........................................................................................11

*Baker v. Atl. Richfield Co.,*
    962 F.3d 937 (7th Cir. 2020) ..................................................................8, 9, 10, 17, 18

*Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988)...................................................................................................19

*Campbell-Ewald Co. v. Gomez,*
    577 U.S. 153 (2016)...................................................................................................19

*City of Charleston v. Brabham Oil Co., Inc.,*
    No. 2:20-CV-03579 (D.S.C. July 25, 2023) .............................................................20

*City of New York v. Chevron Corp.,*
    993 F.3d 81 (2d Cir. 2021).....................................................................................11, 16

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.,*
    996 F.3d 243 (4th Cir. 2021) ....................................................................................8, 9

*Cnty. of Multnomah v. Exxon Mobil Corp.,*
    2024 WL 1991554 (D. Or. Apr. 10, 2024) ...............................................................20

*Exxon Mobil Corp. v. United States,*
    2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ...........................................................6

*Gov't of Puerto Rico v. Express Scripts, Inc.,*
    119 F.4th 174 (1st Cir. 2024).........................2, 4, 5, 9, 10, 11, 12, 13, 16, 17, 18, 19

*Illinois ex rel. Raoul v. 3M Co.,*
    111 F.4th 846 (7th Cir. 2024) ...................................................................................18

*Jefferson Cnty. v. Acker,*
    527 U.S. 423 (1999).........................................................................................4, 10, 12

*Maine v. 3M Co.,*
    2023 WL 4758816 (D. Me. July 26, 2023)...............................................................18

*Martin v. Franklin Capital Corp.,*
    546 U.S. 132 (2005)...................................................................................................19

*Maryland v. 3M Co.*,
   130 F.4th 380 (4th Cir. 2025) ................................................................13, 14, 18

*Mayor & City Council of Baltimore v. BP P.L.C.*,
   31 F.4th 178 (4th Cir. 2022) ...........................................................................14

*Moore v. Elec. Boat Corp.*,
   25 F.4th 30 (1st Cir. 2022)...............................................................4, 5, 6, 10, 12, 19

*New Hampshire v. 3M Co.*,
   --- F.4th ----, 2025 WL 926229 (1st Cir. Mar. 27, 2025)...................................18

*New Hampshire v. 3M Co.*,
   665 F. Supp. 3d 215 (D.N.H. 2023) ...............................................................18

*Pizzeria Uno Corp. v. Pizza by Pubs, Inc.*,
   2011 WL 4020845 (D. Mass. Sept. 9, 2011) ....................................................12

*Rhode Island v. Shell Oil Prods. Co.*,
   979 F.3d 50 (1st Cir. 2020) ....................................................................3, 9, 14, 15

*Rhode Island v. Shell Oil Prods. Co.*,
   35 F.4th 44 (1st Cir. 2022) .............................................................................20

*Roberts v. Smith & Wesson Brands, Inc.*,
   98 F.4th 810 (7th Cir. 2024) ............................................................................8

*St. Augustine Sch. v. Underly*,
   78 F.4th 349 (7th Cir. 2023) ............................................................................11

*Watson v. Philip Morris Cos., Inc.*,
   551 U.S. 142 (2007)..................................................................................5, 8, 9

*Winters v. Diamond Shamrock Chem. Co.*,
   149 F.3d 387 (5th Cir. 1998) ...........................................................................8

## Statutes

28 U.S.C. § 1442 ...............................................................................................4

28 U.S.C. § 1442(a)(1).............................................................................2, 4, 10, 14

28 U.S.C. § 1447(c) ...........................................................................................19

## Rules

Federal Rule of Appellate Procedure 39 ..............................................................20

## Treatises

Black's Law Dictionary (9th ed. 2009)................................................................12

## I.    INTRODUCTION

Federal jurisdiction exists under the federal officer removal statute because Plaintiff, the State of Maine, seeks to impose liability for cumulative untraceable global greenhouse gas emissions from federal and nonfederal sources alike that are inherently indivisible.    But Defendants have produced, distributed, and supplied oil and gas for the United States military for more than the last 85 years, and much of that production, distribution, and supply has occurred under the control and at the direction of the United States Government.    Therefore, removal was proper.

As explained in the Notice of Removal, Plaintiff "brings claims against Defendants seeking damages and equitable relief for 'climate change impacts' it claims to have suffered or allegedly will suffer, such as sea level rise, extreme weather, and other natural phenomena."    Notice of Removal ("NOR") ¶ 9 (quoting Compl. ¶ 1).    But Plaintiff does not limit itself to its territorial and jurisdictional boundaries; "Plaintiff seeks damages resulting from the *global* production, extraction, distribution, and sale of oil and gas products," which Plaintiff alleges have "'driven a concurrent increase in $CO_2$ and other GHG emissions.'"    *Id.* ¶ 10 (quoting Compl. ¶ 6).    "These '[f]ossil fuel emissions,' in turn, 'are the dominant driver of climate change.'"    *Id.* (quoting Compl. ¶ 6).    So, "Plaintiff . . . seeks damages for the alleged effects of global climate change allegedly due to increased greenhouse gas emissions."    *Id.* (citing Compl. ¶ 188).    "Accordingly, Plaintiff's theory of liability necessarily depends on proof that Defendants' conduct led to increased production, distribution, sale, and consumption of oil and gas that in turn produced increased emissions" and thus "led to Plaintiff's climate change-induced injuries."    *Id.*    Critically, Plaintiff's Motion to Remand does not dispute any of this.

Plaintiff similarly does not dispute that the "United States Department of Defense is the

single largest consumer of energy in the United States and one of the world's largest users of petroleum fuels," or that, "[f]or more than a century, United States policy has expressly recognized the fundamental strategic importance of oil and gas." NOR ¶ 1. Indeed, Defendants include three of the top four fuel suppliers to the U.S. military, *id.* ¶ 46, who supply fuel that is the "lifeblood" of the military, *id.* ¶ 45, and is essential to national security and the economy. And Plaintiff does not dispute that "greenhouse gas emissions attributable to Defendants' production of oil and gas under the direction of the federal government have precisely the same alleged impact on Plaintiff as do emissions from any other source." *Id.* ¶ 130.

Because Plaintiff does not dispute, and thus concedes, that its claims depend on the inseparable impacts of actions under federal officers, this case is removable under the federal officer removal statute. 28 U.S.C. § 1442(a)(1).

Even aside from Plaintiff's concessions, recent controlling First Circuit precedent requires the Court to "credit" Defendants' allegations and theory of the case for removal purposes. *See Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 184 (1st Cir. 2024). And here, Defendants have not only alleged—but presented significant evidence—that the federal government directed Defendants to engage in substantial oil and gas production and distribution activities related to Plaintiff's claims and alleged injuries. It is precisely the alleged effects of cumulative emissions from the use of fossil fuel products—including those supplied by Defendants to the federal government under federal direction and pursuant to federal specifications—that Plaintiff contends caused its injuries. Because Plaintiff's claims and alleged injuries are based on Defendants' global oil and gas production, distribution, and sales activities, including those performed under the direction of federal officers, and because Plaintiff cannot separate emissions from fuels provided to the government from those of non-government sources, this Court has

2

federal officer removal jurisdiction.

Plaintiff's reliance on *Rhode Island v. Shell Oil Products Co.*, 979 F.3d 50 (1st Cir. 2020), is misplaced for several reasons. *First*, Defendants here provide additional grounds for removal that were not considered in *Rhode Island*, including, for example, the production and distribution of highly specialized fuels to the U.S. military. *See* NOR ¶¶ 43–58. *Second*, on the sole ground for removal raised in *Rhode Island* that Defendants also raise here—leases for oil extraction in the Outer Continental Shelf ("OCS")—the Notice of Removal provides additional and detailed evidence not presented in *Rhode Island*. *Third*, *Rhode Island* focused only on oil and gas "produced and sold . . . *in Rhode Island*," 979 F.3d at 60 (emphasis added), whereas Plaintiff's claims here necessarily implicate Defendants' *global* production, extraction, distribution, and sales activities, including their activities carried out at the behest of federal officers, *see, e.g.*, Compl. ¶¶ 6–9, 15, 43–54.[1] *Finally*, *Rhode Island* suggested that the "distribution" of petroleum products at federal behest (as opposed to mere extraction) would have supported federal officer removal, 979 F.3d at 60—and, as explained in the Notice of Removal, the record here establishes that Defendants distributed a significant amount of petroleum to the federal government under the direction of federal officers, *see* NOR ¶¶ 27–113.[2] Removal was thus proper.

---

[1]  The First Circuit recognized that the plaintiff's claims were also based on a "misinformation campaign about the harmful effects of their products on the earth's climate." 979 F.3d at 60. In so doing, it recognized, as it had to, that the claims were also based on the production and sales of fossil fuel products. But the First Circuit limited its analysis to production and sales "in Rhode Island." *Id.* While Defendants disagree with that analysis, here, there can be no dispute that Plaintiff is seeking damages for global emissions based on the global production and sales of fossil fuels—if it does not, it should tell the Court and Defendants clearly and unequivocally. Otherwise, it has no basis to rely on *Rhode Island* as supporting precedent.

[2]  Plaintiff suggests that only "three new exhibits" have been introduced by Defendants compared to the exhibits submitted by the defendants in *Rhode Island*. Mot. at 5. That is incorrect. Only three of Defendants' 85 exhibits in this case were introduced at any point in *Rhode Island*.

## II.    ARGUMENT

### A.    Defendants Properly Removed This Case Under The Federal Officer Removal Statute.

The federal officer removal statute, 28 U.S.C. § 1442, authorizes removal where, as here, (1) Defendants "act[ed] under a federal officer's authority"; (2) the "suit" relates "to any act under color of federal office"; and (3) Defendants have a "colorable federal defense."  *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34–35 (1st Cir. 2022).  The statute "must be liberally construed to give full effect to [its] purpose," which is "to ensure a federal forum in any case where a federal official *or private actors acting on that official's behalf* may raise a defense arising out of his official duties."  *Express Scripts*, 119 F.4th at 185 (cleaned up; emphasis altered).

The First Circuit's decision in *Express Scripts* confirms that removal was appropriate here. *Express Scripts* emphasized what the Supreme Court had already squarely held:  Courts "*must* 'credit' [the removing] party's 'theory of the case' for why removal under § 1442(a)(1) was appropriate."  119 F.4th at 184 (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999)) (emphasis added).  This deference extends to the removing party's "allegations" in the notice of removal.  *Id.* at 190.  Plaintiff argues for an unduly cramped reading of this basic principle, while simultaneously and improperly asking the Court to ignore whole swaths of its Complaint, to evade federal jurisdiction.  Mot. at 7–9.  Moreover, a plaintiff's purported disclaimer of relief relating to federally directed conduct is ineffective when, under the defendant's theory of the case, "its federal and non-federal work is indivisible."  *Express Scripts*, 119 F.4th at 194.

Here, Defendants demonstrated in the Notice of Removal that they supplied fuel and performed other critical functions to further the national defense and to support the national economy under federal direction, supervision, and control.  Defendants' theory of this case, which is based on a plain reading of the Complaint, is that Plaintiff's alleged climate change related harms

cannot be traced to any specific statements or emissions but depend on the *cumulative impact of global greenhouse gas emissions*, necessarily implicating *all* of Defendants' production, extraction, distribution, and sales activities—including those taken under the direction, supervision, and control of the U.S. government. *See* NOR ¶¶ 3–4, 10, 16, 26–27, 123–26. Crucially, this theory of the case is necessarily inherent in Plaintiff's *own* allegations, which Plaintiff asks this Court simply to ignore. *See* Compl. ¶¶ 6–9, 15, 43–54. But because these global emissions are impossible to trace to any particular source, and emissions from Defendants' activities performed under federal control are indivisible from other emissions (like the conduct in *Express Scripts*), Plaintiff's purported disclaimer is ineffective. *See* NOR ¶¶ 127–31; *Express Scripts*, 119 F.4th at 188–94. As removal was proper in *Express Scripts*, so too is it here.

## 1.    Defendants "Acted Under" Federal Officers And Agencies.

As the First Circuit recently confirmed, "'[t]he words "acting under" are broad' and, like the rest of the statute, 'must be liberally construed.'" *Express Scripts*, 119 F.4th at 185 (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)). "'Acting under' a federal officer contemplates a relationship where the private party engages in an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior," and "typically involves subjection, guidance, or control." *Id.* (cleaned up). "For example, a private contractor that 'help[s] the Government to produce an item it needs' and thus 'helps officers fulfill other basic governmental tasks' may remove because it assists with a governmental function that the government 'itself would have had to perform.'" *Id.* at 185–86 (quoting *Watson*, 551 U.S. at 153–54). "Courts have consistently held that the 'acting under' requirement is *easily satisfied*" in cases "involving injuries arising from a product manufactured for the government." *Moore*, 25 F.4th at 34 n.3 (emphasis added). Likewise, the First Circuit has recognized that the requirement is satisfied when a contractor has

5

"operated [a facility] in accordance with government contracts, in conformance with military specifications, and under [military] oversight." *Id.* at 33 (cleaned up).

Here, Defendants have presented a robust evidentiary record—the majority of which was not before the court in *Rhode Island*—that clearly and unequivocally establishes that Defendants acted at the direction of federal officers in connection with their fuel production and distribution activities. These examples, any one of which is sufficient to support federal officer removal, are comprehensively detailed in the Notice of Removal, *see* NOR ¶¶ 19–113, and include the following three examples (the first two of which were not before the court in *Rhode Island*).

*First*, Defendants presented evidence of the federal government's coercive control over the petroleum industry, including the production and distribution of petroleum products, during World War II and the Korean War, together with Defendants' wartime construction and operation of government-owned or -funded petroleum production facilities and oil distribution pipelines. NOR ¶¶ 28–42, 59–63. During World War II, the United States pursued full production of its oil reserves and created agencies to control the petroleum industry, including Defendants' predecessors and affiliates.[3] Indeed, federal "directives and orders" "governed the production . . . and distribution within the industry of petroleum" and "petroleum products." *Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020). As Senator O'Mahoney, Chairman of the Special Committee Investigating Petroleum Resources, put it in 1945: "No one who knows even the slightest bit about what the petroleum industry contributed to the war can fail to understand that it was, without the slightest doubt, one of the most effective *arms of this Government* . . . in

---

[3] The Complaint conflates the activities of Defendants with those of their predecessors, subsidiaries, and affiliates. Defendants reject these attributions, but describe the conduct of certain predecessors, subsidiaries, and affiliates to show that the Complaint, as pleaded, should remain in federal court.

bringing about a victory."   J. Dick Decl. in Support of Removal ("Dick Decl."), Ex. 3 at 1 (emphasis added).

*Second*, Defendants have produced and distributed—and continue to produce and distribute—large quantities of highly specialized fuels that conform to exacting Defense Department specifications for the unique operational needs of the U.S. military.  NOR ¶¶ 43–58. These specialized jet fuels are designed specifically to assist the military in fulfilling its unique and essential missions.  Indeed, U.S. Navy Captain Matthew D. Holman recently explained that "[f]uel is truly the lifeblood of the full range of Department of Defense ["DOD"] capabilities, and, as such, must be available on specification, on demand, on time, every time.  In meeting this highest of standards, we work hand-in-hand with a dedicated team of Sailors, civil servants, and contractors to deliver fuel to every corner of the world, ashore and afloat."  Dick Decl. Ex. 17 (emphasis added).

As two former Chairmen of the Joint Chiefs of Staff explained, the contracts to produce these specialized fuels "were *not typical commercial agreements*"; rather, they required Defendants "to supply fuels with unique additives to achieve important objectives" "*under the oversight and direction* of military officials."  Dick Decl. Ex. 15 at 6, 20 (emphases added).[4]  In

---

[4]   For example, during the Cold War, Shell Oil Company developed and produced specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and, later, the OXCART and SR-71 Blackbird programs.  NOR ¶ 47.  These fuels involved special processes, testing and inspection requirements, facilities, and security restrictions to support these unique and highly specialized military airframes.  *See id.*  Similarly, BP entities have contracted with the Defense Logistics Agency ("DLA") to provide a significant quantity of specialized military fuels over decades.  BP entities entered into approximately 25 contracts with the DLA to provide approximately 1.5 billion gallons of specialized military fuels, such as JP-5, JP-8, and F-76.  Dick Decl. Ex. 41 at 6.  To meet these unique operational needs, DLA required that the fuels contain express amounts of "military unique additives that are required by military weapon systems."  *Id.* Ex. 39 at 10, § 6.1; *id.* Ex. 40 at 11, § 6.1.

fact, these specialized military grade fuels have no commercial purpose or use at all.  Accordingly, "in the absence of . . . [these] contract[s] with [the Defendants], the Government itself would have had to perform" these essential tasks to meet the critical DOD fuel demands.  *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (quoting *Watson*, 551 U.S. at 154).

The DOD's detailed specifications for the makeup of the military jet fuels—fuels that, when combusted, result in greenhouse gas emissions and thus, according to Plaintiff, contribute to global climate change and to Plaintiff's asserted harms, *see* Compl. ¶¶ 6–9, 15, 43–54—and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Defendants and the government in each of these examples, *Baker*, 962 F.3d at 943.  As in *Baker*, these specialized fuels have "detailed federal specifications" pursuant to government contracts and must be produced in accordance with those specifications.  *Id.* at 940–41, 944; *see also, e.g.*, *Roberts v. Smith & Wesson Brands, Inc.*, 98 F.4th 810, 814 (7th Cir. 2024) (recognizing that, under *Watson*, the acting-under standard may be met if the federal officer "commanded [a business] or contracted with it to produce a particular item in a specified way"); *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 252 (4th Cir. 2021) (affirming federal officer removal for DOD contracts fixing "[p]ricing, . . . shipping, payment and many other specifications" for opioids); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998) (noting "the government's detailed specifications concerning the make-up, packaging, and delivery of Agent Orange" and holding that "the defendants acted pursuant to federal direction").

*Third*, Defendants presented evidence of Defendants' production of oil and gas under the federal government's close direction and supervision in the Outer Continental Shelf and on federal lands, which assisted the government in fulfilling the basic (and critical) objectives of ensuring

sufficient domestic supplies of oil and gas to protect the nation's economic, security, and foreign policy interests.  NOR ¶¶ 64–93.  Although the First Circuit expressed skepticism regarding this activity because "there appear[ed] to be no 'close supervision'" by the federal government on the record in *Rhode Island*, 979 F.3d at 59, Defendants have now presented substantial additional evidence demonstrating that close supervision—including more than ten new OCS-related exhibits and, most notably, the declaration from Professor Priest explaining, in detail, that the federal government "did not engage in perfunctory, run-of-the-mill permitting and inspection," but rather could "direct how oil and gas resources would be extracted and sold from the OCS."  Dick Decl. Ex. 58 ¶¶ 20, 22.  Indeed, federal officials "provided direction to lessees regarding when and where they drilled, and at what price," and "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety."  *Id.* ¶¶ 25, 28.

Plaintiff's attempts to recast many of these activities as mere regulatory compliance or "arm's-length business transactions" are belied by the record.  Mot. at 10.  For instance, Defendants' evidence shows that Defendants' wartime activities were subject to detailed federal supervision and backed by government coercion, involving "subjection, guidance, or control." *Express Scripts*, 119 F.4th at 185.  Without Defendants' production and supply of specialized military fuels, the government itself would have had to perform these vital tasks upon which the country's security depended.  *Cf. Watson*, 551 U.S. at 153–54.  Indeed, as noted above, these specialized military fuels had no commercial use or purpose.  And, as several circuits have found, when such products have "detailed federal specifications" and must be produced in accordance with those specifications, the acting-under standard is satisfied.  *Baker*, 962 F.3d at 940–41, 944; *see also Arlington Cnty.*, 996 F.3d at 252 (similar).  Collectively, the available evidence far exceeds what First Circuit precedent requires.  "Once [the Court] credit[s] these allegations and theory of

the case . . . the Commonwealth necessarily targets what [Defendants] allege[] are 'acts under' a federal officer's authority" in many substantial ways. *Express Scripts*, 119 F.4th at 190–91.

### 2.    Defendants' Activities At The Direction Of Federal Officers Are "Related To" Plaintiff's Claims.

Plaintiff's "suit" is "'for or relating to'" Defendants' "'act[s] under color of [federal] office.'" *Moore*, 25 F.4th at 35 (quoting 28 U.S.C. § 1442(a)(1)).  Courts have "consistently given this requirement a broad reading" to encompass acts "in association with or connection with" acts under federal office.  *Express Scripts*, 119 F.4th at 186 (cleaned up).  This standard "does not demand[] a showing of a specific government direction" for the defendants' alleged conduct. *Moore*, 25 F.4th at 36 (cleaned up); *see also Baker*, 962 F.3d at 944 (affirming that it is not necessary "that the complained-of conduct *itself* was at the behest of a federal agency").  Again, in performing this analysis, the Court "must 'credit'" Defendants' "'theory of the case.'" *Express Scripts*, 119 F.4th at 184 (quoting *Acker*, 527 U.S. at 432).

Defendants readily satisfy the relatedness prong.  Plaintiff's suit seeks damages for harms allegedly caused by global greenhouse emissions and thus necessarily depends on the worldwide production, distribution, and sale of oil and gas products.  As Defendants have demonstrated, this worldwide activity includes Defendants' production and distribution of oil and gas products under the direction, supervision, and control of federal officers.  And, as Plaintiff alleges, the combustion of these oil and gas products, including those produced and distributed under federal control, released greenhouse gases causing Plaintiff's alleged harm.  Taking Plaintiff's allegations as true, a direct connection or association thus exists between Defendants' "acting under" federal officers by producing and distributing oil and gas pursuant to federal control, and Plaintiff's attempt to seek damages allegedly caused at least in part by that very same conduct.  *Compare* NOR ¶¶ 3–4, 10, 16, 26–27, 123–26, *with* Compl. ¶¶ 6–9, 15, 43–54.

10

Plaintiff principally contends that the Court should consider *only* Defendants' alleged deception and ignore the alleged conduct and mechanisms leading to Plaintiff's alleged injuries. Mot. at 6–7. But the First Circuit has emphasized that such "artful pleading" cannot be used to "circumvent federal officer jurisdiction." *Express Scripts*, 119 F.4th at 187 (cleaned up). Crucially, Plaintiff's allegations place Defendants' oil and gas production and distribution directly at issue as part of its lengthy causal chain: According to Plaintiff, Defendants' alleged misrepresentations increased demand for Defendants' products, which increased production, distribution, and consumption of those products, which increased emissions, which contributed to global climate change, which ultimately caused Plaintiff's alleged injuries. *See, e.g.*, NOR ¶¶ 3–4, 10, 16, 26–27, 123–26; Compl. ¶¶ 6–9, 15, 43–54. As the Second Circuit held in a similar climate change case: "It is precisely because fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that [Plaintiff] is seeking damages." *City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2021). Or, as Plaintiff's Motion itself contends: "regular use of Fossil Fuel Defendants' products releases greenhouse-gas pollution that triggers climatic injuries, including injuries in Maine." Mot. at 3 (footnote omitted). Because Plaintiff seeks damages for harms allegedly caused by emissions, its claims relate directly to Defendants' government-directed activities that resulted in an increase in emissions.

Plaintiff nonetheless seeks remand by slicing and dicing its claims, urging the Court to ignore its allegations when they are inconvenient. But that approach conflicts with well-settled precedent. "A claim is the set of operative facts that produce an assertable right in court and create an entitlement to a remedy." *St. Augustine Sch. v. Underly*, 78 F.4th 349, 352 (7th Cir. 2023); *see also, e.g.*, *Apparel Art Int'l, Inc. v. Amertex Ents. Ltd.*, 48 F.3d 576, 583 (1st Cir. 1995) (cause of action is "a transaction that is identified by a common nucleus of operative facts"); *Pizzeria Uno*

*Corp. v. Pizza by Pubs, Inc.*, 2011 WL 4020845, at *7 (D. Mass. Sept. 9, 2011) (claim is "[t]he aggregate of operative facts giving rise to a right enforceable by a court" (quoting Black's Law Dictionary 281–82 (9th ed. 2009))).  The production and sale of fossil fuels, and the emissions those fossil fuels release into the Earth's atmosphere when they are used, are a key part of the "operative facts" that make up Plaintiff's claims, and that production-sale-emissions chain provides an essential basis for the legal theories Plaintiff asserts and the remedies it requests.  Accordingly, the Court must consider those allegations in evaluating whether Defendants' activities under federal direction are related to Plaintiff's claims.  *See Moore*, 25 F.4th at 35.

As noted, and despite Plaintiff's assertions to the contrary, Supreme Court and First Circuit precedent requires the Court to "credit" Defendants' theory of the case when evaluating whether Plaintiff's claims are related to Defendants' conduct under federal officers.  For example, in *Acker*, the Supreme Court considered whether the federal officer removal statute conferred jurisdiction over a tax collection suit by an Alabama county.  The defendant judges argued removal was proper because the suit sought to tax them for their activities as federal judges; the county argued that it sought only to tax the judges in their individual capacities.  527 U.S. at 432.  This was no mere "factual dispute[]," Mot. at 4, but went to the heart of the county's claims.  The Supreme Court left no doubt how the "dispute" should be resolved:  The Court was required to "credit the judges' theory of the case for purposes . . . of [the Court's] jurisdictional inquiry."  *Id.*  Likewise, here, although Plaintiff may argue this case is solely about deception, the Court must credit Defendants' theory that Plaintiff's alleged injuries are caused by the production, distribution, and combustion of fossil fuel products—including oil and gas produced and distributed under federal control.

Similarly, the First Circuit held in *Express Scripts* that the court must defer to a defendant's "theory of the case for why removal was appropriate."  119 F.4th at 184 (cleaned up).  Despite that

plain language, Plaintiff contends that the Court must credit Defendants' theory of the case "*only* '[t]o the extent the parties raise factual disputes about the scope of a defendant's federal obligations.'" Mot. at 4 (quoting *Express Scripts*, 119 F.4th at 189 (emphasis added)). But that is not what *Express Scripts* held, which is presumably why Plaintiff inserted the word "only" when it does not appear in the First Circuit's opinion. To the contrary, *Express Scripts* made clear that the Court must broadly defer to Defendants' theory of removal. *See, e.g.*, 119 F.4th at 189 (must credit "theory of the case"); *id.* at 190 (must credit "allegations and theory of the case for purposes of . . . our jurisdictional inquiry"); *id.* at 192 (must credit "theory of the case for removal"); *id.* at 194 (must credit "removing parties' theory of removal").

Plaintiff's position not only conflicts with clear First Circuit precedent, but also was recently rejected by the Fourth Circuit, which expressly relied on *Express Scripts*. *See Maryland v. 3M Co.*, 130 F.4th 380 (4th Cir. 2025). In that case, the States of Maryland and South Carolina brought two separate suits relating to 3M's alleged PFAS contamination: one suit relating to PFAS production for aqueous film-forming foam ("AFFF"), a firefighting foam manufactured in part for the U.S. military; and one suit for PFAS production excluding AFFF. *Id.* at 385. Like Plaintiff here, the States alleged that 3M had "concealed [the] dangers" of its products and "misled the public" about those dangers. Compl. ¶ 4, *Maryland v. 3M Co.*, No. 1:23-cv-01836 (D. Md. July 10, 2023); Compl. ¶ 7, *South Carolina v. 3M Co.*, No. 2:23-cv-05979 (D.S.C. Nov. 21, 2023). 3M removed the plaintiffs' non-AFFF suits under the federal officer removal statute, on the ground that the PFAS at issue in those suits "indistinguishably commingled" with the PFAS at issue in the AFFF suits (including AFFF produced for the military). *Maryland*, 130 F.4th at 386. The district courts remanded, citing the plaintiffs' disclaimers against AFFF liability in their non-AFFF suits. After consolidating the appeals for review, the Fourth Circuit reversed.

13

The Fourth Circuit emphasized that, given the "broad scope" of federal officer removal, "a plaintiff in the § 1442(a)(1) removal context is no longer the master of its complaint." *Id.* at 388, 389. To the contrary, the court had to "credit a removing defendant's theory of the case as to whether the conduct with which it has been charged is related to its federal work." *Id.* at 389. The court explained that plaintiffs' "artful pleading [did] not trump 3M's theory for removal," and, because "3M ha[d] plausibly alleged that the PFAS intermingled to the point that it [was] impossible to identify their source," 3M had satisfied the relatedness prong of the federal officer removal analysis. *Id.* at 389, 391. *Maryland* thus reaffirmed what *Express Scripts*, *Acker*, and other caselaw have long held: "In considering whether the relevant conduct relates to a contractor's federal work, we credit *Defendants'* theory of the case when determining whether there is such a connection or association." *Id.* at 389 (cleaned up).[5] The Court should take the same approach here: Defendants have advanced a plausible theory of the case under which emissions from governmental and private sources are inseparable. Crediting that theory, the Court should reject Plaintiff's motion to remand.

Finally, the Court can and should distinguish *Rhode Island* because the theory of liability there focused narrowly on the fact that that "oil companies produced and sold oil and gas products *in Rhode Island* that were damaging the environment." 979 F.3d at 60. By contrast, Plaintiff's claims rest on global production and distribution activities, necessarily implicating production and sales under federal direction. Insofar as Plaintiff asserts that the complaint in *Rhode Island*

---

[5] Plaintiff cites *Anne Arundel County v. BP P.L.C.*, 94 F.4th 343 (4th Cir. 2024), and *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022). But neither of those decisions addressed Defendants' arguments as to the theory of the case and Plaintiff's disclaimer, which *Maryland* addresses explicitly. *Cf. Anne Arundel Cnty.*, 94 F.4th at 347–50; *Baltimore*, 31 F.4th at 228–38.

advanced similar allegations of global conduct and emissions, that misses the point, because the First Circuit focused solely on production and sales *in Rhode Island*, *see id.*, and therefore its analysis is inapplicable here, where it is undisputed that Plaintiff's claims encompass global conduct. Indeed, Plaintiff has not limited its claims to conduct in Maine, which it cannot do due to the Complaint's reliance on global emissions. Moreover, Defendants have presented numerous additional grounds for removal that were not considered in *Rhode Island*, each of which relates to Plaintiff's claims. For example, Defendants here provided evidence not presented in *Rhode Island* of their production and distribution of highly specialized fuels for the military and of their wartime activities conducted under the direction of the federal government. *See* NOR ¶¶ 43–58. Additionally, Plaintiff ignores that *Rhode Island* suggested that federal officer removal *would be proper* under the circumstances present here, where Defendants' "distribution" of petroleum products was "mandate[d]" by the U.S. government. 979 F.3d at 60. Unlike in *Rhode Island*, Defendants have presented considerable evidence of their distribution of petroleum products at the U.S. government's behest and under its control. *See* NOR ¶¶ 27–113. *Rhode Island* therefore does not control, and removal was proper.

### 3. Any Attempt To Disclaim Injury Arising From The Sales Of Specialized Fuels To The United States Military Is Ineffective.

Plaintiff purports to disclaim "injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes," as well as "relief with respect to any federal property, land, or assets." Compl. ¶¶ 17, 18. The First Circuit's decision in *Express Scripts*, however, makes Plaintiff's disclaimer ineffective.

In *Express Scripts*, the plaintiff alleged that defendants "schemed to unlawfully inflate insulin prices through rebate negotiations and price setting" and attempted to evade federal

jurisdiction by disclaiming any "relief relating to any federal program." 119 F.4th at 179, 181. But, as defendants showed, their challenged conduct—the negotiations over rebates and prices for insulin—"simultaneously" affected both insurance carriers serving government employees through a federal program and other carriers serving private parties. *Id.* at 183, 192. The conduct, the court explained, was "indivisible" because it was impossible to "divide" a defendant's negotiations between "federal and non-federal work to enforce the disclaimer." *Id.* at 192, 194. The First Circuit held that this "indivisibility" was "an important facet of [defendant's] theory of the case that must be credited in evaluating removal." *Id.* at 189. The court also noted that "the disclaimer did not foreclose [the defendant's] arguments that it acted under a federal officer and possess[ed] colorable federal defenses." *Id.* at 194.

Federal officer removal jurisdiction exists here for the same reason. As discussed above, Defendants' theory of the case is that Plaintiff seeks damages for harms allegedly caused by global greenhouse gas emissions resulting from the global production and distribution of oil and gas, which create greenhouse gas emissions when combusted by end users, including the U.S. government and military. *See* NOR ¶¶ 3–4, 10, 16, 26–27, 123–26. And, because greenhouse gases "become well mixed in the atmosphere" once emitted, and cannot be traced to any particular source, the emissions from government and military users are indistinguishable from, cumulative with, and inextricably intertwined with all other emissions. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011); *see also id.* ("emissions in New Jersey may contribute no more to flooding in New York than emissions in China"); *City of New York*, 993 F.3d at 92 (same); NOR ¶¶ 127–31. Critically, Plaintiff does not dispute that it seeks damages allegedly caused by global emissions, that Defendants supplied substantial amounts of oil and gas products to the federal government, or that the emissions from those products cannot be segregated from emissions from

products supplied to non-government entities.[6]  Crediting Defendants' theory of the case (which is bolstered by Plaintiff's own allegations and concessions), U.S. government and military emissions sources are "indivisible" from the other emissions for which Plaintiff seeks to impose liability.  Removal was thus proper under *Express Scripts*.

Although Plaintiff suggests that *Express Scripts* supports its disclaimer, *see* Mot. at 8, it also labels the decision "inapposite," *id.* at 9.  But Plaintiff's very attempt to distinguish *Express Scripts* demonstrates why that decision forecloses the disclaimer.  Plaintiff contends that *Express Scripts* is inapposite because the defendants' offending conduct in that case "could not be separated from conduct under government direction, 'no matter what the disclaimer sa[id].'"  *Id.* (quoting *Express Scripts*, 119 F.4th at 181, 190–91).  But that is precisely the scenario here:  Regardless of Plaintiff's disclaimer, it is impossible to separate emissions by government and military users from emissions by other users.  And Plaintiff alleges that the cumulative impact on the climate of *all* the emissions has caused its injuries.  *E.g.*, NOR ¶¶ 3–16, 26–27, 123–31; Compl. ¶¶ 6–9, 15, 43–54.

Decisions from courts of appeal around the country reinforce that Plaintiff's disclaimer is ineffective.  In *Baker v. Atlantic Richfield Co.*, for example, the Seventh Circuit held that the plaintiffs could not "have it both ways" by seeking damages for certain types of pollution, while disclaiming portions of that pollution for jurisdiction—just as Plaintiff does here.  962 F.3d at 945 n.3.  And in *Illinois ex rel. Raoul v. 3M Co.*, which *Express Scripts* cites, the Seventh Circuit affirmed remand only after the plaintiff "clearly and unequivocally conceded" that it would not seek relief for mixed contamination—*i.e.*, contamination from a combination of governmental and

---

[6]  Even if the Complaint were limited to emissions from distribution or production in Maine, it would be impossible to distinguish commercial emissions from emissions generated by energy consumption at Air Force bases, a Naval air station and shipyard, and other federal facilities throughout the State.

private sources.  111 F.4th 846, 849 (7th Cir. 2024); *see also id.* ("If even a morsel of contamination" comes from a government source, plaintiff's "recovery is barred").  Here, Plaintiff does not—and cannot—disclaim such relief, as doing so would eliminate all of its claims.

The Fourth Circuit's decision in *Maryland*, discussing a point not addressed in previous Fourth Circuit cases, joined the chorus of circuit court opinions foreclosing disclaimers like Plaintiff's:  Because a plaintiff is "no longer the master of its complaint" in the federal officer removal context and the court must "credit a removing defendant's theory of the case," the plaintiffs' disclaimers cannot be "dispositive." *Maryland*, 130 F.4th at 389.  Critically, in reaching this conclusion, the *Maryland* court relied on the First Circuit's decision in *Express Scripts*, emphasizing that "[a]s our sister circuits agree, '[a] disclaimer that requires a state court to determine the nexus 'between the charged conduct and federal authority' is not a valid means of precluding removal.'" *Id.* (quoting *Express Scripts*, 119 F.4th at 188).

Finally, the two in-Circuit district court decisions cited by Plaintiff, *Maine v. 3M Co.*, 2023 WL 4758816 (D. Me. July 26, 2023), and *New Hampshire v. 3M Co.*, 665 F. Supp. 3d 215 (D.N.H. 2023), *aff'd*, --- F.4th ----, 2025 WL 926229 (1st Cir. Mar. 27, 2025), both predate *Express Scripts*, which "clarif[ied] how district courts . . . should analyze similar disclaimers" and provided "First Circuit precedent on the subject," 119 F.4th at 194.  Although the First Circuit recently affirmed *New Hampshire*, it did so on timeliness grounds that are not at issue here, while "assum[ing] without deciding that 3M is correct that alleged commingling of MilSpec AFFF PFAS and non-AFFF PFAS satisfies the nexus requirement."  2025 WL 926229, at *3.  Put simply, Plaintiff's purported disclaimer cannot survive logic or First Circuit precedent.

### 4.    Defendants Raise "Colorable Federal Defenses."

Defendants raise multiple colorable federal defenses.  As the First Circuit recognized, a

18

colorable federal defense need not be "clearly sustainable" or "indisputable." *Express Scripts*, 119 F.4th at 186 (cleaned up).  As long as Defendants make "at least a colorable showing," further argument as to the success of the defense "speaks to the merits of the defense but does not undermine [its] colorability." *Moore*, 25 F.4th at 37.  Here, the Notice of Removal devotes nearly six pages to describing several meritorious federal defenses that Defendants intend to assert.  NOR ¶¶ 132–44.  As just one example, Defendants have a more than colorable federal contractor defense.  In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Supreme Court applied a federal common law government contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest because it "ar[ose] out of performance of the contract," and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy.  *Id.* at 504–13.  Both *Boyle* elements are met here.

In addition, "[w]here the Government's 'authority to carry out the project was validly conferred,'" "'there is no liability on the part of the contractor' who simply performed as the Government directed."  *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016) (citation omitted).  Here, Defendants produced oil and gas at the direction of the federal government and thus have a colorable argument that they are immune from liability for any alleged injuries resulting therefrom.  Together, the federal defenses available under *Boyle* and *Campbell-Ewald* more than satisfy the colorable federal defense prong's requirements.

## B.    Defendants' Grounds For Removal Are Objectively Reasonable, And Plaintiff Is Not Entitled To Fees And Expenses.

The Court should deny Plaintiff's request for fee-shifting under 28 U.S.C. § 1447(c).  Fee-shifting is warranted only if the removing party lacked an objectively reasonable basis for seeking removal.  *See Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005).  Here, Defendants'

grounds for removal are not merely "objectively reasonable," but are in fact meritorious.

Contrary to Plaintiff's arguments, removal of this action under federal-officer removal is not foreclosed by First Circuit precedent. *See supra* at 2–18. In fact, *Express Scripts* demonstrates why Plaintiff's purported disclaimer is ineffective and removal was proper. And, as explained above, Defendants have presented numerous grounds, and additional expansive evidence, not considered in *Rhode Island*. *See supra at* 3, 14–15. That other circuits have remanded other climate change cases does not foreclose removal or warrant an award of costs and fees. *Contra* Mot. at 20. Indeed, two other courts in similar climate change cases recently rejected the plaintiffs' requests for fees because there was an objectively reasonable basis for removal. *See Cnty. of Multnomah v. Exxon Mobil Corp.*, 2024 WL 1991554, at *8 (D. Or. Apr. 10, 2024), *report and recommendation adopted*, 2024 WL 2938473 (D. Or. June 10, 2024); *City of Charleston v. Brabham Oil Co., Inc.*, No. 2:20-CV-03579, slip op. at 13 (D.S.C. July 25, 2023). This Court should do the same.[7]

## III.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion to Remand. Defendants respectfully request oral argument.

---

[7] Plaintiff's argument that fees and costs should be awarded because costs were awarded in *Rhode Island* is misleading. Mot. at 2; *see* 35 F.4th 44, 62 (1st Cir. 2022). Costs are *automatically* awarded under Federal Rule of Appellate Procedure 39, so this fact has no bearing on whether this Court should award Plaintiff fees. Indeed, because costs are automatic, the First Circuit did not evaluate when removal was objectively reasonable or unreasonable. And the costs awarded in *Rhode Island* amounted to $66.60 for reproduction of the brief. *See* Taxation of Costs, *Rhode Island*, No. 19-1818 (1st Cir. July 15, 2022).

Dated: April 4, 2025                           Respectfully submitted,

                                       By:  /s/ Paul McDonald

                                           Paul McDonald
                                             pmcdonald@bernsteinshur.com
                                           John A. Woodcock III
                                             jwoodcock@bernsterishur.com
                                           **BERNSTEIN SHUR**
                                           100 Middle Street
                                           P.O. Box 9729
                                           Portland, ME 04104
                                           Telephone: 207.774.1200

                                           **GIBSON, DUNN & CRUTCHER LLP**
                                           Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
                                             tboutrous@gibsondunn.com
                                           William E. Thomson, *pro hac vice forthcoming*
                                             wthomason@gibsondunn.com
                                           333 South Grand Avenue
                                           Los Angeles, CA 90071
                                           Telephone: 213.229.7000
                                           Facsimile: 213.229.7520

                                           Joshua D. Dick, *pro hac vice forthcoming*
                                             jdick@gibsondunn.com
                                           One Embarcadero Center
                                           San Francisco, CA 94111
                                           Telephone: 415.393.8200
                                           Facsimile: 415.374.8451

                                           *Attorneys for Defendants Chevron Corporation and Chevron U.S.A. Inc.*

                                       By:  /s/ Gavin G. McCarthy

                                           Gavin G. McCarthy
                                           Joshua D. Dunlap
                                           Sara A. Murphy
                                           **PIERCE ATWOOD LLP**
                                           254 Commercial St.
                                           Portland, ME 04101
                                           Tel: (207) 791-1100
                                           gmccarthy@pierceatwood.com
                                           smurphy@pierceatwood.com
                                           jdunlap@pierceatwood.com

21

Jeremiah J. Anderson (*pro hac vice* forthcoming)
**MCGUIREWOODS LLP**
845 Texas Ave., Suite 2400
Houston, TX 77002
Tel: (832) 255-6339
jjanderson@mcguirewoods.com

Brian D. Schmalzbach (*pro hac vice* forthcoming)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-4746
bschmalzbach@mcguirewoods.com

*Attorneys for Defendant American Petroleum Institute*

By:  /s/ Clifford H. Ruprecht

Clifford H. Ruprecht
**Ruprecht & Bischoff LLP**
75 Market Street, Suite 303
Portland, ME 04101
Tel.: (207) 618-5400
Email: cruprecht@rb-lawyers.com

J. Scott Janoe (*pro hac vice* forthcoming)
**BAKER BOTTS LLP**
910 Louisiana Street
Houston, TX 77002
Tel.: (713) 229-1553
Fax: (713) 229-7953
Email: scott.janoe@bakerbotts.com

Sterling A. Marchand (*pro hac vice* forthcoming)
**BAKER BOTTS LLP**
700 K Street N.W.,
Washington, D.C. 20001
Tel.: (202) 639-7700
Fax: (202) 639-7890
Email: sterling.marchand@bakerbotts.com

22

*Counsel for Defendant Sunoco LP*

By: /s/ Timothy J. Bryant

Timothy J. Bryant (Bar No.: 7736)
**Preti, Flaherty, Beliveau & Pachios, LLP**
One City Center, PO Box 9546
Portland, Maine 04112
Telephone: 207.791.3000
tbryant@preti.com

**ARNOLD & PORTER KAYE SCHOLER LLP**
Diana E. Reiter, *pro hac vice*
250 West 55th Street
New York, NY 10019-9710
Tel:  (212) 836-8000
Fax:  (212) 836-8689
Email: diana.reiter@arnoldporter.com

John D. Lombardo, *pro hac vice*
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail: john.lombardo@arnoldporter.com

Jonathan W. Hughes, *pro hac vice*
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
Email: jonathan.hughes@arnoldporter.com

*Attorneys for Defendants BP America Inc., BP Energy Company, BP Energy Holding Company LLC and BP Products North America Inc.*

By: /s/ Gerald F. Petruccelli

Gerald F. Petruccelli (No. 001245)
Scott D. Dolan (No. 006334)
**PETRUCCELLI, MARTIN**
   **& HADDOW, LLP**
Two Monument Square, Suite 900
P.O. Box 17555

23

Portland, ME 04112-855
Tel.: (207) 775-0200
gpetruccelli@pmhlegal.com
sdolan@pmhlegal.com

David C. Frederick, *pro hac vice*
James M. Webster, III, *pro hac vice*
Daniel S. Severson, *pro hac vice*
Grace W. Knofczynski, *pro hac vice*
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
dfrederick@kellogghansen.com
jwebster@kellogghansen.com
dseverson@kellogghansen.com
gknofczynski@kellogghansen.com

*Counsel for Shell plc, Shell USA, Inc., Shell Trading (US) Company, and Equilon Enterprises LLC*

By: /s/ Martha C. Gaythwaite

Martha C. Gaythwaite
  mgaythwaite@verrill-law.com
Sarah K. Grossnickle
  sgrossnickle@verrill-law.com
**VERRILL DANA LLP**
One Portland Square
Portland, ME 04101
Telephone: 207.774.4000
Facsimile: 207.774.7499

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Theodore V. Wells, Jr., *admitted pro hac vice*
  twells@paulweiss.com
Daniel J. Toal, *admitted pro hac vice*
  dtoal@paulweiss.com
David K. Kessler, *admitted pro hac vice*
  dkessler@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019
Telephone: 212.373.3000
Facsimile: 212.757.3990

24

*Attorneys for Defendants Exxon Mobil Corp. and ExxonMobil Oil Corp.*